# EXHIBIT 5

1

```
                    UNITED STATES DISTRICT COURT
 1                   EASTERN DISTRICT OF TEXAS
                          SHERMAN DIVISION
 2
   WAPP TECHNOLOGY LTD           :         DOCKET NO. 4:18CV469
 3                               :
   VS.                           :         SHERMAN, TEXAS
 4                               :         APRIL 20, 2020
   MICRO FOCUS INTERNATIONAL     :         1:30 P.M.
 5
   WAPP TECHNOLOGY LTC           :
 6                               :
   VS.                           :         DOCKET NO. 4:18CV501
 7                               :
   WELLS FARGO                   :
 8
   WAPP TECHNOLOGY LTD           :
 9                               :
   VS.                           :         DOCKET NO. 4:18CV519
10                               :
   BANK OF AMERICA               :
11
                     TELEPHONIC MARKMAN HEARING
12           BEFORE THE HONORABLE AMOS L. MAZZANT,
                  UNITED STATES DISTRICT JUDGE
13
   APPEARANCES (BY TELEPHONE):
14
   TECHNICAL ADVISER:           MR. DAVID KEYZER
15
   FOR THE PLAINTIFF:           MR. TIMOTHY DEVLIN
16                              MR. HENRIK PARKER
                                MR. SRIKANT CHERUVU
17                              THE DEVLIN LAW FIRM
                                1526 GILPIN AVENUE
18                              WILMINGTON, DE  19806

19 FOR THE DEFENDANT:           MR. MARK REITER
                                MR. ANDREW ROBB
20                              MS. ASHBEY MORGAN
                                GIBSON DUNN & CRUTCHER
21                              2100 MCKINNEY, SUITE 1100
                                DALLAS, TX  75201
22
   COURT REPORTER:             MS. JAN MASON
23                             OFFICIAL REPORTER
                               101 E. PECAN #110
24                             SHERMAN, TEXAS  75090
   PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
25 PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
```

2

1          THE COURT:  Good afternoon, everyone.  Good to have

2    you all here via telephone.  I would also point out I believe

3    our technical adviser should be on the phone, David Keyzer.

4          And then I moved this from video to telephone just to

5    be easier so I could do it in my courtroom.  Our video

6    conference room is actually across the street in the annex,

7    and it was just easier for me to do this here, so I moved it

8    here so I can spread things out here in the courtroom on the

9    bench.

10          So I don't know if both sides have consulted with each

11    other about if you want to rotate the order.  It doesn't

12    really matter to me, but let me check and see if somebody

13    has a comment on that.

14          And I guess let me go ahead and call the case.  It's

15    4:18CV469, 501 and 519, and we're set today for a Markman

16    hearing.  You've already made your appearances for the

17    record.  As my judicial assistant indicated, please identify

18    yourself every time you speak so we can get a clear record.

19          And then has there been some discussion on who would

20    like to speak first, from the Plaintiff, on the order we're

21    going to proceed in today?

22          MR. DEVLIN:  Your Honor, this is Tim Devlin on behalf

23    of Wapp Technologies.

24          We have not discussed that.  I would say a typical

25    presentation is the Plaintiff would go first and we would go

3

1    sort of term by term.  Of course, that's up to Your Honor.

2    In other words, we would go on a term and then Defendants

3    would go, and we would work through that and then we would

4    move on to the next term and reset.

5        We have a little bit of upfront background and legal

6    stuff that I would suggest we present as part of the first

7    go-round, in other words, a little background and legal --

8    obviously, recognizing the Court's familiarity with a lot of

9    this subject matter.  So the slides are comprehensive.

10   We'll be conservative but we will be able to breeze through

11   some of that, and then go right into the first claim

12   element, which we believe is the preamble, and then have

13   Defendants go on that and then back and forth to whatever

14   extent the Court may desire, and then move on to the next

15   element.

16       I guess that's our suggestion from our perspective, but

17   we're open, and certainly whatever the Court's preference is

18   we would be happy to follow.

19           THE COURT:  Okay.  For the defense, who would like to

20   comment on our procedure today?

21           MR. REITER:  Hi, Your Honor.  This is Mark Reiter.

22       I'm fine with what Mr. Devlin suggested.  Having done a

23   couple of hearings now with Your Honor, I understand that

24   you'll give both sides an opportunity to speak as much as

25   necessary, within the Court's patience.  So if they would

4

1   like to proceed with a term first and then we get to

2   respond, and we'll work through the term until Your Honor is

3   satisfied, I have no problem with that.

4        I believe the parties have laid out in both the

5   briefing and the slides -- and we just exchanged slide decks

6   a few minutes ago, so I haven't had a chance to look through

7   all of them, but we have laid out all of the terms in the

8   same order, so that shouldn't be a problem.

9             THE COURT:  Okay.

10             MR. REITER:  I think that's right.  Isn't that right,

11   Tim?

12             MR. DEVLIN:  I believe that's correct.  If somehow we

13   get out of order, I'm sure we can adjust on the slides.

14             THE COURT:  That's fine.  And I will let you know, I

15   have both of your slides pulled up on my computer here in the

16   courtroom, so since we don't have the ability to see when the

17   slide is changing, just let me know as we go through those

18   slides.

19        So if you both want to, I guess we'll start with the

20   Plaintiff first, if you have any background information, and

21   then go straight into the first few terms dealing with the

22   preamble.  The only thing -- and then we can hear from the

23   defense on any background information you want to present

24   and then a response to the first term and we'll go back and

25   forth.

5

1      The one question I have is I know the last two terms in

2  dispute, the defense argued they're indefinite.  I don't

3  know if defense wants to go first on those and then

4  Plaintiff respond to those.  Typically that's the way the

5  Court has done that, but we can discuss that as we get to

6  the end on those.

7      So if Plaintiff wants to go ahead and proceed, we'll go

8  ahead and begin.

9          MR. DEVLIN:  Thank you, Your Honor.  May it please

10  the Court.

11      May I ask Your Honor if there's any sort of expectation

12  in regard to time limits today?  I don't think we're going

13  to take all that long.  There's not a ton of terms.  Both

14  sides have a hundred or so slides, but I think there's a lot

15  of signposting and so forth because we're on a telephonic

16  hearing.  But if Your Honor has guidance there, I would love

17  to know that just so we can try to meet the Court's

18  expectation in terms of total time today.

19          THE COURT:  Well, typically Markmans last two -- two

20  hours, no more than three.  But because we're having to deal

21  with the virus and our docket, you have the afternoon, but I

22  hope you don't take the whole afternoon.

23          MR. DEVLIN:  Understood, Your Honor.  I think

24  somewhere right in the midst of those estimates is probably

25  where we'll end up without any trouble at all.

6

1          THE COURT:  Okay.  Sounds great.

2          MR. DEVLIN:  Thank you, Your Honor.  So, again, Tim

3     Devlin.  May it please the Court.

4          We did a fairly significant amount of background in our

5     tutorial, so I won't belabor this unless the Court has

6     questions.  I'll just sort of breeze through these first few

7     up to about slide ten and hit the high points.  If the Court

8     has questions, please, of course, interrupt and we'll

9     address them.

10         We have three patents in the case.  I'm on slide three

11    right now of Plaintiff's presentation.  There are three

12    patents-in-suit, as the Court knows.  They're all the same

13    family and share many common specifications, but there are

14    some differences there.

15         In general, we cite in this presentation to the '864

16    just for convenience, the specification.  Obviously the

17    claims will come from the patents.

18         Moving to slide four, just a little bit of background

19    on the inventor.  The inventor was very experienced in this

20    industry.  This is not a sort of garage invention, as it

21    were.  This was developed over -- his experience was

22    developed over many years and extensive experience in the

23    development, offering and testing of apps.

24         Quickly on slide five, the inventor actually wrote and

25    developed code that implemented this invention.  In fact,

7

1    that was the starting point and the invention grew out of

2    that.  It was the conceptual notion.  A number of the

3    figures in the patent are actually from the implementation

4    at the time.  That's not always true in a patent case, and

5    we thought that was interesting to note.

6         Moving now to slide six, the leading work that led to

7    these inventions was done in the 2004, 2005 timeframe.  As

8    sort of a measuring stick, thinking back, the first Apple

9    iPhone, which didn't launch the conceptive smartphones, per

10   se, but certainly really brought it wide-spread, that was in

11   2007, Your Honor, so we're a couple of years before then.

12        Your Honor, it sounded like someone just joined.  Maybe

13   we should pause and take roll to see who that is, just for

14   the record.

15             THE COURT:  Okay.  Can we ask who just joined the

16   call for purposes of the record?

17             MS. YOUNG:  Yes.  Hi.  This is Kathryn Young with

18   Micro Focus.

19             THE COURT:  Very good.  Thank you.  Go ahead and

20   continue.

21             MR. DEVLIN:  Thank you, Your Honor.

22        In short, what the invention is about, just so we're

23   all on the same page, is when you're developing an

24   application, you want to be able to test it on different

25   devices.  You want to be able to test it under different

1  circumstances of what your network would look like.  So on a

2  device that would be processing powers, screen size, memory,

3  so forth, things like that, the power of the resources that

4  are available on the device itself.

5       And, of course, from the network you're looking at

6  bandwidth, how the phone interacts with the network on a

7  typical basis as it's sending and receiving information,

8  things like that.

9       And in order to be able to develop an app for multiple

10  different phones and multiple different networks, you used

11  to have to physically test it on all these different things

12  to make sure it worked and to troubleshoot and to improve it

13  and to clear out any bugs, and to make sure that what the

14  app was needing in terms of its resources, both on the

15  device side and the network side, wouldn't exceed those

16  resources.

17       To do that took a lot of time.  It takes awhile to put

18  the app as you're adapting it onto a phone and do that

19  testing and development and then bring it back and so forth.

20       So Mr. Poulin's idea -- oh, and one thing I should be

21  clear on, Your Honor, is that one of the common tools at the

22  time, Flash, had developed a tool and it had sort of a

23  generic model phone that it could emulate.

24            UNIDENTIFIED SPEAKER:  Hello?  Hello?

25            THE COURT:  Did someone just join the call or did we

9

1    lose people?

2              MR. REITER:  I think we lost Mr. Devlin.

3              MR. DEVLIN:  Your Honor, this is Tim Devlin joining

4    again.  Let me make sure first that everyone can hear me again.

5              THE COURT:  Yes, we can hear you back.

6              MR. DEVLIN:  Your Honor, I apologize for that.  I

7    have a couple different ways to -- to operate my phone here at

8    home.  I'm connected to one that is typically the more robust

9    way and rarely has issues.  If I continue to have issues,

10   I will sort of reconnect the other way.  I just have to put

11   myself in one particular spot in my place so that I can get

12   good signal.  But hopefully that's the last time that happens.

13   I apologize.

14             THE COURT:  No worries.  Go ahead and continue.

15             MR. DEVLIN:  Thank you, Your Honor.

16        So what I was saying, and I hope the Court heard this,

17   that one of the common development tools at the time, Flash,

18   had a generic model phone that you could sort of test the

19   app with and work with it, but it didn't give you specifics

20   about available phones or potential phones or so forth.

21        So Mr. Poulin's invention allowed the system to emulate

22   playing the app on a variety of different actual real-world

23   phones by looking at a set of characteristics and using

24   those characteristics from the phone, and the same thing

25   with network conditions.

1    That's generally what we're talking about here.

2    Obviously the specifics are in the claims and that's what

3    we're getting at today.

4    Slide seven I really just spoke about.  There were

5    limitations in how the prior art worked.  I think, just in

6    contrast, the advantages of what the invention are that I

7    just mentioned.

8    Slide eight -- I kind of got ahead of myself, Your

9    Honor.  Slide eight is really what I just mentioned so I'll

10   pass that by.  And the same with slide nine, other than to

11   note that the third bullet on slide nine really gets to the

12   heart of this, that the amount of time and money that is

13   saved -- this can be extremely expensive, and that is more

14   and more true as the variety of mobile devices has

15   proliferated over the years.  There are more and more

16   options that consumers have, and therefore, more and more

17   possibilities for things to go wrong.

18   And then the fourth bullet also if you have confirmed

19   the app is good on a variety of devices, it's going to

20   launch more quickly.  And the launch of a phone -- I'm

21   sorry -- of an app is really important, that initial public

22   feedback, acceptance and growth.  If it gets bad reviews

23   from the start, that's going to impede the growth of that

24   app from the very early stage and perhaps its total

25   existence.  Given the volume of apps that are available to

11

1   people these days, having negative early reviews can be

2   deadly.  So avoiding that is very important to app

3   developers.

4        Again, Your Honor, here we are on slide ten and things

5   I've already spoken about in this brief intro so I'll slide

6   past slide ten.

7        So now moving to slide 11 and 12, the legal standards,

8   Your Honor, I won't belabor this because I know Your Honor

9   is very familiar with this, but there are a couple of

10  fundamental issues here about what you should go on in terms

11  of this construction effort today.

12       And if I may -- I'm sure Your Honor is familiar with

13  the quotes on slide 12 and slide 13.  I would like to focus,

14  if we can, a little bit on slide 14.  And first I want to

15  mention this top quote.  Obviously this quote is talking

16  about the importance of intrinsic evidence versus extrinsic,

17  but the very first phrase is actually important here, the

18  clause I mean:  When necessary to construe a claim.

19       There's a dispute that the Defendants have raised here

20  to suggest that simply one party identifying a potential

21  dispute and attempting to have the Court construe the words

22  of a claim, and other parties saying, no, there does not

23  need to be construction, what Defendants are suggesting to

24  the Court and cite cases like Eon and O2 Micro is that

25  somehow that obligates the Court to adopt a construction

12

1   that's different than the words of the claims themselves,

2   and that's just not the case.  The law doesn't say that.  In

3   fact, those two cases themselves don't say that.

4        I'll just note, since it's in the slides, that Eon,

5   this is Eon LP, it says that the determination that a claim

6   term needs no construction, which is what Wapp is seeking

7   here, or has the plain and ordinary meaning, those types of

8   conclusions by the Court may be inadequate under certain

9   circumstances.  Eon goes on to talk about those

10  circumstances.

11       So it might be inadequate to say the term needs no

12  construction, but it's not automatically inadequate just

13  because one side raises a dispute and the other side says,

14  no, we think the claims are fine as is.  O2 Micro said the

15  same thing but even clearer.

16       And I'm sorry.  For the record, the citation is Eon 815

17  F.3d 1314 at 1318.

18       And O2 Micro, which Defendants have also cited, says it

19  even more clearly.  It says a District Court -- this is a

20  quote:  A District Court is not obligated to construe terms

21  with ordinary meanings, end quote.

22       Then the Court goes on to explain why.  There's a

23  policy decision behind it.  Again, I'm quoting now:  Lest

24  Trial Courts be inundated with requests to parse the meaning

25  of every word in the asserted claims, end quote.  And that's

13

1    02 Micro, 512 F.3d 1351 at 1360.

2         And this makes sense.  Simply asserting that something

3    needs to be construed does not obligate a Federal Judge to

4    change the words of the claim, and that's what claim

5    construction is.  It's substituting words in the claim for

6    other words that the fact finder will then use for a

7    determination of infringement and validity.

8         The Court instead is readily capable and has the power

9    to simply say this term needs no construction, even though

10   one side says that it should be.  So if the Defendants are

11   suggesting otherwise is just wrong.

12        The second -- that's the first major legal issue here.

13   The second major legal issue is one that comes up a lot,

14   which is how are we going to leave the specification and

15   what does that mean with respect to the claims.

16        And the case law has quotes, of course, that seem

17   contradictory to one another, and the two in red on slide 14

18   here are from the same case.  The claims should be read in

19   light of the spec is one, and the second is it's a cardinal

20   sin to read the limitations from the spec into the claims.

21        So how do we resolve that?  And when you just look at

22   the overall body of the case law, it becomes clear that the

23   first quote doesn't mean you limit the claim to the

24   specification.  It simply means, of course, that the

25   specification reads like what the claims might mean or what

14

1    the subject matter is and at least shows what the claims

2    cover because of the examples.

3         Now I'm going to shift to slide 15 and this is just a

4    simple representation.  Your Honor, there are some types of

5    patents where the claims are limited to the written

6    description.  Those are the so-called unpredictable arts,

7    which is simply biology, chemistry, pharma, that sort of

8    thing.  But in all other types of cases, mechanical,

9    electronic, et cetera, the claims can generally be read

10   broader than the example in the specification, and that's

11   the little diagram we have on slide 15.

12        If you go to slide 16, this is what happens in these

13   cases when the Defendants look and point to all the examples

14   in the spec and they say aha, here's what all the examples

15   say, and so the claim should be limited.  And that happens

16   over and over again.  You'll see that argument from

17   Defendants regularly.  The specification says that example

18   and that's how the claim should be restricted.

19        That's not what the law says.  The law says the exact

20   opposite.  It's a cardinal sin to do that.  That's slide 16.

21        Moving on to slide 17, this is even worse, and this

22   happens a lot here.  This is where the focus is on one

23   embodiment, to the exclusion of other disclosed embodiments,

24   so that the claim is read to exclude even things that the

25   patent specification cites or describes as examples, and

1    that happens here a lot as well.

2        Why do Defendants do this?  Well, maybe they're

3    practicing one of those examples, and so by limiting the

4    claim, that would be an example that got deleted, and so now

5    they have created a sort of safe harbor for themselves.  And

6    this happens sometimes, and we see this type of argument

7    here as well and we'll go through that.

8        Finally, also important is the prosecution history.

9    Yes, the prosecution history is one of the tools that can

10   legitimately limit the scope of a claim, other than what the

11   words on their face might mean.

12       There's no such argument here.  Not any dispute, as far

13   as we can tell, are the Defendants saying there is a clear

14   and unmistakable disclaimer of subject matter through

15   prosecution.  It's a very high bar.  As far as we can tell,

16   it's not even being argued here at all.

17       And that's important, because some of the very common

18   tools that do permit construction of claims, changing the

19   claim language, patentee is his own lexicographer,

20   prosecution history has a clear disclaimer, those are not

21   even being argued here.  The Defendant is on tenuous grounds

22   to try to alter the language of the claims in ways that are

23   narrower or exclusive of examples in the embodiments.

24       Extrinsic evidence.  I'm now on slide 19.  We see the

25   declaration of Dr. Shoemake and he -- and we'll go into that

16

1    in detail, but the bottom line is whatever he is saying when

2    the intrinsic record is clear and doesn't suggest a

3    construction, you can't alter that with extrinsic evidence.

4    That should not be done.  That's slide 19.

5         All right.  Your Honor, let me pause there and ask if

6    Your Honor has any questions on any of that or would like

7    some discussion or elucidation?

8                   THE COURT:  No, I'm good.  Go ahead and continue.

9                   MR. DEVLIN:  Thank you, Your Honor.

10        So moving on to the disputed terms on slide 20, the

11   first is the preamble.  That's slide 21.

12        And, Your Honor, we have a sort of common structure in

13   the slide deck.  We -- we just put the claim term -- we show

14   where in the claim it shows up, just for the Court's

15   convenience.

16        Here there are two related terms in the preamble that

17   are being talked about here:  A system for testing an

18   application for a mobile device.  That's the heading on

19   slide 22 that we have in the exemplary claim 1 of the '864

20   patent.  And then the similar term on slide 23:  A system

21   for developing an application for a mobile device.  A system

22   for testing and a system for developing.

23        Then we have, of course, slides showing both parties'

24   constructions on slide 24.  The heading of this, Your Honor,

25   should say system for testing slash developing an

17

1   application for a mobile device.  The Defendants' proposed

2   construction is the same other than putting in a word

3   evaluation or writing.

4       Okay.  First there's a question about whether the

5   preamble should be limiting here.  Your Honor, we really

6   don't have a position on that.  Candidly, whether the

7   preamble is limiting or not is not meaningful to us.

8       What is meaningful to us is if it is limiting, there's

9   no construction necessary.  Other than that, it's limiting,

10  that's fine.

11      But what the Defendants are trying to do is alter the

12  words of that preamble so that they say a lot more than they

13  actually say, and that's what gets into the problems.

14      Now, for each of these disputes we have a slide similar

15  to slide 25.  I'm on slide 25 now, and it just goes through

16  a couple of basic important points, and if you will just

17  keep these in mind in every instance, within the claims

18  themselves the words that are in dispute are not being used

19  in a unique or odd way that would require some construction.

20      Number two, there's no contention that the patentee has

21  acted as his or her own lexicographer in providing express

22  definition for that term or phrase in the spec.  Not

23  happening in this preamble cite.

24      Lastly, there is no argument at all of any clear and

25  unmistakable disclaimer of subject matter during

18

1    prosecution.

2        So that's where we end up as a starting point for the

3    discussion here.  The claims, the spec, the prosecution

4    history all favor leaving the claim language alone.  It is

5    what it is.  It's clear on its face and there's no reason to

6    change it.

7        Moving to slide 26, the contrast here are Defendants'

8    proposals, and, Your Honor, I would submit that they suffer

9    from one fundamental issue, which is they're just confusing.

10   The words of the preamble here are very simple and

11   straightforward.  They're not confusing.  They're easily

12   applicable by anybody.

13       The Defendants are trying to put in a hodgepodge jumble

14   of aspirational limitations of the claim in the preamble,

15   trying to shovel that in into words that are not needed, and

16   to add that stuff in is just going to make things more

17   confusing, and we can see it in the constructions

18   themselves.  The case law says let's not do that.  That's

19   slide 26.

20       Looking at slide 27, there are four issues with the

21   Defendants' proposal, with their construction of the

22   preamble.  The first here I'll start to address is this

23   issue of teaching a system that mimics, or the system has to

24   mimic something.

25       The first point we made, and Your Honor, I'm sure,

19

1    knows this, mimic is the proposed construction for the term

2    "emulate" which we're going to talk about later on.  The

3    preambles don't even use the word emulate but the Defendants

4    are trying to read that word mimic into even the preamble,

5    so it's really a back door effort to get their emulate

6    construction in.  We don't think there's any basis here.

7    That's one.

8        Talking about mimicking in general, we'll get to a

9    couple of points here, and that is whether this system is

10   restricted entirely to the concept of modeling, emulating,

11   mimicking, whatever you want to call it, as opposed to

12   testing the phone on a real device.  And the answer is it's

13   not so limited.  The patent contemplates using real-world

14   devices from time to time in the testing, as needed.  You

15   don't necessarily have to do it but you can.  And so to try

16   to limit the scope of the entire system in a way that might

17   be read to preclude that from happening would be wrong.

18       Looking at slide 28, we see one example of this, and

19   I'm looking at the upper right-hand clip and the highlighted

20   text there.  The interface, the testing interface, may allow

21   an application to be deployed for final testing.  So the

22   final testing is part of the process as it's disclosed, if

23   you want to perform that step, and you can do that.  The

24   specific claim doesn't necessitate it, it's not required,

25   but certainly it can be included.

1        Looking at slide 29, if you look at the upper box here

2  first, the upper right-hand text box of the '864 patent at

3  column nine, 60 to 62, here it's talking about this is step

4  714, and if you look at step 714 in the flowchart on the

5  left-hand side, you can see it's a dotted line.  It's an

6  optional step.  It may be in some claims, may be in others,

7  may be recited, may be not.  But it's an optional step.

8        And the specification discloses, though, that this is a

9  step that you can do using a real mobile device if you want

10  to.  To say that the claim reads out the use of real-world

11  mobile devices if you want to would be wrong.  Certainly

12  some elements of the claims are going to require emulation

13  or simulation of certain things.  When those elements

14  require it, then that limitation is meaningful, but to limit

15  the entire system to that concept, that's what's wrong with

16  that word mimic.

17        Slide 33, a summary of what I just said and relevant

18  case law.  Slide 31 is similar.  The Defendants are looking

19  to read out the embodiments in the examples of the claims

20  and that's improper.

21        All right.  Now, looking at other words that are

22  problematic.

23        By the way, Your Honor, I was reading Defendants' brief

24  again yesterday and somewhere along the way in their brief

25  they complain that we're picking on individual words of

1   construction and that we're not really making an argument as
2   to why, we're just complaining about them.
3       That's kind of wrong for two reasons.  First, the
4   presumption is that the claims are going to take on their
5   regular meaning and that they can stand on their own, that
6   they don't need to be construed unless there's a reason to
7   construe it.  That's the Defendants' burden to demonstrate
8   why something needs to be construed, not our burden to
9   demonstrate why it does not.
10      But secondly, in each of these instances where we're
11  taking issue with certain words in the proposed
12  constructions, it's because those words are too limiting or
13  too confusing or some other reason that makes it
14  unadvisable, unnecessary and wrong to substitute that word
15  or phrase for something that is recited in the language of
16  the claims themselves.
17      This is an example on slide 32 looking at the second
18  topic here.  This is just signposting, Your Honor.  The
19  evidence here is on slide 33 and 34, that developing an
20  application is more than just writing it.  In the
21  construction that Defendants are proposing, if you track the
22  preamble there, it says "developing".  They propose to
23  replace that word with "writing".  Writing is more narrow
24  than developing.  Developing includes lots of different
25  activities, any of which could be encompassed by what this

22

1    system does or assists with.  And this is slides 33 and 34.

2        And in the same manner, looking at slide 35, where the

3    preamble says "testing", the Defendants are looking to

4    insert the word "evaluating".  But there I say, again, we

5    have issue with the scope.

6        If we look at slide 36 and 37, we see the other

7    examples of what testing might mean.  And I would submit,

8    Your Honor, that the word "evaluating" might lead to

9    confusion.  Does that mean an operator is looking at

10   information and analyzing it, evaluating it?  I don't know.

11   But that's another reason why inserting that word where it's

12   unnecessary would be problematic.  That's slides 36 and 37.

13       Lastly, we have this issue of real-world mobile device,

14   so this is the tail end of the construction and what needs

15   to be modeled in a sense, and something is modeled.

16       And we take issue with this in a number of places, this

17   concept of real-world.  You just don't need it and it's

18   confusing.  In particular, the specification makes clear --

19   looking now at slide 39, and the left-hand box makes clear

20   you can be talking about pre-release mobile devices,

21   scheduled release or current mobile devices.

22       So, in other words, if you're planning a mobile device

23   or you know that someone is planning a mobile device or have

24   the expectation as an app developer of what the next

25   generation might look like and thinking ahead, hmm, I could

23

1   really use that processing power or that side view

2   capability or whatever, I can -- I can look up a set of

3   characteristics that will emulate that or model that and use

4   those in the system so I can start developing apps for

5   future devices.

6        So is that a real-world device?  We don't know.  That

7   future device may never materialize.  That's why real-world

8   is wrong.  It's overly limiting.

9        And on the right-hand box, still on slide 39, you

10  can -- this spec actually says that in the first highlight:

11  Allowing application development to start before a physical

12  mobile device is available.  That's one of the advantages of

13  the invention here, and Defendants are looking to read that

14  out.

15       Or then they say, well, we're not looking to read that

16  out, Your Honor.  We may hear that, well, real-world doesn't

17  mean it can't be in the future.  We're in the kind of fight

18  or subsidiary fight that ambiguous claim constructions

19  invite and that's what this would be, at a minimum.  We

20  think it's just wrong.

21       But even Defendants say, no, real-world really means

22  future things that are planned, which would be an odd way to

23  think about real-world.  I think you're still inviting

24  confusion and a potential dispute down the line.

25       Your Honor, that's -- that's all for us on the preamble

24

1   unless Your Honor has any questions.

2           THE COURT:  No, that sounds good.  Thank you.  And

3   who will be arguing for the defense?  Let me pull up your

4   slides.

5           MR. REITER:  Good afternoon, Your Honor.  It's Mark

6   Reiter who will be arguing for the Defendant.

7           THE COURT:  Very good.  Go ahead.  Thank you.

8           MR. REITER:  All right.  Thank you, Your Honor.

9       Well, that was quite a presentation from Mr. Devlin,

10  and I'll do my best to work through all of the issues and

11  cover the many disputes, and I think that is a key -- key

12  noun here is that there are many disputes between the

13  parties and many disputes that require the Court's help in

14  resolving.

15      Let me start with -- the way that I laid out our

16  presentation is not dissimilar to what Mr. Devlin did.  I

17  have a brief summary of the background of the purported

18  invention.  I'm not going to go into the legal issues in the

19  same way that Mr. Devlin did.  Not going into them doesn't

20  mean that I agree with them.  In fact, I disagree with

21  virtually everything he said about the law in the context of

22  what is happening here.

23      The cases are the cases and the cases say what they

24  say, but the way in which Plaintiff is trying to apply those

25  cases here is entirely wrong.

25

1        In fact, Your Honor, just as kind of a predicate to --

2   to our presentation, I have never, in the 30 years that I've

3   been doing this, been involved in a case where a party has

4   refused to take a position on any single claim term.  I have

5   never been involved in a case where a party has said that no

6   construction is required of every single term that is

7   raised.

8        In fact, the Plaintiff didn't raise a single term,

9   which is not surprising, given their positions, did not

10  raise a single term for construction.  Everything, according

11  to Plaintiff, either needs no construction or simply should

12  be given its plain and ordinary meaning.

13       But, of course, as Phillips says, as the Federal

14  Circuit has said and as I'm sure Your Honor is very

15  well-aware, the object of this exercise is, absent a -- an

16  example of the inventor acting as his own lexicographer, is

17  to identify -- where there is a dispute, to identify what

18  one of ordinary skill in the art at the time of the

19  invention would have thought these terms mean.  That is the

20  so-called ordinary meaning.  That is what Phillips and the

21  Federal Circuit has said over and over again.

22       And simply punting, simply saying that no construction

23  is necessary for every single term, particularly when there

24  are terms here like "simulate" and "emulate" and "profile

25  display window" that are technical terms that a lay jury

26

1   would not understand, to simply say that no construction is

2   necessary I think turns this entire process on its head.

3       So with that little preface, I will go through very

4   briefly, and we did provide Your Honor with obviously a

5   technical tutorial, but very briefly a summary of what the

6   alleged invention is and the problem that it purported to

7   solve, because I think that's very, very important in

8   understanding what these claims are trying to capture.

9       So if we look at slide three of our presentation, we

10  start with the provisional application, which is just

11  Mr. Poulin's business plan that he prepared and then filed

12  as a provisional application.  It is -- it contains a lot of

13  ideas of things to do, with very little explanation of how

14  they are to be done.

15      But it starts off saying that there are going to be

16  700 million new handsets in 2005 and developers trying to

17  keep up with apps or programs that could be run on those new

18  handsets as they come out is very, very difficult and there

19  needs to be a way -- the provisional application and also

20  the patents explain there needs to be a way to allow the app

21  developers to keep up with that new introduction of phones.

22      What the provisional application talks about is it is

23  very difficult right now to do so, because as we see in the

24  bottom -- the bottom bullet or pasted excerpt that we have

25  down here is that transferring the application to a new

27

1    phone, a physical real-world phone, and trying to test it

2    out takes a lot of time and it's very costly, because you

3    have to go out and buy -- the app developer has to go out

4    and buy the phone.

5        So what Mr. Poulin appears to have conceived is, well,

6    let's use emulators.  Let's -- instead of using real-world

7    devices, let's use emulators, and he points to Flash Lite

8    environment.  That's not something that he developed.

9    That's something that came from Macromedia, and he was

10   building on top of that.  And if we go over to slide four,

11   we see that concept carried forward to the patent.

12       And just as Mr. Devlin did, we are going to just cite

13   to the '864 patent, but all of this is found in the other

14   patents as well.

15       So the '864 patent in the very first column talks about

16   the 700 million new mobile phones expected to be released in

17   2005 and the -- the difficulty that app developers have in

18   keeping up with new programs that would run on these

19   devices, and the patent explains that transferring the

20   application to the device and playing it is really the only

21   way that the developer can decide or can determine whether

22   his or her new program can work.  And again, Mr. Poulin

23   explains that is very time-consuming and very costly.

24       So what does he do?  What is the solution?  We see on

25   page five the solution.  The solution is we're not going to

28

1    use real-world devices.  We're going to use emulators, and

2    the patent is very, very specific and goes on for column

3    after column about what these emulators might do and how

4    precise they need to be.

5        We have Table 1.  We have Fig. 2, as we see on slide

6    five, about how the emulator generates a mobile device

7    model.  So it looks like, acts like, smells like virtually

8    the actual device, but it allows, according to the patent,

9    the developer to work more quickly and not have to go and

10   buy each device and can that way test his or her application

11   as it's being developed.

12       Mr. Poulin, as we see on slide six and this also comes

13   out of the patent, says you can get these emulators.  He's

14   not purporting to have invented emulators or doesn't explain

15   how to build the emulators.  He says you can buy them.  You

16   can subscribe to them for a fee of ten to $15 per handset,

17   which saves a lot of money, a hundred to $200 per mobile

18   device.  So he's explaining again, let's use these

19   emulators.  It will speed things up.  It will be less

20   expensive.

21       And he also says, as we go to slide seven, we want to

22   see how that application, the application under development

23   is going to operate on the mobile device, and the mobile

24   device has a certain amount of resources.  And we saw -- and

25   we'll go over this in more detail as I get into the preamble

29

1   term, but we see back on slide five that the mobile device

2   has characteristics.  It has a processor, processor speed

3   and memory size and storage size, and it even describes how

4   big the screen on the actual device would be.

5        And so back on slide seven, the patent explains that

6   you need to have a -- a display that shows what resources

7   are available of the device, and that's that red line, and

8   we'll refer to that as we go throughout the presentation

9   today as the cap out line or the capacity line.

10       And the application as it's running and those bars that

11  we see in Fig. 3 are different time sequences of the

12  application running.  If a bar goes above that red line,

13  then we know that the resources available to the application

14  of the mobile device are too limited and the mobile device

15  is likely going to crash.

16       And the other thing that the patents describe is that

17  these mobile devices, because they are mobile devices, are

18  not just working in isolation.  They operate on a network,

19  and operating on a network also consumes resources of the

20  mobile device.  We see this on slides eight and nine.

21       So what the invention talks about, what the patents

22  describe is accounting for those resources consumed of the

23  mobile device by the network.  So if a phone call comes in,

24  if a message, a text message comes in, that will consume

25  memory.  It consumes processing power.  And as we go from

30

1    slide eight to nine, we see that red line goes down because

2    the network -- the interaction between the mobile device and

3    the network takes up processing power, memory power, and so

4    the resources available to the application are limited.

5        And that's really what this purported invention is

6    about, is taking a virtual version of the mobile device, an

7    emulator device, testing the application on that device,

8    having a display which shows exactly how that app -- that

9    program under development is running in comparison to the

10   available resources of the mobile device, and then also

11   including in the mix the network -- the network consumption

12   of the resources of the mobile device.

13       So taking all that into account, then the app developer

14   can see if his or her app is going to work on that phone or

15   if it's going to cause the phone to crash.  So that's the

16   background, and I think that background is very, very

17   important as we get into each of these terms and each of --

18   particularly the preamble, because that is what Mr. Poulin

19   purported to have invented, this emulated system or this

20   system that uses an emulator to develop these apps.

21       And it doesn't mean that you can't -- that a developer

22   can't go off and test the device on a physical device as a

23   final test, but what his invention is about, and it's very,

24   very clear from the provisional application, from the

25   background of each of the patents, that using real devices

1    and only using real devices doesn't work.  It's too

2    time-consuming and it's too expensive.  So you have to use

3    the emulator devices.

4         Now, Mr. Devlin talked about 02 Micro, and our reliance

5    on 02 Micro is demanding, respectfully, that this Court

6    resolve these disputes.  02 Micro does say that that is not

7    an excuse for a party or parties to ask the Court to resolve

8    the construction of every single term in the patents, and I

9    don't think that is at all the case here.

10        We see on slide ten the six terms grouped together that

11   are at issue here.  We're not -- out of three patents and I

12   think there are 150 total terms, of course, not all asserted

13   here, but having six terms is very, very far from what 02

14   Micro talks about in the context of over-populating the

15   construction analysis.

16        We have been very diligent in identifying the terms

17   that there are a dispute for and which absolutely require

18   construction and resolution of that dispute.

19        So if we go to slide 11, and that is again 02 Micro:

20   Where the parties present a fundamental dispute regarding

21   the scope of the claim term, it is the Court's duty to

22   resolve it.  And we do have a fundamental dispute with

23   respect to each of these six terms as to what they mean and

24   how they should be applied with respect to these patents.

25        Most particularly -- not most particularly, but

32

1    focusing now on just the first limitation, the preamble,

2    it's very, very clear that we have a dispute over scope that

3    needs to be resolved.  And just simply saying no

4    construction necessary really I think turns O2 Micro and

5    this process on its head.

6          I've already talked very briefly, on slide 12, words of

7    a claim are generally given their ordinary and customary

8    meaning.  We see Phillips cite to the Innova case in this

9    slide.  The Court construing a patent seeks to accord a

10   claim the meaning it would have to a person of ordinary

11   skill in the art at the time of the invention.

12         And that's exactly what we have attempted to do here,

13   Your Honor, and we believe we have done.  And we believe

14   that Plaintiffs, on the other hand, are just simply punting.

15   They want to wait, keep their powder dry, and hope that they

16   can keep these claims as amorphous as possible, through the

17   expert discovery phase and possibly trial.

18         So skipping on to now slide 15, we get to the preamble

19   term, and I'll pause for just a second and see if Your Honor

20   has any questions about what the alleged invention is or

21   anything that I described there.

22              THE COURT:  No, I'm good with that, but let me ask or

23   make a general statement.  Although Plaintiff hasn't really

24   wanted to take a position on whether the preambles are

25   limiting, the way I look at it, they are limiting, but I don't

33

1    see a problem with giving them plain and ordinary meaning.

2        I say that as you discuss your slides and your

3    presentation on this, of why someone skilled in the art

4    would not understand the limitations of the preamble,

5    without having to import other words that you put into it

6    like mimic or real-world mobile.

7        And so I just make that statement as you go through

8    your presentation, because the Court's view is the Court

9    finds or is probably going to have to find that these are

10   limiting, but I don't see why I can't give it its plain and

11   ordinary meaning and that someone skilled in the art

12   wouldn't understand that.

13           MR. REITER:  Understood, and thank you for that

14   clarification, Your Honor.

15       I think the way that Your Honor put it is really the

16   crux of what the dispute is, is what would one of ordinary

17   skill in the art understand these terms to mean, based on

18   what the alleged invention is and what the patents disclose.

19   I think that a jury looking at this, a lay fact jury would

20   not understand what it means to be just a system for

21   testing, for example, an application for a mobile device.

22       I think it is absolutely critical to this invention, to

23   the extent that there is an invention, that that -- that

24   claim, it be clear to the jury that it requires the use of

25   an emulated device.

34

1    Now, if Your Honor wants to provide that or thinks it
2    better to provide that someplace else and we can talk about
3    where that might be, that's fine.  But that is why I
4    think I'm -- and I feel good that the Court understands that
5    these limitations are limiting, and so I'll skip to slide 18
6    which kind of I think underscores that.

7    We see in Pitney Bowes that if the preamble is
8    necessary to give life, meaning and vitality to the claim,
9    then the claim preamble should be construed as if in the
10   balance of the claim.  So it's talking about a construction,
11   and we see on that slide, slide 18, that a system for
12   testing can't just be, in the abstract, a system for
13   testing.

14   In patents and the provision I'll talk about, testing
15   on physical devices was known in the art.  The patents
16   disparage that approach and the patent's purported solution
17   was to use an emulated device.  Otherwise, without that
18   limitation, without that understanding, all that's left of
19   the body of the claim is really just software that does
20   something, and it is software that includes a display window
21   and simulates a network while a mobile device executes an
22   application.

23   Absent the preamble and understanding exactly what that
24   preamble means and construing it consistent with the way one
25   of skill in the art would understand it leaves the body of

35

1   the claim without any structure, without anything to

2   complete it.

3        And so we need to have the concept of the testing

4   system being done on an emulated device, and we see that's

5   all very consistent with what the abstract says on slide 19.

6   The mobile device is emulated in real time, and we see the

7   mobile device is emulated in every single abstract.

8        And we see, for example, on the '192 patent and on the

9   '678 patent that the model is based on characteristics

10  indicative of performance of the mobile device.  It is

11  talking about the emulated version of the mobile device, not

12  the real version of the mobile device.

13       We see on slide 20 that the patents talk about in all

14  embodiments it is to be noted that emulation is performed.

15  It's performed on a processor extrinsic to the mobile device

16  that's being emulated when testing is not done on the actual

17  device itself.

18       Looking again at slide 21, we've already seen this

19  concept that two of the most adverse variables for the Flash

20  Lite developer are trying to load the device or the

21  application into the real device, the time and expense

22  associated with that.

23            THE COURT:  Well, let me ask this.

24            MR. REITER:  Sure.

25            THE COURT:  In terms of the preambles here, they

36

1    don't refer to simulating, emulating or your use of the word

2    mimicking, so why should the Court impose that on the preamble,

3    especially --

4              MR. REITER:  Well, first --

5              THE COURT:  Let me just finish, because -- and add

6    something else.  Especially considering mimic doesn't appear

7    anywhere else in either the claims or the specification, but

8    simulate and emulate appear in other disputed terms presented

9    by the parties.  So why should such limitations be imposed like

10   a generic term system when you look at -- I'm just trying to

11   see.  You're trying to add those into the preamble, further

12   limitations, and that's what I'm trying to understand is why

13   should the Court do that?

14             MR. REITER:  Okay.  I understand Your Honor's

15   question.  So there's two concepts that I think need to be

16   understood here, and we're going to be getting into these later

17   but maybe it makes sense to skip ahead.

18        The concepts of simulation and emulation in these

19   patents are two entirely different concepts, two entirely

20   different concepts.  The patents refer to simulation when

21   they refer to the network and simulating the network, very,

22   very consistent.  And I have slides and maybe Your Honor has

23   seen those over the weekend that explain and show how the

24   patents consistently and exclusively refer to simulation of

25   the network, not simulation of the mobile device.  With

37

1   respect to emulation, the patents only refer to the mobile

2   device as being emulated.  Two very different concepts.

3        Consistent with that, these claims, with the one

4   exception of the '192 patent in claim 1, and we think that

5   was a drafting error in prosecution, but very consistent

6   with that, the claims do not ever refer to emulation of the

7   mobile device.

8        If you look at claim 1 of the '678 patent, it only

9   talks about simulating the network.  Claim 1 of the '864

10  patent only talks about simulating the network.  Claim 1 of

11  the '192 patent does talk about emulating the network, but

12  that's not right.  That is an error in prosecution and I'm

13  going to go through that.  And if the Court construes that

14  or keeps that word "emulate" there, that patent -- that

15  claim is invalid for lack of support in the written

16  description.

17       So to understand the difference between emulate and

18  simulate, one referring to the network and one referring to

19  the mobile device, then one realizes that this system for

20  testing, for developing, which is in the preamble, a

21  application for a mobile device has to be done on an

22  emulated device.

23       That is the hook.  Renishaw talks about having a hook.

24  That is the hook for making sure that what the inventor

25  purportedly invented, a system for testing using an emulated

38

1    device and requiring an emulated device, is included within

2    the scope of the claim.

3         And let me pause there and see if I've answered Your

4    Honor's question, at least in part.

5              THE COURT:  No, go ahead.  Thank you.

6              MR. REITER:  Okay.  So going back to the slides, I

7    think there is an agreement between the parties if we go to --

8    and what we heard from Mr. Devlin today about the background of

9    the invention was very different from what we saw in their

10   tutorial.

11        If we look at slide 23, they agree that the

12   disadvantage in the prior art where it's using actual phones

13   is because it was extremely slow, and so what we had to do

14   was go to the emulated device.

15        And I mentioned a moment ago, and this kind of

16   dovetails with Your Honor's question of just a second ago,

17   that perhaps there's another place in the claim to -- to

18   capture that concept of emulation, and I think that's in

19   what we see on slide 24 where I have the '864, the '192 and

20   the '678 first claims where it talks about indicative of

21   performance of the mobile device.

22        If you remember, if we go back to the abstracts, the

23   abstracts talk about the model, which is the emulated

24   device, is based on characteristics indicative of

25   performance of the mobile device.  It's not using the actual

39

1    device.  If it were using the actual device, it wouldn't say

2    indicative of.  It would say equivalent to or some other

3    characterization.

4         But here the claims are trying to capture that

5    emulation aspect, and that's carried out -- carried forward

6    or from the preamble where you have the antecedent basis for

7    mobile device.  The mobile device is in the preamble and it

8    talks about the preamble in the body of the claim, and that

9    mobile device has to be an emulated device.

10        As I said, it is very clear as we go through every

11   single embodiment of the claims, and we cited, Your Honor,

12   at page eight of our brief In Re:  Abbott Diabetes, 696 F.3d

13   1142.  In that case the Federal Circuit talks about the

14   primary purpose of the invention was to provide, in that

15   case, a small compact device that operates a sensor and so

16   forth.  And it goes on to say:  Every embodiment disclosed

17   in the specification shows a sensor without cables or wires.

18   And it said that the patentee repeatedly, consistently and

19   exclusively depicted a sensor without wires, while

20   simultaneously disparaging sensors with wires.

21        That's exactly the situation we have here.  The primary

22   purpose of Mr. Poulin's invention was to avoid using

23   physical devices.  Every embodiment disclosed in the patent

24   uses an emulated mobile device and the patent disparages the

25   use of physical devices.  We see on slide 25, slide 26, and

40

1    summarized on slide 27 how every embodiment teaches the use

2    of an emulator.

3           And, again, from Wapp's tutorial, on slide 28, the

4    patents are directed -- this is their words, not mine.  The

5    patents are directed to systems and methods for developing

6    and testing mobile applications or mobile apps.  They do

7    this by emulating mobile devices without loading up the app

8    onto an actual phone.  That is the crux of this alleged

9    invention.  Without it, there is nothing.

10          You see they double down on this on slide 29.  The

11   invention overview, the model emulates the mobile device.

12          So the preambles are limiting.  I understand the Court

13   already recognizes that, and the preambles are limiting

14   because they provide that context for the rest of the body

15   of the claim, and they can only do that if the concept of

16   that emulated device is attributed to the preamble.

17          Mr. Devlin talked about -- we will turn to slide 31 --

18   that we are reading out limitations or embodiments.  That is

19   entirely false.  Yes, the patent does say that as a final

20   test -- this is in column six.  That as a final test, the

21   developer may, and it's permissive, may, test the device in

22   a final way on a physical device, but that's after all of

23   the testing is done on the emulated devices.

24          And we see this and I think Mr. Devlin referred to

25   these figures in his presentation but certainly in his

41

1   briefing.  Fig. 7, which we see on slide 32 of my

2   presentation, shows the application claim within an emulated

3   mobile device at 704, and then you transfer the application

4   to the mobile device.

5       Well, if we look at what the patent actually talks

6   about, it's publishing the application to the mobile device.

7   Not testing it.  The testing is done.  The testing is done

8   at that point.

9       The same thing on Fig. 13.  It talks about loading the

10  simulator interface into the mobile device model.  The

11  emulator loads the network simulator.  There is nothing

12  about testing in Fig. 13.  Nothing about testing on the

13  physical device.

14      And going on to slide 34, again, yes, the patent says

15  that the developer may transfer the application to a

16  physical device for final testing, but that's permissive.

17  Certainly our construction, our construction of the preamble

18  doesn't take that away, doesn't preclude that, and we see

19  this in all types of situations and technologies.

20      As we see on slide 34 with the picture of the car, Ford

21  doesn't crash car after car after car to see how it's going

22  to work.  It models it first and then it does a final

23  testing on a real car.  And that's exactly what's described

24  in column six, lines 31 to 33.

25      Again, our construction doesn't preclude the final

42

1    testing on a mobile device, an actual mobile device.  It

2    requires, on the other hand, that the testing include the

3    emulated device.  Absent that, there is no invention here,

4    Your Honor.  There is no invention.

5        And finally, Wapp's nitpicking about the use of testing

6    versus evaluating or developing versus writing I think is

7    just that, just nitpicking.

8        They haven't provided any construction.  They haven't

9    provided any alternative.  They've said that we are reading

10   things out, but that's not at all true.

11       Mr. Devlin's slide 33 shows various elements of the

12   patent, the emulation and testing and so forth.  That's the

13   entirety of what's going on.

14       What we're saying, Your Honor, and what we think is

15   absolutely critical, again, is that in order for this claim,

16   for the body of this claim to have structure, for there to

17   be any meaning to the body of this claim, it has to be

18   focused on an emulated -- the use of an emulated device as

19   opposed to a real-world device, and there is absolutely no

20   dispute here.

21       We did meet and confer with Plaintiffs for the 4-5

22   submission that we submitted a few weeks ago, or a week or

23   so ago.  We asked -- we thought we were close based on the

24   tutorial that, okay, we agree that emulated devices need to

25   be used here, and they said, no, we don't.  We think you can

43

1    use a physical device without an emulated device.

2        So there is absolutely a dispute between the parties.

3    This is not some hypothetical dispute that Mr. Devlin was

4    alluding to in O2 Micro.  There is a real dispute here and a

5    real dispute that requires the Court's assistance.

6        And I'll stop there, Your Honor, and see if there are

7    any other questions.

8            THE COURT:  Let me ask one question on something you

9    briefly mentioned.  The issue of in the '192 patent you want

10   to -- your construction there puts the word "writing".  Where

11   do you find support limiting "developing" to "writing"?

12           MR. REITER:  A fair question, of course.  We felt

13   like that was conceptually what was being described in that

14   claim, given the background of the patent, given what we see in

15   the -- I'm sorry, turning back to slide -- slide four.  With

16   the rapid development it requires that applications be designed

17   to run on these systems.  Development systems targeted may

18   become obsolete.  The only way to determine if an application

19   plays.

20       So looking at column one over to column two, focusing

21   on the '864 patent again, we believe that it was talking

22   about the app developer writing these applications, these

23   programs for these -- these devices.

24       If the Court doesn't believe that writing is the right

25   word or gerund, that's fine.  What we were trying to do is

44

1    trying to avoid defining the term with a term.

2         I don't think we really have a problem with keeping the

3    word "developing" there.  The concept here that I believe is

4    really critical, as I've said over and over again, and I

5    apologize for sounding like a broken record on this but I

6    feel very strongly about it, is the idea of the use of

7    emulated devices as opposed to real-world devices.

8         So, again, we were trying not to be tautological in

9    defining the term with a term.  If the Court thinks that

10   word should stay, that's not an issue for us.  The bigger

11   issue, again, is making it clear to the jury that this

12   system has to use an emulated device, and it's a system that

13   is developing applications that are going to be used on

14   mobile devices as opposed to just generically applications

15   that might be used on a computer or elsewhere.

16             THE COURT:  Okay.  Thank you.  Would you like to give

17   a short response and then go on to the next term?

18             MR. DEVLIN:  Thank you, Your Honor.  Yes.  This is

19   Tim Devlin again.

20        Just briefly, first just from a legal point and then

21   the specifics on preamble.  The argument that I'm hearing

22   again is that somehow because the Defendants have asserted

23   that something needs to be construed, then we, as the

24   Plaintiff, must propose our own set of alternate words for

25   the claim language and then the Court must select from the

45

1    alternate set of words to supplant what is actually recited

2    in the claim itself, and that's just not the case.

3         The follow-on argument is, of course, that we, the

4    Plaintiff here, have no sort of entrant in the contest, as

5    it were, we've ceded the field, and so the Defendants win by

6    default.  That is absolutely wrong.

7         Sometimes the best words to connote what the claim

8    means are the words that are used in the claim, and that's

9    what we have here in every one of these instances.

10        I don't always, as a matter of course, Your Honor, just

11   say no construction.  Sometimes I think something needs to

12   be construed and we offer a construction.  We do that in

13   many cases.

14        But here for every term the clearest language is what

15   is in the claim itself already.  That's what should be

16   adopted.  That's why we're saying no construction is

17   necessary.

18        On the specifics of the preamble, a couple things.

19   And, Your Honor, I'm going to set aside all of the -- unless

20   Your Honor is interested, I'm going to set aside for now the

21   detour into emulate and simulate itself and just focus on

22   the preamble here.

23        And one of the problems is that the Defendants are not

24   actually offering a plain and ordinary meaning here.  Over

25   and over again what we're hearing is it says this in the

1    spec, it says this in the provisional, says it in the spec,

2    so we have to have it in here.  That's reading in a

3    limitation from the specification.

4        If you look at the actual language of each of these

5    preambles, a system for testing an application for a mobile

6    device, it's plain as day.  It does not need to be

7    construed.  Its plain and ordinary meaning is best expressed

8    by those words itself.

9        That's not what the Defendants are trying to do here.

10   And simply because they're trying to push stuff into this

11   preamble that shouldn't be there doesn't mean that we have

12   to propose alternate language or that the Court has to adopt

13   some alternate language.  That's not how the law works.  So

14   that specifically is on the preamble.

15       And talking more specifically here, the Defendant is

16   sort of acting as if the rest of the claim language doesn't

17   exist.  The claims define the scope, and sometimes these

18   claims use the word emulate, in which case that will be

19   required, and sometimes they don't.

20       A simple example is claim 1 of the '864 patent.  It

21   talks about simulating a variety of network characteristics

22   but nothing in that claim involves emulating.  It does not

23   recite emulating anything in the claim.  That word does not

24   appear in any form, emulate, emulated, at all.

25       What the Defendant is saying is, well, that's required

47

1    because of what the spec is saying.  That's not the case.

2    And they say we're not reading out any embodiment because

3    the spec is loading it up at the end.  That's not the case.

4        If we go back, Your Honor, if we may, to our slide,

5    Wapp's slide 29 and 28, the embodiment is described in the

6    specification itself.  Looking at the top quote, it's

7    talking about step 714, which is testing the network, which

8    is optional, but it is recited in some of these claims, like

9    claim 1 that we just talked about, and it cites to the

10   testing application, for example, application 104, which is

11   the reference we'll use, running on a mobile device, that is

12   a mobile phone.  Right there, when it says mobile device,

13   this says e.g. mobile device 114.  What is that?  If you go

14   back up to slide 28 and see Fig. 1A, you see mobile device

15   114 is the actual device.

16       So the claims that don't cite emulate but recite

17   simulate the network environment could include potentially

18   the use of a real-world phone.  That's what the Defendant is

19   leaving out.  That's the embodiment that was read out by

20   inserting in the preamble a requirement of mimicking, which

21   is the word for emulate.  And applying that to the preamble

22   throughout the whole set of claims, even if some of those

23   claims don't actually recite emulate, that's a problem.

24   That's not plain and ordinary meaning.  That's reading one

25   embodiment in the claim to the exclusion of others.

48

1          And plus, I'll say, Your Honor, the word nitpicking,

2     that changing a word from developing to writing is

3     nitpicking.  Your Honor, there are only two steps in this

4     whole endeavor in the long run, interpreting the claims and

5     then applying those interpreted claims to see if there's

6     infringement and validity.  And if in interpreting claims

7     we're going to change words, particularly words that are now

8     (unintelligible), that's a problem.  It's going to impact

9     things tremendously.

10          And none of this is nitpicking.  All of this is

11     critical.  Every word matters.  That's why generally, unless

12     there's a reason to change the words, don't construe them.

13          Okay.  Any questions there, Your Honor?  And I'll move

14     on to the next step.

15               THE COURT:  No, go ahead.

16               MR. REITER:  Your Honor, can I -- I'm sorry.  This is

17     Mr. Reiter.  Can I interrupt for just one second and make one

18     very quick response?

19               THE COURT:  Yes, go ahead.

20               MR. REITER:  Thank you.  First, I hear Mr. Devlin

21     saying that we don't need emulated devices.  I think that turns

22     this patent, this invention to the extent there is one, on its

23     head.  It's entirely contrary to what the patent discloses and

24     to what the inventor said he is trying to -- the problem he is

25     trying to solve.  So that's point number one.

49

1    Point number two, finally, is with respect to Fig. 7

2  and that step 714, all that is saying is that, yes, a real

3  device run on a system, but that is not talking about

4  testing the application on that real device.  It is just

5  talking about a real device running on a network.  That's

6  all that 714 is.

7    And we say, as I already explained, at step 716, once

8  the testing is done, then it is published to the mobile

9  device.  There's no testing on a mobile device in Fig. 7.

10    Thank you, Your Honor, for that indulgence.

11    THE COURT:  Okay.  Mr. Devlin, go ahead.

12    MR. DEVLIN:  Thank you, Your Honor.  Moving on to

13  application -- Your Honor, I won't address that unless the

14  Court has questions.  I'll move on.

15    THE COURT:  Go ahead.

16    MR. DEVLIN:  Hearing nothing, thank you, Your Honor.

17    The next word is "application".  Slide 41 shows it

18  within the context of the claims and then slide 42 just has

19  the Defendants' proposed construction and Wapp's proposal as

20  well, again, no construction.

21    And, Your Honor, this one, I would suggest, is a really

22  good example of where adding words is just going to confuse

23  the issue.  It's going to create confusion where none

24  exists.

25    We all know what an app is now.  I don't think there's

50

1    going to be a lot of confusion in anyone's mind what an app

2    is, and we're going to apply this claim accordingly and go

3    forth.  That's it.  It's a very simple term.  It's

4    well-understood from a technological standpoint these days

5    and from a lay person standpoint.  No juror will be confused

6    by the use of this word.

7        Moving on to slide 43, again, these same three bullets

8    are true.  The term is used in the claims in its normal

9    meaning.  There's nothing special about it that would

10   require some interpretation.  There's no express definition

11   in the specification and there's no argument that there's

12   any disclaimer from prosecution.  All of the normal claim

13   construction tools say, leave it alone, it's fine.

14       Moving to slide 44, we want to talk about some of the

15   issues now with what Defendants do.  The first one is using

16   the term "program" as a substitute for "application", and

17   going on to slide 45, I don't think there's a dispute that

18   an app is some sort of program, but there's two problems

19   with it though using that word "program".

20       One is the specification happens to use program when

21   talking about the broader system, as opposed to the app that

22   is under development and testing and so forth.  So to the

23   extent someone is looking at the spec and a juror picks up

24   an exhibit in the jury room or whatever, there is some

25   potential for confusion by using that word in place of

51

1    application.

2         The other problem -- and here I happen to be on slide

3    45, Your Honor, but in slide 45 it's going to go through

4    showing clearly how what's referred to as the app is the

5    component that's being tested or developed, not the broader

6    system, and that is what is referenced as program now in the

7    specification, and we have citations to that in our brief.

8         The other problem that exists is using the word

9    program, you realize that an app is a program but a program

10   is not necessarily an app.  And, Your Honor, I'm being a

11   little colloquial here to say that, but what I can say is

12   that the world of a program can include things that are not

13   apps.  So once you insert the word program and begin your

14   construction by replacing the word app with that word,

15   you're now obligated to follow through and provide

16   additional words that define the word program into the

17   things we're talking about here, which is apps.  So you

18   specifically have to go down this path of using additional

19   words that then create additional problems, and that's

20   what's happening here.

21        So slide 47 talks about these problems in their

22   proposed construction, that it is designed to run on a

23   mobile device, whatever that means.  Does it mean the

24   software was originally designed to run on a desktop

25   computer but is now accessible to be run in what looks like

52

1   an app on a mobile phone?  That now that is excluded from

2   the claims?  That doesn't seem right, especially as we go on

3   and on in time and mobile phones become more powerful.  I

4   don't think that word "designed to run" is going to be

5   particularly useful.

6       Of course, if you look at slide 48, there's many

7   different ways that the specification talks about how an app

8   might be utilized within a system:  Played on, published to,

9   running within, whatever, without having to get into the

10  intent of its design, which is just going to invite some

11  confusion and potential dispute down the line.

12      Lastly, starting on slide 49, back to our signposts,

13  the problem here that Defendants' construction -- and,

14  again, they're forced to do this.  By starting with a broad

15  term and then trying to delineate it, they're forced to make

16  a problem with the construction and here it's that it

17  renders other claim language superfluous.

18      If you look at slide 50, we can see that.  The

19  construction proposed by Defendants is on the left-hand side

20  of slide 50, and the right-hand side is the typical claims

21  where the term appears.

22      In the preamble, if you insert the words "program

23  designed to run on a mobile device" for the word

24  "application", you get something that reads "for testing an

25  application designed to run on a mobile device or a mobile

53

1    device".

2        If we go to slide 51, as Your Honor is aware,

3    interpretations that render other claim terms superfluous

4    are disfavored because they're duplicative, because they

5    don't take into account the whole structure of the claim

6    language, and that invites confusion.

7        Your Honor, that's all we have on that, if Your Honor

8    has any questions.

9        THE COURT:  No, that's fine.  Thank you.  Then let me

10   ask defense just a general question.  Why would the word

11   "program" be any clearer or more accurate than using the term

12   "application"?  Because wouldn't someone skilled in the art

13   understand what application means?

14       MR. REITER:  I -- Your Honor, Mark Reiter for the

15   Defendants again.

16       I'm not sure that that's true.  So if we look at slide

17   38 of our presentation, these are dictionary definitions

18   that Wapp proposed with its opening brief.  These are not

19   our definitions or our dictionaries, but this is the

20   extrinsic evidence that Wapp proposed.

21       We see that an application can be pretty much anything,

22   and in fact, Wapp's own dictionary, the Microsoft Dictionary

23   we see at the bottom of the page, talks about a program

24   designed to.  That's exactly what our construction

25   describes.  It is a program designed to run on a mobile

54

1  device.

2      And that is also consistent, Your Honor, with slide 40

3  where it says in the background again, this rapid mobile

4  device development requires that applications designed to

5  run on these mobile devices.  So we use the word "program"

6  because it is consistent with what one of ordinary skill in

7  the art would understand an application to be, that is, a

8  computer program, but it's a computer program in this

9  context designed for a particular use, that is, for a

10  particular technology, that is, one designed to run on a

11  mobile device.

12      That's consistent with Wapp's dictionaries, that's

13  consistent with what the specification says, and that's how

14  one of ordinary skill in the art, we believe, reading this

15  patent would have understood the word "application".

16      And Mr. Devlin talks about everybody understands what

17  an app is, but I haven't heard him say what it is.

18  Everybody understands what it is.  I heard him say that

19  multiple times, but he never said what it is.

20      We have provided for the Court, for the jury, a

21  construction that is clear, that is true to the context of

22  the claims and the specifications, and would help the jury

23  understand what exactly the limits of this patent is and

24  are.

25      And I think I went beyond Your Honor's question.  I'm

55

1    sorry.

2         THE COURT:  Well, let me ask, based on that answer,

3    are you contending that "application" has some special meaning

4    in these patents-in-suit?  And if so, where's the intrinsic

5    evidence to support that?

6         MR. REITER:  I -- yes, I think we are saying that it

7    has not necessarily a special meaning, but it is a restricted

8    meaning.  It's a limited meaning.  In fact, Wapp in its reply

9    brief agrees that it is a limited meaning.

10        If Your Honor will bear with me, on page four of their

11   reply, they say the language of the claims establishes the

12   opposite.  Indeed, because the surrounding claim language

13   shows that the quote/unquote application is more specific

14   than its normal use.

15        And that's exactly what our construction is intended to

16   capture is that the patents here, just as Wapp itself has

17   explained to Your Honor, the use here is more restrictive

18   than just the broad use that one might find in these

19   dictionaries that we just looked at.

20        And the specification and the background, now to answer

21   Your Honor's question, is all very, very clear.  We start

22   with the claim and the claim talks about, as we see on slide

23   39, that the mobile device is executing the application.  We

24   see on slide 40 again, and I mentioned this briefly, that

25   because of the rapid development, it requires the

56

1    applications designed to run on these mobile devices.  Also

2    on slide 40, transfer the application to the device.

3         Going on to -- I think I lost my page -- slide 41, the

4    abstracts executing in real time in a mobile device.  This

5    is the application playing on a mobile device.

6         Slide 42 from Figs. 6 and 7, load the application into

7    the model, into the model, the emulated version of the

8    mobile device.  These are programs that are specific.

9         And we see this same language I was talking about a

10   moment ago on the next slide, I believe slide 43, because

11   the surrounding claim language shows the application is more

12   specific than its normal use.

13        We haven't heard a definition from Wapp, from the

14   Plaintiff, that explains what that more specific definition

15   is, more specific use is.  Our construction captures that.

16        Their tutorial is consistent, that it's testing mobile

17   applications or mobile apps.  We see on the right side of

18   the next slide where -- of the same slide, the model

19   emulates the mobile device and can play the application and

20   show what would be displayed.  So the mobile device is

21   playing the application.  It's not just a generic

22   application.  It is something specific to the mobile device.

23        And the last slide that we have, this is slide 45 of

24   this part of the presentation, is we believe that program

25   accurately captures what this is.  It is a computer program.

57

1    It's a computer program that has a specific purpose and

2    context.  Its context is that of mobile devices.

3        And with respect to run versus play, we're not wedded

4    to run.  We're not wedded to play.  They both -- both of

5    those verbs appear in the specification.  And I think I

6    showed you on column one in our slide 40 how it talks about

7    applications designed to run on these devices.

8        Then finally, with respect to the redundancy, I'm not

9    really sure that there is any redundancy here.  But if there

10   is, then our construction of the preamble, which takes all

11   of this into account, that identifies the emulated device

12   and that says that it is an emulated mobile device that is

13   testing an application designed to be run on a mobile

14   device.

15       So the specification very, very clearly supports the

16   concept that this application is not just a generic

17   application that could be used in any context.  Wapp agrees

18   with that, as we've seen in their reply brief, and our

19   construction captures that.

20           THE COURT:  Let me ask, so if the Court finds that

21   the preambles are limiting, isn't your proposed construction,

22   run a mobile device, isn't that redundant?  I mean, how is that

23   not?

24           MR. REITER:  I don't think that it is, Your Honor,

25   because, as I've said -- and maybe I'm hoping too

58

1   optimistically.  I'm hoping that the Court -- at least that I

2   was clear in what I explained before, that our construction of

3   the preamble, of the entire preamble, takes out any redundancy

4   that was there, but I don't think, even without that, that

5   there would be redundancy.

6       It is a program designed to run on a mobile device or a

7   mobile device.  It's a system for testing an application.

8   What is that application?  It's a program designed to run on

9   a mobile device and it's a system for testing a mobile

10  device.

11      So the application provides context.  The application

12  has to be one -- a program that runs on the mobile device.

13  I think that's very clear.

14      I don't hear -- although it appears that they're saying

15  that if that redundancy is there, then it's clear that the

16  application has to be limited to that mobile device, but I

17  don't hear Wapp taking any position at all.

18          THE COURT:  Okay.  Thank you.  Then one other thing

19  is you just indicated you're not wedded to either run or to

20  play.  So you're not arguing there's anything special about how

21  the application operates, are you?

22          MR. REITER:  No, Your Honor.  As I said, the word

23  play, the word run, the word execute, all of that appears in

24  the specifications.  We felt like run was a very clear and

25  understandable way of describing this.  Play is fine as well.

59

1    The context of it is what's critical, the context in

2 which this program -- the context in which this program is

3 designed, and that context is for a mobile device, not just

4 generically a computer or a server or something else.  It's

5 for a mobile device.

6         THE COURT:  Okay.  Thank you.  I guess we'll go ahead

7 and go on to the next term.

8    Mr. Devlin, I don't know if you want to respond to

9 anything.  I have a general question I want to ask before we

10 start on simulate and emulate, but I didn't know if you had

11 a response to say before we begin that.

12         MR. DEVLIN:  Just very briefly, Your Honor, thank

13 you, and then I'll pause and we'll deal with your question on

14 emulate and simulate.

15    Right at the end the Defendants' counsel indicated that

16 the big issue is saying that an app is something that is on

17 a mobile device, but the claims already say that.  There's

18 no need to keep saying that again.  The preambles say an

19 application for a mobile device, and so it's unnecessary

20 entirely to try to say something more to make that point,

21 because it's already made in other claim language.  That's

22 the redundancy issue.

23    Now, what Defendants are saying on redundancy, Your

24 Honor, is they have construction of the preamble that really

25 accounts for the whole preamble, including the word

60

1    application already, and so you would kind of -- when you

2    use that construction, you sort of sweep away the redundancy

3    issue is I think what they're getting at.

4         The problem is it assumes that the Court adopts the

5    Defendants' proposed construction for the preamble, as

6    opposed to what the Court's concern I think is, which is the

7    Court finds it to be limiting, but then it doesn't need to

8    be construed.  It's clear on its face.  And once you do

9    that, now you have a problem with that.  The redundancy is

10   an issue, and so I think that's just to clean that up.

11        That's really all I wanted to say there, Your Honor.

12            THE COURT:  Okay.  Thank you.  So as to simulate and

13   emulate, just a general proposition is why shouldn't we presume

14   that these different terms have different meanings in the

15   patents, since they were used differently, versus you want to

16   say we can use them interchangeably?  So as you craft your

17   presentation on this, that's my general overarching question.

18            MR. DEVLIN:  Thank you, Your Honor.  And I don't know

19   if we actually ever said it that way, but if that came across

20   or certainly if we did say something that way, that they're

21   interchangeable, that's not what we intended, so I appreciate

22   Your Honor raising that and I'll try to address that as I go

23   through the points here in the presentation.

24        One thing to note at the outset, Your Honor, is that

25   when you sort of think about what does this claim mean, it's

61

1    a little confusing.  How do we deal with what emulate

2    implies in this claim?  Looking at the claim language as a

3    whole, both emulate and simulate, each case carries forward

4    or preludes to additional claim language.  So you can't --

5    there's no need to pluck this term out of thin air and look

6    at it in isolation and say what does that mean, because in

7    each case, the claim kind of tells us as part of a broader

8    phrase what the claim requires.

9        For example, I'm looking now at claim 20 of the '864

10   patent.  And if Your Honor wants to take a moment -- I don't

11   have it on my slides, it occurred to me as I was hearing the

12   argument today, so I flagged it here.  I can read it or if

13   Your Honor --

14           THE COURT:  No, that's fine.  I have those in front

15   of me, all three of them, so that's fine.  I have them in front

16   of me.

17           MR. DEVLIN:  Thank you, Your Honor.  So looking at

18   the '864 patent, claim 20, when we see the word emulate, it's

19   not just there by itself, emulating.  It's emulating each of

20   the mobile devices in real time using respective model running

21   on a processor extrinsic to the mobile device.  In other words,

22   in this claim right here, it's not running on the mobile device

23   itself.  Instead, the emulating involves in real time using

24   respective models of a device.  The claim informs claim it's

25   talking about when it's talking about emulate.

62

1        It generally does the same thing with simulate.  It's

2   talking about simulating network characteristics.

3        In the context of the claims, we don't think those

4   things are unclear in any way.  We think they're fairly

5   straightforward.

6        I think the Defendants raise a good point or a

7   reasonable point in that in most cases the patentee sort of

8   utilized the word emulate when talking about the -- what

9   happens with the app on a mobile device, sort of emulating

10  that process, and generally used simulate to talk about the

11  broader environment, like network characteristics and so

12  forth.

13       But each claim on its own reads as it does, and in the

14  context of each claim, these words, what they mean are

15  clear.  So I think they may have used two words, Your Honor,

16  in order to delineate, because some claims have emulating

17  something and simulating something else.  So by using two

18  different words, you can keep track of what's going on with

19  more clarity.  That's the point, before we get into the

20  details here.

21       Looking at slide 53, that's just where the words appear

22  in the claims.  Slide 54 outlines the parties'

23  constructions.

24       Slide 55 is our typical recitation or reconciliation

25  that what is happening here is not one of the normal needed

63

1    rationales for claim construction.  Nothing in the claims

2    causes these things to be used unusually.  They give context

3    to it.  There's nothing unusual about it that requires a

4    different meaning to these words than they normally have.

5        The specification doesn't provide any express

6    definition, certainly not the express definition --

7    certainly not the definition Defendants propose here.

8        No prosecution history estoppel.

9        Then there's a fourth one here, which is that their own

10   expert concedes that these words are not used in any special

11   way in these patents.  And if you go to slide 56, we'll deal

12   with that one first.

13       And I won't bother to read these, Your Honor, but if

14   you read the highlighted portions, one with respect to

15   emulate, one with respect to simulate, and the expert

16   saying, yeah, there's no special meaning here.  Plain and

17   ordinary meaning as understood is fine.  So there's really

18   no need to inject anything new for that reason.

19       All right.  Slide 57, Your Honor, these are the

20   problems with Defendants' construction.  They fall really

21   into two separate categories.  One relates to intrinsic

22   record and the other relates to the extrinsic record.

23       First, intrinsic record, and we're at slide 58.  And I

24   apologize for being a little snarky here, Your Honor.  I

25   think I would redo this slide if I could.  But the reality

64

1   is that there is no usage of Defendants' proposed terms in

2   the intrinsic record.  The Defendants, looking at the world

3   outside the intrinsic record, entire world and saying to

4   themselves, hmm, we're going to pick a couple of words,

5   let's do that.

6        And one thing that's in their briefing, Your Honor,

7   that I don't know if it's in the slides is that the

8   Defendants' expert was not involved in the selection of

9   those words.  They were selected by the Defendants or their

10  counsel, and they were presented to the expert and he agreed

11  with them.  But they're not from the intrinsic record.

12       In fact, if we look at slide 59 and I'll sort of --

13  yes, let me stop at 59.  The specification uses the word

14  "emulate" regularly obviously, and "simulate" regularly.

15  And so the specification, to the extent that these words

16  need some sort of conveyance, the specification just uses

17  these words.  These are the natural words that are being

18  used and the words are clear from the context of the claim.

19  Not the Defendants' proposals.  They do not come from the

20  intrinsic record.

21       Slide 60 shows one of the problems with using a word

22  that doesn't appear anywhere from the intrinsic record, and

23  that's that if you look at the patents themselves and see

24  what happens, the application is run -- the application

25  itself is run, not mimicked.  It's emulated as being run on

65

1   a target mobile device, and that's what's modeled is this

2   target mobile device characteristics.  The application does

3   not mimic, and their construction confuses these issues.

4        And I'm going on to slide 61 and this is where,

5   speaking of confusion, Your Honor, the problem -- you know,

6   any effort at claim construction should at least keep things

7   less confusing, not more confusing.  But injecting these

8   words as substitutes, that is "mimic" and "imitate" as

9   substitutes for "emulate" and "simulate" is just a recipe

10  for confusion.

11       The central argument here -- and I want to talk for a

12  minute on slide 62.  The central argument that's being

13  offered up here is that emulate is more precise and simulate

14  is less precise.  Your Honor, I'm not sure that's truly the

15  case.  There's nothing, I don't think, in the specification

16  or intrinsic record that supports that.  We see in the

17  extrinsic evidence there's really nothing to support that

18  either, because of the cross-pollinization of these various

19  words and the definitions for each one.

20       But there is something going on here behind the scenes,

21  and that is Defendants trying to load onto the word emulate

22  some degree of precision that the claims themselves don't

23  require.

24       And in their briefing -- I'll give you one example,

25  Your Honor, from the briefing, and that is on I think page

66

1   17 of Defendants' brief.  I may be wrong but I'll check that

2   citation, Your Honor.

3       But they point to Table 1 of the patent, which is a

4   table of exemplary characteristics of a phone and they

5   contrast that with where simulate is used and the breadth

6   and lack of specificity in the details of the network

7   environment.  So saying it's much more specific looking at

8   how it's used in the patent.

9       In the patent, Table 1 is expressly identified as

10  exemplary, those sets of characteristics.  So this concept

11  of precision is trying to read in an example in the

12  preferred embodiment.

13      The specific citation, Your Honor, is in the '864

14  patent, column five, starting at line 36.  The patent says

15  Table 1, mobile device characteristics shows exemplary

16  characteristics that may be used to specify hardware

17  attributes.

18      If you follow down in the text onto column six, about

19  two paragraphs later, at the end of the paragraph that

20  begins on column six around line six or so, patent expressly

21  says as appreciated, additional or fewer characteristics

22  may be included.  And so the patent itself talks about how

23  you can use fewer characteristics.  You might only use one

24  or two.  Who knows?  The claims aren't limited to any

25  particular number.

67

1        But the patent definitely says you don't have to be as

2   specific as this table, but that's the kind of thing that

3   Defendants are pointing to to say, aha, emulate is more

4   specific than simulate.  It's reading an embodiment into the

5   claims without any justification, other than it happens to

6   be there in the spec, and that's what the cases say is a

7   cardinal sin.  That whole concept of relative precision, to

8   me, is wrong.

9        If you look at slide 63 and the subsequent slides, Your

10  Honor, and we have some of this in our brief, what you see

11  is that the definitions for these terms, even technical

12  dictionaries, non-technical dictionaries, they don't show

13  this clear delineation of precise or is it imprecise.

14  There's a lot of cross-pollination of these words.

15       We've put examples up on slide 63 and more examples up

16  in slide 64.  And I'm sort of breezing through this, Your

17  Honor, and I can focus on this one example in slide 65.

18       And for the record, this is looking at definitions from

19  MacBook Dictionary.  Those are collected on slide 64 and

20  slide 65 looks at one of those definitions for emulate.

21       The reason we looked at this one in particular is

22  because this was the resource that Dr. Shoemake, Defendants'

23  expert, admitted that he consulted while he was doing his

24  analysis.  But then he said he didn't rely on it so he

25  didn't actually identify it in his declaration.  It came up

68

1    in his deposition.  He said, yeah, I looked at that, but I

2    didn't consider it or rely on it.  It happened to come up

3    though.

4         And this just gets at how these two terms, if you try

5    to start specifying some sort of specificity with them,

6    you're going to get things wrong.  Sixty-five is a good

7    example.  That's the definition of emulate.  The first word

8    after the exemplary sentence is imitate, and imitate is the

9    proposed construction for the word simulate that Defendants

10   are proffering.

11        So, again, it just gets to -- I think, imagining us at

12   trial talking about emulate and simulate and mimic and

13   imitate, or any other two words, it will be a mess.  And it

14   will be a mess because, A, there is overlapping coverage of

15   these words, and B, where the patent in the claims take care

16   to kind of delineate what each one means in the concept of

17   that particular claim, Defendants' constructions don't do

18   that.  Instead, they conflate two other terms that also have

19   overlapping meaning and assert that one of those is more

20   akin to emulate and the other is more akin to simulate,

21   without any support because it's really not true.  Those

22   words have overlapping meaning also.

23        So in the end, Your Honor, we reach the point where you

24   say to yourself, okay, what's the best thing to do here, and

25   given that the word emulate and the word simulate appear in

69

1   the patent over and over again and the patents make clear

2   what they mean, given that they're in the claims and the

3   claims, as part of broader phrases, in every instance

4   explain to someone what's going on -- they're not alone,

5   they're part of broader phrases -- we don't think

6   construction is necessary.

7        And we think actually changing these words is just

8   going to either narrow them in a way that's improper or

9   create confusion in a way that's improper.

10            THE COURT:  Okay.

11            MR. DEVLIN:  And I hope, Your Honor, I also addressed

12   your question.  But we're not saying they're interchangeable.

13   I'm just suggesting they're overlapping and that the patent

14   delineates already what they mean in the context of each claim,

15   and that trying to replace them with other words does not serve

16   any of the purposes of claim construction, and in fact,

17   undermines many of them.

18            THE COURT:  So would you take issue if the Court

19   construed simulate as emulate?

20                    (Pause in proceedings.

21            UNIDENTIFIED SPEAKER:  Are people still there?

22   Hello?

23            MR. DEVLIN:  I'm sorry, Your Honor.  You know what,

24   that was the classic example of talking while I'm muted.

25            THE COURT:  Okay.  I asked a question and I thought

70

1    you were contemplating my question.

2         MR. DEVLIN:  Yeah.  No, I was -- I was talking.  And

3    you know what?  I'll say, Your Honor, it really sounded good.

4    I wish you guys had heard it.

5         THE COURT:  Well, go ahead and do it again and we'll

6    hear it this time.

7         MR. DEVLIN:  Thank you, Your Honor.

8         So that's a question of first impression obviously, and

9    as I'm understanding it, what Your Honor is saying is, well,

10   if these terms are so -- if they're not quite overlapping,

11   maybe it's just easier and cleaner for everyone if we just

12   replace one with the other so we have one term that's used

13   throughout.

14        At first blush, Your Honor -- I really would love to

15   consult with the team on this, and if this is a possibility,

16   perhaps we can give you a position on it in like a one page

17   letter or something, you know, in a couple of days.

18        My first impression is that it wouldn't be a huge

19   problem, but I do think the way the claims do operate now,

20   when some claims, dependent or otherwise, have the concept

21   of emulating and simulating in them, emulating one thing and

22   simulating another, I think that might lead to confusion as

23   opposed to resolve any confusion.

24        That's just my first reaction, but with Your Honor's

25   permission, I would like to think about that for say 24

1   hours and get back to the Court.

2          THE COURT:  Sure, that's fine.  And the reason I ask

3   that, and it's a question I really have for defense, but it

4   evolved into asking you as well, because claims 9 through 11 of

5   the '864 patent seem to me to use simulate and emulate

6   interchangeably, because if you look in the series of the

7   dependent claim, claim 9 uses simulate but then claims 10 and

8   11, which depend on claim 9, use emulate when describing the

9   same type of action.  So that's what led me to believe that

10  they were being used interchangeably.

11         But I'll give you that opportunity, if you want, since

12  -- I didn't mean to stump you.

13         MR. DEVLIN:  No, Your Honor, and I'm looking at those

14  claims right now.  And we always appreciate these questions

15  because obviously we love an opportunity to address whatever

16  the Court is thinking about.

17         But if you look at these, it looks like there may be

18  just a subtle difference in usage in the sense that you

19  simulate a user but you emulate action.  So simulate a

20  thing, emulate an activity.

21         Again, this might be a subtle phrasing that helps

22  clarify for people, just to keep things straight with

23  respect to what's happening with the elements in the claims.

24  But, again, that's something it sounds like, if we could

25  have an opportunity to confer on and get back to the Court

72

1   on, we very much would appreciate it.

2          THE COURT:  That's fine.  Thank you.

3          MR. DEVLIN:  Thank you, Your Honor.

4          THE COURT:  We'll have a response and then --

5          MR. REITER:  Your Honor --

6          THE COURT:  Oh, I was just asking my court reporter

7   to see when we need to take a break.  When we finish this term

8   we'll take a break, but I was asking her.  That's what we'll

9   do.  We'll finish with simulate and emulate and then she needs

10  a short break and then we can come back and do the rest of the

11  terms.  But go ahead.

12         MR. REITER:  Okay.  Thank you, Your Honor.  Mark

13  Reiter again for Defendants.  And I'm sorry for interrupting.

14  Whenever there's silence on something like this, I get nervous

15  that I might have lost the connection.  So I apologize.

16         THE COURT:  No, y'all have done a great job doing

17  this by telephone.  Go ahead.

18         MR. REITER:  Okay.  Thank you, Your Honor.

19      So with respect to your last question for Mr. Devlin,

20  with respect to claims 9 and 10, I think those terms are

21  used very differently and consistently with what we have

22  explained in our paper and presentation is that there is a

23  level of precision associated with emulate and a level of

24  approximation associated with simulate.

25      With respect to claim 9, they simulate real users, so

73

1    those users are approximate.  It may be some virtual set of
2    users.  They don't have to have specific characteristics.
3    But when we talk about the actual actions, what that user
4    might do -- and, remember, we're talking about acting on a
5    network, so that user might actually send a text.  That user
6    might actually receive a phone call.  That is precisely
7    mimicked in the emulating claim 10, whereas in claim 9 it's
8    more of an approximate representation of those users.  They
9    don't need to have any specific characteristics.  So I think
10   claims 9 and 10 are using the terms very consistent with
11   what we have tried to define them as.
12       And let me go through some things that Mr. Devlin said
13   and then I'll jump into my presentation.  One thing that
14   really struck me as he was speaking is he said if we try to
15   put some specificity on these terms, then we're going to get
16   it wrong.  If we try to put some specificity on these terms,
17   then we're going to get it wrong.
18       If we don't put specificity on these terms, then we're
19   going to get it wrong.  Then the jury is going to get it
20   wrong.  That is the whole purpose of what this process is,
21   is to understand what the scope of these claims are
22   precisely and exactly.
23       To say, well, it's really hard, I don't know, they're
24   close, so we'll just leave it alone, that's not what this
25   process is about.

74

1          And to say that the terms are overlapping but not

2    interchangeable, again, I don't understand what that means.

3    I mean, I'm imagining in my head a Venn diagram, that

4    they're overlapping so a part of them are overlapping, so in

5    some context it's okay to say simulate when you mean emulate

6    and in some context it's okay to say emulate when you mean

7    simulate but in other contexts it's not?  That's exactly why

8    these terms need to be construed.

9          And what the Plaintiff is doing here is looking at

10   these terms in isolation, and we made this point in our

11   brief, and they didn't correct it in their reply brief, that

12   Wapp not once, not once in their arguments do they cite to

13   the intrinsic record, do they cite to the specification in

14   trying to ascertain what these terms mean.

15         We hear Mr. Devlin talking about not putting

16   specificity on, but we don't hear him explaining when

17   they're interchangeable or when they're overlapping or what

18   exactly they mean.

19         And we heard him say that maybe there's really not a

20   difference in precision.  If there's not a difference in

21   precision, then what is the difference?  Because these terms

22   very clearly are used differently in the patents, in the

23   claims.

24         I heard Mr. Devlin talk about that there's no

25   lexicography here, and I keep hearing this throughout his

75

1    presentation, that we haven't seen the inventor act as his

2    own lexicographer and so, therefore, we don't need to do

3    construction.

4        Well, it's very rare, as the Court understands, that

5    the inventor actually acts as his or her own lexicographer,

6    but yet, nonetheless, it's very common for Courts, in

7    situations where there is no specific lexicography, for the

8    Court to construe the claims.

9        Finally, I hear over and over again in the presentation

10   that it sounds like if I'm using a word from the

11   specification like emulate in the preamble, then I'm reading

12   something into the claim.  But in this case where I'm using

13   a word that's not in the specification, then it's wrong as

14   well.  So I can't win for losing.  If I read something from

15   or used in the specification, I'm reading it in.  If I'm not

16   using a word from the specification, then that's wrong.

17       So I think very clearly what we have to do is we have

18   to step back and understand what exactly one of skill in the

19   art would have understood these terms to mean in the context

20   of this patent at the time of the alleged invention.

21       And we cited at page 23 of our brief, Your Honor, the

22   Power Integrations case, 711 F.3d 1348, where the Federal

23   Circuit said that in that case the party argued that just

24   the plain and ordinary meaning should apply, but the

25   opposing party provided expert testimony that testified what

76

1    the term meant based on the specification, what the term

2    would have meant to one of skill in the art at the time of

3    the invention.  All that the opposing party did in response

4    to that expert declaration is say, no, it's just plain and

5    ordinary meaning.  And the Federal Circuit in that case

6    rejected that, saying there was no evidence to contradict

7    the expert's testimony other than the assertion that it's

8    the plain and ordinary meaning.

9        Then the Federal Circuit in Power Integrations went

10   through the specification and explained what it meant, and

11   that's exactly what we have -- that's exactly what we have

12   done here.

13       So going back to our slides and starting at slide 47,

14   yes, we use mimic, and what that's intended to represent or

15   to capture is precisely represent.  Emulation is a precise

16   representation, and simulate through the word imitate is an

17   approximate representation.  That's very consistent with

18   what the specifications disclose and what the extrinsic

19   evidence shows.

20       We see on slide 48 that Wapp, the Plaintiff, agrees

21   these are nuanced terms.  We see that at their reply brief.

22   And there are differences between these limitations, but

23   they've offered no explanation as to what those differences

24   are.  And those differences, again, are levels of precision.

25       Going to slide 49, Dr. Shoemake is the only evidence,

77

1    along with some dictionaries -- and I'm going to address

2    what Mr. Devlin said about those dictionaries, because I

3    don't think it's complete.  But the only evidence that is

4    presented about the difference in these terms is what Dr.

5    Shoemake explained.

6         And Dr. Shoemake's declaration is not conclusory at

7    all, as Wapp alleges in its brief.  It's very, very

8    detailed.  He has 33 pages of detail going through page

9    after page after page and column after column after column

10   of the specification explaining why one of skill in the art

11   at the time of the invention would have construed these

12   terms as mimic and imitate and understood that that's a

13   difference in precision.

14        So we see that on slide 49, slide 50, just going very

15   quickly, slide 51.  He explains with respect to simulate

16   that it is relatively imprecise as compared to emulation.

17        Slide 52, it is -- the representation of that imprecise

18   modeling is an imitation, not a mimic.

19             THE COURT:  And let me ask -- let me ask you about

20   that, about his opinion.  Can you point to anything in the

21   intrinsic record that expresses or implies this distinction

22   between simulate -- or emulate being a relatively precise

23   representation and simulate referring to a relatively imprecise

24   representation?

25             MR. REITER:  Yes, Your Honor.  Let's move on.  First,

78

1  slide 54 shows a difference between these terms, emulate with

2  respect to the mobile device and simulate for the wireless

3  network.

4      And now skipping ahead -- and we see that consistently,

5  slide 55, 56, how the patent, in the same sentence when

6  using emulate and simulate, they have to mean different

7  things.

8      Now skipping forward to Your Honor's question, where

9  does Dr. Shoemake get that support in the specification for

10  this level of precision and this level of approximation with

11  respect to emulate and simulate respectively.  So first at

12  slide 57 we see --

13      And I apologize.  It looks like, similar to the

14  citations, that got erased.

15      But from again the '864 patent it says as if the

16  application were running on a mobile device.  As if it were

17  actually running on a mobile device.  On the right side of

18  slide 57, i.e., as if application 15 or 16 is actually

19  running on a mobile device being emulated.  The emulator, at

20  the beginning of the paragraph, it's actually running, as if

21  running.

22      Mr. Devlin pointed to Table 1, and we think Table 1 is

23  very, very important, and Dr. Shoemake relies on that.  We

24  see that in slide 58.  There's no approximation with respect

25  to Table 1.

1    When they talk about the processor speed, it's not

2    talked about approximately 100 megahertz.  It says 104

3    megahertz.  When it talks about storage access speed, he

4    doesn't round up or the patentee doesn't round up to six

5    files per second.  It's very precise, to the hundredth

6    decimal point, 5.88 files per second.

7    And Mr. or Dr. Shoemake is clear that this tells one of

8    skill in the art that the emulator has to be precise.  It

9    has to be precise.

10   We don't see this level of precision with respect to

11   simulate.  Looking at the claim, slide 59, we see when it's

12   talking about simulate -- and this is claim 1 of the '864 --

13   and it talks about simulating the network characteristics

14   and the wherein clause, wherein the network characteristics

15   are based on.  It's not replicate, not like what we saw with

16   respect to the emulator, but are based on.  Dr. Shoemake

17   relies on this.

18   Then going on to slide 60 we see when the patent is

19   describing things that are simulated, it does it at a very

20   high level description.  It doesn't get into the detail of

21   104 megahertz or 5.88 files per second.  It just talks about

22   a very high level of descriptive events, consumer events,

23   incoming events, no level of precision.

24   We contrast these two disclosures on slide 61 where we

25   have the approximate representation for the simulate versus

80

1    the precise representation for emulate, and these are all

2    the things that Dr. Shoemake relies on in paragraph after

3    paragraph of his report to explain how one of skill in the

4    art would have understood these terms and why they should be

5    construed in this way.

6          Let me pause there and see if I've answered Your

7    Honor's question with respect to the intrinsic evidence.

8               THE COURT:  Thank you, yes.

9               MR. REITER:  So now moving on to the extrinsic

10   evidence -- and that level of precision is very, very

11   consistent with the extrinsic evidence, and I'm not talking

12   about Dr. Shoemake's extrinsic evidence.  I'm talking about

13   dictionaries that explain this.

14         We see on slide 62 the Wiley Dictionary and the

15   Microsoft Dictionary where simulate, describing an

16   approximate imitation or -- imitation is actually used.

17         I'll agree, and there's no argument here, that mimic

18   does not appear in the definitions that we see of emulator,

19   but it talks about exactly like another, in the same manner.

20   We don't see that explanation, that level of precision

21   carried into the simulate definitions.

22              THE COURT:  Well, then let me --

23              MR. REITER:  If you --

24              THE COURT:  Let me ask then, how is your proposal of

25   mimic any clearer than the term emulate?

81

1          MR. REITER:  I thought I did that question.  And we

2     think it is.  We think that Dr. Shoemake explains it, but

3     perhaps a better construction for emulate is "precisely

4     represent", as we see on slide 62, and for simulate

5     "approximately represent".  Maybe that is a better

6     construction.  After having gone through all the briefing and

7     heard the complaints about the use of the word mimic and

8     imitate, maybe those two words "precisely represent" and

9     "approximately represent" capture better what we were trying to

10    do.

11         I think the words mimic and imitate do capture that,

12    and Plaintiff's use of ordinary, non-technical dictionaries

13    I don't think really does anything here.  I think what we

14    have to look at are the technical dictionaries.

15         So, as I said, Your Honor, I think as Dr. Shoemake

16    explains in paragraph after paragraph that one of skill in

17    the art would recognize "mimic" to capture that precise

18    representation and "imitate" the approximate representation,

19    but maybe, given the unintended confusion that it sounds

20    like we may have caused, "precisely represent" and

21    "approximately represent" would be better.

22         And carrying that forward and just talking about the

23    dictionaries as extrinsic evidence, if we turn next to slide

24    64, what we saw in Exhibit 7 of Wapp's brief, opening brief,

25    there was a chart and they pick and choose or chose

82

1    definitions from the different dictionaries that Dr.

2    Shoemake thought were most pertinent, but they didn't

3    provide the Court with everything.

4        So with respect to the Microsoft Dictionary, they cited

5    to emulation, the process of computer device or program

6    imitating the function.  But what they left out,

7    interestingly, are the other definitions of emulate or

8    emulator that were contained in the Microsoft Dictionary:

9    Behave in the same manner, type of computer component to act

10   as if it were another.  They left those out.  Those were

11   excluded from their chart.  I think they were also excluded

12   from Mr. Devlin's presentation.

13       Same thing on slide 65, the Chambers Dictionary.  What

14   Plaintiff identified in their Exhibit 7 in their chart was a

15   zoological definition for simulation, a zoological

16   definition.  But, as we see on slide 65, a zoological

17   definition is between the computer definition and the

18   behavioral definition, both of which talk about a

19   representation of systems, investigation of thought

20   processes, program to imitate them.

21       So what -- what Wapp has done here is very carefully

22   pick and choose, chose, among the technical definitions,

23   picking ones that really aren't even applicable here, a

24   zoological definition, when right in the dictionary three

25   lines above is the computer dictionary.

83

1        And when we look at the emulator, it says exactly as

2   we've been talking about all along:  To behave as if it were

3   another type of computer.

4        And the rest of the dictionaries are exactly the same.

5   We see on slide 66, exactly like another, whereas simulation

6   is an imitation.

7        With respect to slide 67, duplication of the functional

8   capability.

9        And slide 68, yes, simulate and emulate may be related,

10  but they are related in the sense of different levels of

11  precision.  Yes, one might, as we see in the IEEE

12  Dictionary, might also look to see simulate, and in the

13  definition of simulate, you might look to emulate.  But that

14  doesn't mean they have the same definition.  In fact, they

15  are different definitions.

16       So, Your Honor, to wrap this up, it is extremely

17  important to understand that these are two different terms.

18  It's extremely important for the jury to recognize that

19  these are two different terms, consistently used differently

20  in the patents.  Emulate with respect to the mobile device

21  and simulate with respect to the network.  Emulate

22  explaining very precisely how that's supposed to be, because

23  if that mobile device -- remember, the whole idea here is to

24  see whether or not that application that's being developed,

25  whether or not it is going to exceed the resources available

84

1   of the mobile device.  And if that mobile device is not

2   precisely -- is not precisely mimicked, is not precisely

3   reproduced, then that testing is not going to matter.  It's

4   not going to help the developer know whether or not his or

5   her application is going to work on that mobile device,

6   whereas whether or not the network approximates an incoming

7   call or an outgoing text or an incoming text, that's not as

8   important because all that needs to be done there is to see

9   that some of the resources of the mobile device are used

10  when that activity, when that incoming text or call happens,

11  and that affects how -- what the total resources are for the

12  application being developed.

13      So it's very clear in the patent that they are two

14  different words, having two different meanings, having two

15  different contexts, one the device, one the network, and

16  it's very important that they be construed differently.

17      And I'll stop there and see if the Court has any

18  questions.

19          THE COURT:  No.  Thank you.  Any short response to

20  that before we take a break, Mr. Devlin?

21          MR. DEVLIN:  Yes, Your Honor.  I'll be quick.

22      I won't go into the details about the characterization

23  of our arguments.  I think we're not saying that nothing can

24  be construed if it's not actually defined in the spec.  The

25  point is those are the very easy ones.

85

1      The Defendants have a much tougher burden to show we

2  should be reading things in from the spec when they're not

3  express definitions or there's not some clear disclaimer in

4  the prosecution history, and they're not meeting that

5  burden.  That's the point of that recitation.

6      They mention the -- this confusion about overlapping

7  meanings, and this happens all the time in our language and

8  we deal with it.  Theft and burglary have overlapping

9  meanings but they're slightly different.  That's just one

10  example of many.

11      These words have overlapping meanings.  It's not

12  confusing when that happens.

13      Let me talk about the specifics very briefly, Your

14  Honor, and I just want to focus on the Defendants' slides

15  and the evidence that they're -- that they're pointing the

16  Court to here about trying to show some specificity or

17  precision with emulate that doesn't happen in simulate, and

18  it's not there in the intrinsic evidence, looking at this

19  evidence through very specific lenses, and I'll explain

20  exactly what I mean, Your Honor.

21      For example, on slide 56 there's really nothing there

22  that indicates more specificity for emulate or more

23  precision than simulate.  It's just not there.

24      Same with 57, it's just not there.  There's nothing

25  here that suggests saying as if something is running on a

86

1    mobile device.  Clearly the specification doesn't mean

2    exactly every detail.  We know that because Table 1 is just

3    exemplary characteristics of a mobile device.  You don't

4    have to have every detail.  You can pick a handful of those

5    if you wanted to.  So you're approximating something.

6        And that gets to -- I won't bother with slide 58, but

7    that's the very point.  The things they're pointing to being

8    so specific is described as exemplary and says -- again, we

9    said this earlier, you can use less of this.  You can be

10   less precise when you're emulating the phone.

11       Then I want to talk about 59.  This is an important

12   one.  And these are all Defendants' slide numbers, Your

13   Honor, so Defendants' slide 59.  They're looking at claim 1

14   as an example of why simulate isn't that precise.  That's

15   because it's just based on characteristics.

16       Well, if we look at -- and I don't have it here on a

17   slide here, Your Honor, but claim 20 of the same patent

18   talks about emulating, and the phrase which I didn't read

19   fully before, starting at line 29 -- sorry, 21, line 21 of

20   column 24, reading from claim 20:  Emulating each of the

21   mobile devices in real time using respective models.  That's

22   the first thing, using a model.  Nothing exactly like the

23   phone.  Models running on a processor extrinsic to the

24   mobile device.  Then it has a wherein clause, just like

25   claim 1 on slide 59.  Wherein each of the models is based on

87

1    retrieved characteristics.

2        So this distinction that supposedly is in the claim

3    that makes emulate so precise doesn't exist, Your Honor.  It

4    simply doesn't exist.

5        Then the subsequent slides don't do any better in

6    showing the precision on one to the other.

7        And, Your Honor, I have a note here that I think there

8    is some precision about some of the network characteristics.

9    Maybe I'll try to grab that on a break and just give a quick

10   cite on the record when we come back.

11       But even in their own evidence, again -- let me talk

12   about the extrinsic evidence, Your Honor.  And we got

13   critiqued for being selective in our definitions.  Your

14   Honor, we're showing the problem with Defendants' proposed

15   construction, which is ignoring things.  And they're saying,

16   well, you guys were selective and they pulled a few things

17   out.

18       Your Honor, they were selective as well.  If you look

19   at slide 65 and look at the simulation, they -- they

20   criticize Wapp because we use something that was somehow,

21   you know, zoological, whereas they highlighted the computer

22   electronics and the behavioral.  Well, the word imitate only

23   shows up in the behavioral definition.  Psychology I guess

24   is what that is.  When we look at the computer definition of

25   simulation, just above it, there is no word imitate.

88

1    They're selective.

2         And the same is true just to the left of that on

3    emulate.  There's two definitions of emulate, both for

4    computers.  They have selected the bottom one to highlight,

5    but the top one says something kind of broad:  A mode in

6    which a device may emulate operational characteristics of a

7    device, e.g., a printer may behave like another type of

8    printer.  Not a specific printer, just a type of printer.

9         So that's the issue here.  Again, the Defendants have

10   the burden of showing why their words, their proposed

11   terms -- excuse me -- their proposed constructions should be

12   adopted.  They selectively use the evidence to reach a

13   conclusion, and that's wrong.

14              THE COURT:  Okay.  Thank you.  I think at this

15   time -- I was talking to my court reporter and she said if we

16   could just take a five minute break.  So what I would ask you

17   to do is just put your phones on mute and then we'll come back

18   in five minutes and continue.

19        Now, I'll just remind you of what the time is.  We're

20   only going to take a five minute break here but we need to

21   be done by 5:00 o'clock, so in terms of evaluating how you

22   utilize the rest of the remaining time.

23        See you back in five minutes.

24              (Recess.

25              THE COURT:  Okay.  We're back in the courtroom.  I

89

1    assume everyone is still here.

2              MR. REITER:  Yes, Your Honor.  Defendants are still

3    on the line.

4              THE COURT:  I'm sorry.  We're making sure our

5    lines -- we muted our lines on this end, so we're making sure I

6    can hear everybody.  I think I can now.  Can y'all hear me?

7              MR. REITER:  Yes, Your Honor.

8              THE COURT:  So we'll go on to the next set of terms.

9              MR. DEVLIN:  Thank you, Your Honor.  So I think we're

10   at slide 67, the claims of simulating or emulating via one or

11   more profile display windows.  We see these claims on slide 68

12   and the claim language in the context of the claim, just for

13   reference, if the Court needs it, and the proposed construction

14   on slide 69.

15        Again, not to say you could never construe a claim

16   otherwise, but some of the real driving reasons for claim

17   construction simply are not present here, looking at slide

18   70, Your Honor.

19        In fact, moving on to slide 71, I think when we try to

20   parse through Defendants' constructions, you end up with a

21   lot more confusion, unnecessary confusion, than if you just

22   use the claim language on its face.  We think the claim

23   language is clear.

24        Looking at slide 72, the first issue, we see the

25   reading in of the proposed constructions for emulate and

90

1   simulate.  And I think Mr. Reiter is going to address this,

2   Your Honor, but -- and I don't think there's a dispute that

3   in this case, regardless of whether the claim uses the word

4   simulate or uses the word emulate, the Defendants are not

5   proposing to dispute between those, but instead, to use the

6   word imitate, which is the proposed simulate definition, not

7   the proposed emulate definition, mimic, even though the word

8   emulate is in the claims.

9        That's obviously an issue and I think Mr. Reiter will

10   address that.  We see it as a problem.

11        So moving on to slide 74, there's this inclusion of the

12   phrase "in real time" and slide 75 the first issue is that

13   there are embodiments that definitely do not have to

14   visualize something in real time.  The profile data may be

15   output as a report, which obviously generally happens later

16   than what's going on as the testing is taking place.  And

17   for the record, you see that in the second highlight in the

18   excerpted block on slide 75.

19        Also, Defendants say that they're not excluding this

20   embodiment because they only use "in real time" when the

21   word "simultaneously" is used, and that helps.  But there's

22   still an issue there, moving on to slide 76, that when the

23   word "simultaneously" is there, we see some redundancy

24   inside the construction, while at the same time, in real

25   time, again, phrasing that simply generates confusion.

91

1          Lastly, it may be useful to go -- stay on slide 76 for

2    a second just to look at Defendants' proposed construction

3    for this one.  The back end of it, after the word real time:

4     Resources of the mobile device that are available to the

5    application.  That we think is over limiting, Your Honor.

6    The emulation or simulation and the demonstration of that is

7    not necessarily limited to resources that are available to

8    the application.

9          And so the bullet point there is on slide 76, and at

10   slide 78 -- actually, I'll skip slide 78, Your Honor.  I

11   think it's probably easiest to look at slide 80 first.  So

12   slide 80 is showing what this visualization might look like.

13   That's Fig. 3 from the patent.  And there's this horizontal

14   line, which we emphasized in red, and that's the resources

15   that are available to an application, that's the sum of the

16   power of the device, so to speak, the device being modeled.

17         Also shown here on this visualization is the resource

18   utilization not just available to but used by the

19   application.  Those are the vertical bars, and we see that

20   text from the specification in the lower block on the

21   right-hand side.  Again, at slide 80.

22         So to limit it to resources available to an application

23   only is improper, and there's other support for this.  I'll

24   note first, Your Honor, that the Defendants -- I'm looking

25   at slide 81 now -- try to look at the claim language, and in

92

1   particular, the dependent claims 13 and 20, to support the

2   argument that somehow this limitation of resources available

3   to an application is appropriate as opposed to used by the

4   application.

5        But if you look closely, the language really

6   contradicts their construction.  This is on slide 82.  If

7   you look at claim 13 on slide 82, it talks about displaying

8   data graphically to identify either application performance

9   or network performance or both.

10        And so any of these -- what's not true for any of this

11   information here from the specification or from the claims

12   is that certainly nothing precludes -- nothing precludes

13   showing resource used by an application, as opposed to

14   available to an application.  In fact, the specification

15   demonstrates the opposite, that you can show resource

16   available by -- sorry -- resource used by an application.

17   That's one of the things that you can see visually.  So to

18   limit the claims to another option, one other example of the

19   thing that you can show, would be improper.

20        That's all I have for that, Your Honor, unless the

21   Court has questions.

22             THE COURT:  So let me make sure I understand.  So do

23   you feel these limitations could refer to the resources

24   utilized by the application rather than the available

25   resources?

93

1           MR. DEVLIN:  Your Honor, the specification identifies

2     both things as being shown, and slide 80 probably conveys it

3     best, that there's something on the screen here that shows

4     resource available to, and that's generally represented by that

5     horizontal line.

6           And the Defendants are suggesting that the claim

7     requires that, it has to be there, just by virtue of the

8     words that we're construing here.  Now some claims may

9     require this specifically, resource utilization available

10    to, that horizontal line, but that's not what this element

11    is saying.  You just have to show visually what's going on.

12          And another option to show that from the specs, still

13    looking at slide 80, are the vertical bars.  The vertical

14    bars aren't showing resource available.  They're showing

15    resource used by.

16          So if the claim were construed in the way that

17    Defendants are suggesting here and if -- if a system only

18    showed vertical bars, as an example, but did not happen to

19    have this kind of horizontal information available or

20    another way to represent what was available to the

21    application, then according to Defendants, that would be

22    outside the scope of these claims.

23          But the claims don't say that.  The claims don't

24    specify that a thing that has to be shown is what's

25    available to an application, the horizontal line.  Certainly

94

1   this claim element doesn't say that.  Some other claims may

2   recite that expressly, in which case it would be required,

3   but not by virtue of these words.

4        That's the problem is the Defendants are trying to read

5   in that particular visualization as opposed to another kind

6   of visualization into these words, and that makes it

7   narrower.

8             THE COURT:  Okay.  Thank you.

9             MR. DEVLIN:  Thank you, Your Honor.

10            MR. REITER:  Thank you, Your Honor.  Mark Reiter

11  again for the Defendants.

12       Responding to that last point and then I'll cover it in

13  a little more detail as I go through the presentation, but,

14  again, we need to take a step back and recognize what Mr.

15  Poulin purportedly invented.  He purportedly invented a

16  system that allows an application developer, developing

17  applications for mobile devices, to use an emulated device

18  and to determine whether or not the device that's being

19  emulated, the device for which the application is being

20  written is going to work on that mobile device.

21       And if you don't know what the resources of that mobile

22  device are, if you don't know how fast that processor is

23  going to go, you don't know how much memory that device has,

24  you have no idea whether or not that application is going to

25  exceed those resources and crash the device.

95

1    If I tell you I have two gallons of water that I want

2    to put in your bucket, will it fit, I need to know how big

3    your bucket is.  If your bucket is only a gallon, it will

4    overflow and it's not going to fit.  If your bucket is

5    five gallons, I'm going to be fine.

6    So I have to know how much space is available in your

7    bucket, just like what Mr. Poulin described is you have to

8    know the resources available on the mobile device for which

9    the application is being designed, and that's what that red

10   line, that cap out line is.  If you go over it, you have

11   problems.

12   And if you just know how much you're using or if I just

13   know I have two gallons but I don't know what my capacity

14   is, that doesn't tell me anything.  I have to know how much

15   capacity I have.

16   So I'll go through that in a little more detail, but

17   the other thing I wanted to circle back on, because as Mr.

18   Devlin correctly pointed out, we do use the word "imitate"

19   in this construction to capture the simulate concept.  What

20   I think is very, very clear here, and going back to the very

21   first minutes of this telephone conference hearing, is that

22   there is a fundamental dispute between the parties as to

23   what this invention is and what the scope of these claims

24   are.  Do they require an emulated device?  I think very

25   clearly, as I've explained, they do through the preamble or

96

1    at least through the claim language indicative of

2    performance, as I explained before.

3        And do the claims require a display showing what is

4    available?  There is an absolute dispute between the parties

5    that requires resolution.

6        So now turning to the deck and slide 71, I've presented

7    here the claim language that's being construed.  Mr. Devlin

8    did the same thing.

9        We see in the upper left-hand corner, terms are not

10   sufficiently clear.  That was Wapp's argument is that the

11   terms here, displayed simultaneously, visually simulate via

12   one or more profile display windows, was sufficiently clear.

13       That's not true at all.  These terms are unique to the

14   patents and these terms are technical and they are

15   grammatically confusing.  Simultaneously visually simulate,

16   via one or more profile display windows, that is very

17   confusing language that has to be construed.

18       I have spent two years almost working on this case and

19   I still am not sure that I understand it, although I think

20   that our definition captures that.

21       And to go on to slide 72 where we repeat what Wapp

22   argued in its opening brief, that simultaneously and

23   visually and then emulate and simulate, we've talked about

24   those a lot.  Those are not clear.

25       Profile and display window, these -- that's not the way

97

1   we do this.  We don't take and parse each individual word

2   and say, oh, well, somebody knows what visually means, and

3   therefore, we don't need to construe the term.  We need to

4   construe the term in context as it exists in the phrase, in

5   the claim, in the specification.

6       Dr. Shoemake explains that there is no understood

7   meaning apart from the patents.  We see that on slide 73.

8   So we need to do a construction.

9       Going back to the Power Integrations case that I talked

10  about before the break, that is the only evidence.  Wapp's

11  blanket statement that no construction is necessary, when we

12  have these technical terms and this grammatically confusing

13  phraseology, just falls flat.

14      Again, on slide 74, Dr. Shoemake again, paragraph 52,

15  he explains that a person of ordinary skill would not

16  understand what it means to simulate via a profile display

17  window.  That is the language of the claim, simulate via a

18  profile display window.

19      And what we saw in Wapp's reply brief, and this is

20  depicted on slides 75 and 76 of my presentation, is they

21  said the word "via" clarifies everything.  This is a new

22  argument that they raised.  We didn't see this in their

23  opening brief.  We didn't see this during the negotiations

24  for the 4-1, the 4-2, the 4-3 discussions.

25      But "via" -- I looked it up -- means by way of.  That's

98

1   what it means, quote/unquote, by way of.  So looking at this

2   language, looking at the claim that I have here, software

3   configured to simulate via one or more profile display

4   windows, is software configured to simulate by way of a

5   display window.  That doesn't make any sense and that's why

6   construction is required here.

7        And what Wapp seems to be saying is let's ignore what

8   the words in the claim actually are and we'll just

9   substitute "simulate" for "present".  Software configured to

10  present via one or more profile display windows a plurality

11  of network characteristics.  Okay.  That makes sense, but

12  that's not what's written.

13       Then slide 76 says get rid of the word "via".  Software

14  configured to simulate and present in one or more profile

15  display windows a plurality.  But that's not what's written,

16  and that's why it's so important here to construe this

17  phrase because it is so confusing.  It just doesn't make any

18  sense with the words that are written.

19       So I think what we need to do is, again, is take a

20  little bit of a step back.  Mr. Devlin did this.  I'm on

21  slide 77 and we need to think again about what the purported

22  invention is.  And so we explain this in our brief and I

23  explained this a little bit at the beginning of my

24  presentation.

25       The asserted patents explain essentially four concepts.

99

1   You play or develop an application that's designed for a

2   mobile device on an emulated device, and you simulate the

3   mobile device working in the network.  You simulate network

4   events, such as an incoming call and a text, and then you

5   display in a window -- and we saw all of this in Fig. 12.

6   You display in a window the overall resource availability of

7   the mobile device as affected by the network events.

8        And that's the line at the top, the cap out line that

9   we've talked about.  So if those horizontal -- if those

10  vertical bars exceed that horizontal bar, you have a

11  problem.

12       So you have an application that's being developed.  You

13  play it on an emulated device.  And, again, we think that's

14  captured in the preamble but at least it's captured in

15  "indicative of" in the body of the claim.  And we take into

16  account in the claim language the network characteristics.

17  That's clearly in the claim, the simulation of the network

18  characteristics, and I explained how the patent

19  specifications describe simulation in the context of a

20  network and emulation in the context of the device, and then

21  that's displayed so the app developer can see if his or her

22  program is going to work.  And that's what our construction

23  captures.  That's exactly what it captures.

24       And if we go on to slide 78, and this is from Wapp's

25  tutorial, the profiler -- it's talking about a profiler --

100

1    monitors simulation on a monitor how the app is utilizing

2    the resources of the modeled mobile phone.  How is it

3    utilizing those resources?  And that's what our construction

4    captures.  Resources of the mobile device that are available

5    as a result of the imitated activity.

6         And then Wapp's tutorial goes on, as we show in slide

7    79, that the modeled phone's resources and then it sends

8    that resource utilization to a data display.  That's exactly

9    what we have, displaying one or more windows that show the

10   resources of the mobile device that are available for the

11   application, so the app developer can see if the app is

12   going to crash.

13        Quickly going again through Fig. 3, we see the red line

14   on the top.  That's the cap out line.  This is the profile

15   data display window or the profile display window as the

16   claim language uses.  If you go over that line, you crash,

17   and that's what we see on slide 81.  It shows the cap out

18   line that has the device resources available to the

19   application.

20        Again, from Wapp's tutorial, the second bullet on slide

21   81, the profile display window allows a user to identify

22   areas within the application that would exceed the resources

23   of the mobile device.  Exceed resources, that's the

24   resources available.  They agree.  They just don't want to

25   agree now.

101

1        And we continue on, keeping in mind what the alleged

2   invention is, and taking into account how the network

3   resources consume -- or the network characteristics or the

4   network activities consume resources of the mobile device,

5   and you see that in slide 82.  As the application plays

6   within model the effects of the mobile device 114

7   interacting with the network are simulated such that the

8   data display window shows resource utilization.

9        Then we go to the next slide and the highlighting at

10  the bottom says:  So, for example, if the message is

11  received or retrieved while playing the application, certain

12  resources are required to handle that, and therefore, the

13  available resources are reduced.

14       If you look between 82 and 83, Your Honor, you see that

15  line, that red line goes down between 82 and 83 because the

16  network consumes those resources.  There are fewer resources

17  available and it is more likely that the application under

18  development will crash the phone.

19       This is also captured on slide 84 where we show

20  resource utilization and then the dynamic modification to

21  show actual resource availability.  And you see on the far

22  side of the figure on the right side, we have the green bar

23  and the blue bar.  The blue bar shows what additional

24  resources are available.  We see what's used, but how much

25  more do we have?  How much more do we have as a result of

102

1   what the network is doing, what the network has consumed of

2   the mobile device?  And that's what the purported invention

3   is about.

4        The same thing on slide 85 with respect to a different

5   embodiment to talk about exceeding the available resources

6   of the mobile device.

7        So that's where we get the available resources.  That's

8   why we think it's very important to capture that in the

9   construction.

10       Displays is extremely confusing.  It doesn't make sense

11  as written, and the construction that we provided is

12  absolutely true to what's disclosed in the patent and what

13  the inventor purportedly invented.

14       Now, with respect to real-time versus non-real-time,

15  going to slide 86, so there are two embodiments that are

16  disclosed, column seven, line 56, to column eight, line

17  three of the '864 patent.  In there we see one embodiment.

18  We highlighted the first one:  Profiled data 152 may be

19  displayed in real time as the application is played.

20  Alternatively, the profiled data may be output as a report.

21  That's not shown.  Our constructions capture that and the

22  claim language captures that.

23       So we see on the next slide 87 that the '192 and the

24  '678 claims talk about simultaneously visually simulating,

25  whereas the '864 patent doesn't use the word "simultaneous".

103

1    It leaves that out.

2         And we recognize that there are two different

3    embodiments and these claims are directed to the two

4    different embodiments.  We're not trying to read in

5    real-time.  We're not trying to read it in at all.  We're

6    trying to capture that through the word "simultaneous".  And

7    we're not applying it to every claim where simultaneous

8    doesn't appear.

9         So we believe that for the '678 and the '192 claims,

10   the construction is absolutely appropriate where it's

11   talking about doing it in real-time, is while at the same

12   time displaying in one or more windows, showing in real-time

13   the resources.

14        And I'm going to get to Wapp's argument, Mr. Devlin's

15   argument that at the same time and in real-time are

16   redundant.  They're not, and I'll explain why.

17        But we believe that "simultaneous" is that hook that

18   the Federal Circuit says requires us to go back to the

19   specification and understand what is meant there.

20        So Wapp's arguments really kind of boil down to three

21   things.  We think they tell half the story by focusing on

22   just resource utilization rather than resource availability.

23        We think that they're wrong when they talk about the

24   display -- the profile display window displays resources of

25   the network.  That is not at all true.  It's only displaying

104

1    resources available of the mobile device.

2        And then Wapp is wrongly conflating "at the same time"

3    with "real-time".

4        So very quickly, and I know I've belabored this point,

5    on slide 89, there is a difference between just showing

6    resource utilization.  Resource utilization is not going to

7    show whether or not the application is going to crash the

8    product.  You have to know whether or not that resource

9    utilization exceeds the available resources, and that's why

10   available resources is critical and why Wapp is only telling

11   half the story.

12       Wapp also says in their reply brief at page eight that

13   our construction is wrong because what we've cited confirmed

14   that the profile display window displays resources of the

15   network, and they highlight network, that are available to

16   the application.  Well, that's entirely wrong.

17       If you look at what they cite, column ten, line 65 over

18   to column 11, line two, it says:  In one embodiment,

19   capacity line 308 in profile display window 110 is

20   dynamically modified to show actual resource availability to

21   application, resulting from resource utilization by

22   simulated wireless network activity within device model.

23       In other words, because the network consumes resources

24   of the device, that line, that red cap out line, reduces it.

25   That's all that this passage says is that in that

105

1  embodiment, from the -- the network simulation is taken into

2  account, the cap out line lowers and the resources available

3  to the application of the mobile device are reduced.

4      Finally, same time is not the same as in real time, and

5  in real time means that it is simultaneously -- real time

6  means simultaneously as the application is played, as the

7  application is played.  And something may be displayed at

8  the same time without being in real-time.

9      And I know we've all forgotten this because we're all

10 stuck at home and not watching sporting events anymore,

11 other than things that happened a long time ago.  But if we

12 look at slide 92, we might all remember that a basketball

13 spectator watching a game live sees the player take the shot

14 in real time, while at the same time seeing the shot clock.

15 You see that in slide 92.  In real time, the spectator sees

16 that shot, and at the same time, sees the shot clock and

17 tries to see whether or not that shot will be valid.

18     We see 0.1 seconds on the clock.  It looks like it

19 would be a good shot.  But if you go to the next slide, the

20 referees are not watching that shot in real time, but at the

21 same time they are watching -- they're reviewing it.  So the

22 playback is taken of the shot taken, while at the same time

23 reviewing the shot clock, but that's not in real time.

24     So there is a difference between real-time and at the

25 same time.  Real-time is as it's actually happening.  At the

1     same time doesn't have to be in real-time.

2         And finally, Your Honor -- and I talked about this at

3     the beginning of my presentation and I didn't hear Mr.

4     Devlin say anything about in their briefing they say it's

5     not clear that it's a mistake.

6         But we believe -- and this is consistent with our

7     position that emulate and simulate are two different words

8     and used consistently throughout the specification, and

9     there was a mistake in the '192 patent where it says

10    simultaneously visually emulate network characteristics.

11    That was a drafting error, and it's clear from the

12    prosecution history that it was just a mistake that

13    wasn't -- there was an amendment, and you see that on the

14    next slide, slide 95.

15        There was an after allowance amendment where the

16    attorney changed the word "hardware characteristics" to

17    "network characteristics", but he failed to change emulate

18    to simulate.  So previously it was emulate hardware

19    characteristics, which is entirely appropriate.  The

20    emulation occurs of the hardware of the mobile device and

21    that's right, so the word "network" was substituted in for

22    "hardware".  But for whatever reason, the word "emulate" was

23    not changed to "simulate", as it should have been.

24        And absent that, this claim would be invalid because

25    there's no support in the specification for emulating

1   network characteristics.  Again, they are two different

2   words.

3        We see all of the remaining claims, going to the next

4   slide, slide 96, all of the remaining claims of the '192 are

5   consistent.  They are talking about emulating hardware

6   characteristics.  They never in any other claim talk about

7   emulating network characteristics.

8        So it's clear that the word "emulate" in claim 1 should

9   really be "simulate", and that's the way in which we have

10  construed it in our briefing, Your Honor.

11       And that concludes my presentation.  I know I'm running

12  a bit long, and I'll pause and see if the Court has any

13  questions.

14            THE COURT:  No, thank you, Mr. Reiter.

15       But, Mr. Devlin, I will tell you this.  I agree with

16  the defense that these terms do need construction, in the

17  Court's view.  And, of course, you haven't given the Court

18  really any construction.  And so I'm going to ask you, do

19  you have some construction?  Because I think it does need

20  construction, in the Court's view, so the question is where

21  do I come out on this?

22            MR. DEVLIN:  Thank you, Your Honor.  I'm looking at

23  the Defendants' proposal right now to see if parts of it would

24  be acceptable, and one option is to -- first of all, having

25  redundancy between at the same time and in real-time I think

108

1   can be removed.  That's one problem where those -- where those

2   phrases occur.

3       I'm looking at slide 75, Your Honor, of our

4   presentation, which shows the different claim terms being

5   proposed for construction.

6       So Defendants' counsel noted some of the claims don't

7   use the word "simultaneously" and some do, but for the ones

8   that do, which is the upper window in slide 73, using "at

9   the same time" and "in real-time" -- and I appreciate

10  counsel's explanation of that, but we just think it's --

11  that's one issue, to remove that redundancy.

12      And the other is the limitation available to the

13  application as opposed to also adding an "or" there, that's

14  or used by the application as a result of the emulating

15  activities.  The words after "available to the application",

16  to put in "or used by the application".

17      And then lastly, the word "imitate" being there, both

18  at the start and the end of that, I think you can remove

19  that word and adjust the construction slightly to take out

20  the "while".  So at the same time, or choose real-time,

21  displaying one or more windows showing, again, in real-time

22  or at the same time, resources of the mobile device that are

23  available to the application or used by the application,

24  period.  The rest of it, as a result of imitated activity,

25  is just to recap.

109

1    So that -- and, Your Honor, I can -- I did that off the

2    cuff, but I'm pretty sure we can get that to you within an

3    hour after this hearing, if it wasn't clear.

4         THE COURT:  Well, that's fine.

5         MR. DEVLIN:  So that was my first point.  Thank you,

6    Your Honor.

7         THE COURT:  Go ahead.  Any other response?

8         MR. DEVLIN:  Yes, of course.  So I really want to

9    focus on this -- so I really responded to "at the same time"

10   and "real-time" already.  They're just redundant phrases that

11   don't both need to be there, in our view.

12        And I talked about imitate, which, again, is just a way

13   to read into this claim element the word imitate -- sorry.

14   The Defendants' construction on simulate or emulate.

15        Another possibility, Your Honor, instead of the word

16   "imitate" is just use the word simulate or emulate again in

17   Defendants' proposal, but we'll clear that up and get you

18   something very clean very quickly after this hearing.

19        But as to this issue of the resources available to, the

20   requirement of this language of the claim, Your Honor,

21   that's just not right, and I want to point to two slides of

22   the Defendant and talk about them.  These are Defendants'

23   slides now.  The first is slide 90 and that gives us the

24   specification, and we went through a long recitation through

25   the slides in the 80s numbers of all these examples in the

110

1    specification that the Defendants are using to try to show

2    that the claims should be so limited as what they're

3    suggesting.

4        But the problem is they're just examples from the spec.

5    Even if those were the only examples shown, over and over

6    again the Fed Circuit has held that if the specification

7    just shows a single example, that's not a reason to limit

8    the claims to just that one example, when the claim language

9    is naturally broader.  That would be wrong.

10       But it goes beyond that, because what's the real issue

11   here on the quote at the bottom from the specification, on

12   slide 90 of Defendants, is it's talking about showing the

13   utilization by.  We get that.

14       But the first words in this part are "in one

15   embodiment", the specification is making clear this is one

16   thing that can be shown of these red lines, as they're

17   highlighted in red.  But that's not necessarily what you

18   have to show.  You can show something else.  You can just

19   show how the application is using -- sorry -- the

20   application would be using the resources.

21       What's the evidence there?  Well, in the claims you

22   have the '864 patent up in front of Your Honor, claim 20,

23   page one of these exemplary claims, and this shows, at least

24   as far as the exemplary claim here, but this shows the way

25   that the patent treats what can be shown.

111

1      So if we look at, for example, dependent claim 21, we

2  see that one of the things that can be displayed is the

3  resource utilization information graphically using a

4  timeline number to indicate points in time for the execution

5  of the application.  And that is a reference to these points

6  in time here in the vertical bars, not just the horizontal

7  lines, but the vertical bars that are also an option of what

8  can be displayed.

9      Claim 24, also dependent from claim 20, says a little

10  more clearly you can simulate execution of one or more

11  frames of a frame-based application.  Again, that's these

12  vertical bars.

13      Then probably more important, claim 25 talks about

14  identifying one or more frames where the resource

15  utilization exceeds the maximum number of maximum resource

16  availability.  So that's a dependent claim.

17      The notion that you have to show -- necessarily that

18  you have to show when resources exceed available resources

19  and that that's inherent in every claim that visually shows

20  anything is just wrong.  The patents say that's an option.

21  It's there as a dependent claim.

22      And so to read it into this phrase, which doesn't

23  require it, this phrase in particular, that would be

24  improper.  That exclusion of the option of simply showing

25  available resources used by an application, not available to

112

1    an application.  That -- that's one of the main problems

2    here.

3         So I'll stop there, Your Honor, unless you have

4    questions on that one.

5              THE COURT:  No, that's fine.  Any quick reply to that

6    before we go on to the next one?

7              MR. REITER:  Yes.  Thank you, Your Honor.  I was

8    going to ask for that.

9              THE COURT:  I knew you would so --

10             MR. REITER:  I guess you're getting to know me.  It's

11   been just a short while but you're getting to know me.

12   Thank you, Your Honor.

13        So I think very important, in response to what Mr.

14   Devlin said, claim 20 that he was focusing on and the

15   dependence to claim 20 don't have this language that we're

16   focusing on in claims 1, 1 and 1 of the three patents.  It

17   doesn't have that language.

18        Claim 20 is very clear that it's talking about, as he

19   said, monitoring the application playing to determine

20   resource utilization by the application and displaying that.

21   That's different language than what we see in claim 1 of

22   each of the patents, and instead, claim 1 talks about

23   simulating a plurality of network characteristics indicative

24   of performance of the mobile device when executing the

25   application.

113

1        That's why it's so important to go back to those

2    figures that I was focusing on, for example, on slide 20,

3    which Mr. Devlin pointed Your Honor back to, is what is

4    happening to the performance of the mobile device is when

5    the network is interacting with the mobile device, that

6    performance of the mobile device is affected.  The available

7    resources of the mobile device are reduced.  That's what

8    claim 1 or the claim 1s of the various patents are talking

9    about, not what claim 20 and its dependents are talking

10   about.

11       So looking at claim 20, I agree that's different and I

12   agree that claim 20 talks about resource utilization, but

13   claim 1 does not.  Claim 1 doesn't have that language.

14   Claim 20 doesn't have the language of claim 1.  So to

15   compare and contrast those or use claim 20 to construe claim

16   1 is wrong.  It's different embodiments.  Different way of

17   characterizing the alleged invention.

18       So very quickly, again, every embodiment that we

19   disclosed -- and I pointed Your Honor to the In Re: Abbott

20   case that we cited at page eight of our brief.  Every

21   embodiment talks about how the available resources are

22   necessary to determine whether or not the application is

23   going to work on a mobile device or whether it's going to

24   crash it.  And every -- and in the embodiments, not every

25   embodiment, but in the embodiments in which the network

114

1    issues are at play, in which the network issues are at play,

2    then the -- then the performance of the mobile device is at

3    issue.

4        I don't believe, looking at claim 20, that we see

5    anything about the network, and I'm reading it very quickly.

6    Indicative of performance, emulating the mobile device,

7    running on a processor extrinsic, application playing within

8    the models, monitoring the application playing to determine

9    resource utilization.  Nothing about the network, nothing at

10   all.

11       So claim 20, in this context, is a red herring that has

12   nothing to do with the construction of claim 1.  And I'll

13   stop there and see if Your Honor has any questions.

14            THE COURT:  No, that's good.  Are we ready to go on

15   to "configure to"?

16            MR. DEVLIN:  Yes, Your Honor.

17            THE COURT:  Mr. Devlin, before we start there, let me

18   just say to try to help, because of the shortness in time, I

19   agree that this needs to be construed also, and I don't

20   necessarily see a problem with, in part, Defendants'

21   construction of saying configure to would mean actually program

22   to.  So that's my thinking going in here, so I give that to

23   maybe help hone your arguments.

24            MR. DEVLIN:  Sure, Your Honor.  I guess if I were to

25   offer up a proposed construction on the fly here, I would just

1  remove "actually".  Either programmed or implemented with

2  hardware and I would say and/or software obviously, to make

3  sure they're not mutually exclusive.  I don't think anyone

4  would really try to make that argument, but if we're going to

5  be precise, let's do it.

6       You know, in our view the word "actually" is a little

7  bit confusing like what it means?  How do you actually

8  program something as opposed to just programming?  How do

9  actually implement something?  What does that mean beyond

10 just implementing it in general?

11      So with the removal of that word, I think -- and,

12 again, this is one where maybe we can, without argument, put

13 in a proposal to Your Honor after the phone call, you know,

14 within the next two hours or overnight or whatever makes

15 sense for Your Honor, just so you have a clear record of our

16 proposal, but we could do that without argument.

17            THE COURT:  That's fine.

18            MR. DEVLIN:  I think this one's more clear than the

19 last one in the sense that I think if we remove the word

20 "actually" it would be -- I feel 90 percent confident we would

21 be okay.

22            THE COURT:  So you're okay with -- let me make sure I

23 understand.  You're saying right now you think you would be

24 okay just saying "configure to" being "programmed to"?

25            MR. DEVLIN:  Yeah, I would just literally remove the

116

1    word "actually" from their construction, and then I guess I

2    would change the "or" to "and/or".  So the result would be

3    programmed or implemented with hardware and/or software to.

4            THE COURT:  Okay.  Let me make sure the record is

5    clear.  You're okay with their construction if we remove the

6    word "actually"?

7            MR. DEVLIN:  Correct.  And, again, if I could have an

8    hour at least to ruminate on this after the call, Your Honor.

9    If I can't, then the -- the proposal we would make would be

10   remove the word "actually" and change the word "or" to

11   "and/or", those two changes.

12           THE COURT:  Okay.  Let me ask, Mr. Reiter, what would

13   your thoughts be on that?  Can we come to an agreement on that

14   or no?

15           MR. REITER:  Your Honor, this is Mr. Reiter again.

16       I don't think so.  My colleague, Mr. Robb, if it's okay

17   with the Court, is going to address this term and the

18   remaining two terms, so I'll introduce Mr. Robb to cover

19   this question.

20           THE COURT:  Okay.  Go ahead.

21           MR. ROBB:  Thank you, Your Honor.  So the term

22   "actually" is taken specifically from the case law, and this

23   comes from a long body of case law that recognizes that

24   "configure to" is more narrow than say "capable of".  And to

25   emphasize that point, the term, the Courts use phrases like

1    "actually programs to" in the case of the two EDTX cases we

2    cite.

3        Another example is in Typhoon Touch Tech, which is a

4    Federal Circuit case that we cite, and it interprets

5    configure to as requiring that it must do something.

6        So the problem here, the claim language is largely

7    devoid of structure.  It's a software -- it's a testing

8    system with software configured to, so software is about as

9    generic of a term as you can get.

10       The patentee intentionally chose the phrase "configured

11   to" which has an established meaning in patent law as being

12   particularly narrow.  And it's not the case that this

13   limitation can be met if a customer tweaks and configures

14   and customizes and does all these different things in a way

15   that the product is not naturally implemented, right?  The

16   product has to actually do this thing.  It has to.  It must

17   do this thing.

18       And so that point of emphasis, I think, is important

19   for informing the jury, which doesn't have the context of

20   this established meaning in patent law, to explain to them

21   what is meant by this phrase.

22       And then I'll just say on the "and/or" part, I think

23   and/or is redundant with "or".  It can be implemented in

24   hardware or software.  Our proposed construction is agnostic

25   to those two, and I think and/or is a grammatically

118

1    imprecise term that causes confusion.

2            THE COURT:  Okay.  Thank you.  Mr. Devlin, do you

3    want to respond to that?  I will say that I know that I think

4    the Defendants in their response brief indicated the Federal

5    Circuit case Aspex.  It didn't deal with the exact terminology

6    in terms of defining this, but this idea of "configure to" is

7    narrow.  So if you want to respond to Mr. Robb.

8            MR. DEVLIN:  Yeah, the -- the case law that really is

9    is at the heart of this is this question of whether something

10   can be just capable of something, and there's a couple of

11   different layers to that.

12       So one thing Mr. Robb said that caught my attention is

13   that somehow someone actually has to use this in a certain

14   way.  I don't think that's right.  I think if -- if my

15   Microsoft Word program is able to import an Excel

16   spreadsheet, which I've never done, as long as that

17   functionality is operative and I can do it if I wanted to, I

18   think that would be within the scope of the claim.

19       If someone -- these cases with "configured to" or

20   "capable of" and so forth, it generally relates to

21   someone's -- you know, to remove the ability to do something

22   in the code, does that still qualify.  I don't think -- I

23   mean, what's the point?  I mean, there's really nothing to

24   do about it right now, I don't think, Your Honor, but I

25   wanted to note the point for the record, that there may be a

1   disagreement in the future around that.

2       Then just in general in terms of using one case and one

3   patent's extrinsic record to -- to construe the same terms

4   in another patent with a different extrinsic record, the

5   claims in those cases are very different than the claims

6   here, and we don't think they're necessarily controlling.  I

7   don't think any patent -- any case of a patent with a

8   totally different intrinsic record is controlling as to

9   another patent.  The intrinsic record is what controls.  And

10  there's nothing here in the intrinsic record that says these

11  words or makes these words necessary here.

12      As I said, the main thing here, just the word

13  "actually", which I think will create confusion.  The

14  "and/or" we may not have a dispute.  As long as I -- I just

15  heard from Defendants they're not going to make the argument

16  that something that's both hardware and software

17  implementation is not going to be excluded from this -- I

18  think that's what I heard from them -- as long as we never

19  hear that argument, I think we're fine.  I don't really care

20  whether it's "and/or".  It feels like we're on the same

21  page.

22          THE COURT:  Mr. Robb, anything else on this?

23          MR. ROBB:  Yes, if I may respond briefly just to one

24  point.

25      The point about the different technologies, so Radware

120

1   answers this question.  The long line of Federal Circuit

2   cases answer this question.

3        So in patent law, independent of any given technology

4   or any given patent, "configured to" has an established

5   understanding of being particularly narrow and narrower than

6   "capable of".  And I think the best way to communicate that

7   well-understood, narrow meaning is through the phrase

8   "actually programmed" to do something.

9        It's not enough that it could be or might

10  hypothetically be.  It must be actually programmed to do A,

11  B and C, and that's the construction that's been adopted by

12  courts in this district and that's the construction the

13  Defendants propose.

14       THE COURT:  But you can't cite me any Federal Circuit

15  decision or any definitive statement from the Federal Circuit

16  that "configured to" means "actually programmed", can you?

17       MR. ROBB:  So the -- not specific.  The closest case

18  is Typhoon Touch Tech, which is another case we cite.  Typhoon

19  Touch Tech, the case uses the phrase "configured to" and the

20  Court construes it as "it must", so it must do this thing.

21       THE COURT:  Okay.  Thank you.  The last two terms

22  deal with indefiniteness.  I didn't know if defense wants to go

23  first, Mr. Robb, on these last two and then the Plaintiff can

24  go, or --

25       MR. ROBB:  Sure, defense is happy to go first.

121

1          THE COURT:  Go ahead.

2          MR. ROBB:  So starting with "the software",

3    Defendants contend that the software is indefinite as used in

4    certain claims.

5          Turning to slide 106, you see claim 1 and claim 2 of

6    the '678 patent.  You see "a software testing interface" in

7    claim 1 and in claim 2 you have "the software as

8    configured".

9          So the question of what does the software refer to?

10   Does it refer to the software testing interface?  Does it

11   refer to the overall system for testing?

12         I would make the point that in Plaintiff's opening

13   brief in connection with the "configured to" language, they

14   make the point that the whole -- the patents, the claims,

15   everything is directed to software systems.  Now, on the one

16   hand, we whole-heartedly agree with that.  The systems are

17   directed to software systems, right?  The testing is done on

18   an emulated software system, not on a physical hardware

19   device.

20         But the system -- so the system overall is a software

21   system.  And so does the software refer to the overall

22   software system, or does it refer to the specific software

23   testing interface?  Or does it refer to some third module of

24   software, the profile display window or something else?

25         Turning to slide 107, we see that the ambiguity is

122

1    actually compounded by dependent claim 48.  You have

2    software in the dependent claim being capable of importing

3    real world network profiles.  Now, this is inconsistent with

4    how one would typically think of a software testing

5    interface, right?  The testing interface, the user interface

6    that the user is working with is the optical display.  You

7    see the profile display windows, those sorts of things.

8         You would think that the software module that is doing

9    the importation of the network profiles is going to be

10   something on the back end, something under the hood, but

11   something there that's not the testing interface.

12        So it's, again, unclear.  Does the software that's

13   doing this particular thing, must it be a part of the

14   software testing interface, or if any software in the whole

15   system does this step, is that enough to satisfy the claim

16   limitations?

17        So on slide 108 we see Wapp's arguments, so Wapp points

18   to the '864 patent and says, well, in the '864 patent, that

19   answers the question because there you have software

20   configured to simulate in claim 1, and in dependent claim 2,

21   the software is further configured.  They say because the

22   software in claim 2 refers up to software configured to in

23   claim 1, that that must mean that the software in claim 2 of

24   the '678 patent refers up to a software testing interface

25   configured to in claim 1 of the '678 patent.

1        This argument does them more harm than good.  So in the
2   independent claims, "a software testing interface configured
3   to" must mean something different than "software configured
4   to", right?  If they use different language in the different
5   claims, then there's a presumption that they mean something
6   else.

7        So "software configured to" is of course broader than
8   "software testing interface configured to".  So "software
9   testing interface" is narrower.

10       So if the software is configured, as using claim 2 of
11  the '678, refers to the software testing interface, you now
12  have a disconnect between the software of the two claim 2s,
13  right?  You're using the same language to refer to two
14  different things.  Or when the narrowed software in the
15  independent claim 2 requires software testing interface,
16  right?

17            THE COURT:  Well, Mr. Robb --

18            MR. ROBB:  This is not --

19            THE COURT:  Mr. Robb, let me go ahead and stop you.
20  Let me ask, why isn't it fair to read these claims as reciting
21  a testing interface that is implemented in software?  Why isn't
22  it reasonably clear that the antecedent basis for the software
23  is the software testing interface?

24            MR. ROBB:  So the software testing interface is
25  implemented in software, of course, but there are other

124

1   software modules in the system that are also definitionally

2   implemented in software, right?  The whole system as a whole is

3   a software system.

4        So the software -- I think the fact that the software

5   interfaces implemented in software doesn't answer the

6   question of whether the software of dependent claim 2 refers

7   to that particular software module or some other software

8   module where we know, and Wapp admits, that the system as a

9   whole is a software system.

10            THE COURT:  Okay.  Go ahead.

11            MR. ROBB:  That's all I have to say on that claim, in

12   the interest of time.

13            THE COURT:  Okay.

14            MR. DEVLIN:  Your Honor, Tim Devlin.  I'll be very

15   brief here and we can just stay on the Defendants' slides so we

16   don't have to look at ours.

17        Looking at slide 107 right now, I think this sort of

18   negates the argument -- oh, by the way, claim 45 itself at

19   the end recites what's highlighted in claim 48 by

20   Defendants', the software can import real-world mobile

21   network profiles.  I don't think there's anything special

22   about claim 48 here.

23        But looking at it and looking at the highlighted terms,

24   this to me seems abundantly clear that the antecedent basis

25   for the software in claim 48 and also at the end of claim 45

125

 1   is the software testing interface.

 2        I think Defendants would have an argument if the word

 3   "software" was used anywhere else in these highlighted

 4   terms.  If it said a software system for testing and then it

 5   said a software testing interface and later said the

 6   software, well, now you might have some ambiguity.  But I

 7   don't think you do here.  I think it's very clear that the

 8   antecedent basis for the software is a software testing

 9   interface.  I can't see how you would read this claim any

10   other way.

11        And with respect to slide 108, the suggestion from

12   defense counsel was that we say this answers the question.

13   It doesn't answer the question.  It just informs the same

14   thing.  If you look at the analogous claims in another

15   patent, you see the same structure that one would naturally

16   draw anyway from the claims that recite software testing

17   interface.

18        So for us this is just additive, cumulative evidence

19   that there really is no antecedent basis question here.  We

20   certainly won that result in invalidity, so that's it.

21        THE COURT:  Thank you.  Mr. Robb, any quick response

22   before we go to the last one?

23        MR. ROBB:  Sorry.  Give me one second.

24        Let me potentially come back to that.  In the interest

25   of time, I want to move on to "the test", because I think

126

1    we can handle this very quickly, and then rather than look

2    through my notes, I can make the point in a little bit.

3         So for "the test", this is pretty straightforward.  The

4    test we think is indefinite for lacking antecedent basis.

5    Turning to claim 111 -- sorry -- slide 111, dependent claim

6    9, it requires that an event occurred during the test.

7    During is the key language.  So in order to know if

8    something occurs during the test, you need to know the metes

9    and bounds of when the test starts and stops.

10        And there is no answer provided anywhere in the

11   specification or anywhere in the claims as far as what is

12   the scope of the test.  In fact, the specification says that

13   there are potentially hundreds of instances where you need

14   to run the process of evaluating whether the application

15   crashes or doesn't crash.  So, for example, if each of those

16   hundreds of processes, are those all separate tests or are

17   they part of the same test?

18        And, again, it's an important distinction, because if

19   it's all a part of the same test, if there's one super test,

20   right?  Then the one or more events that occur during the

21   test, essentially any time the event occurs, it would be

22   during the test.

23        On the other hand, if you narrowly define "the test" to

24   be something like one instance or one iteration, then you --

25   it's a lot less clear that it would be during the test.  And

127

1    by not providing any metes and bounds to what the scope of

2    the test is, it is wholly unclear whether the events would

3    happen during that test.

4           THE COURT:  Well, let me ask you this.  This claim

5    ultimately depends on claim 1, because we're dealing with the

6    test in claim 9, which recites -- claim 1 recites a system for

7    testing.  So why isn't it reasonably clear that the test in

8    claim 9 is the test that's carried out by the recited system?

9           MR. ROBB:  Right.  So the problem is that it's a

10   system for testing, and it is, you know, the test carried out

11   by the system.  But by not more accurately defining what the

12   test is, what the antecedent basis of the test is, you don't

13   know what the scope of that test is.  So you know you have a

14   system for testing, but you don't know have I run one test or

15   have I run a hundred tests.  And without knowing that, you

16   don't know whether an individual event that occurred, occurred

17   within the scope of the test, right?  Or during the test that

18   claim 9 requires.

19          THE COURT:  Okay.  Thank you.  Mr. Devlin?

20          MR. DEVLIN:  Very briefly, Your Honor.  I think Your

21   Honor has identified what's the right concept here.

22          When the system is operating to do what is recited in

23   the claims, there's a test going on.  The question of

24   whether there's one test or multiple tests, that's just not

25   even a material question.  This is a compromising claim, and

128

1    that carries down through -- claim 1 uses the words, and of

2    course, that carries down through the recitation in claim 9.

3        And so if it happens for some tests that the user ever

4    wanted to define the scope of a test, whether you want to

5    look at that as a broad set of activities that would go on

6    or whether you want to look at each one of them individually

7    as a test, it doesn't matter, because if this happens during

8    any one at that time, it's happening during the test.

9        And even if we were to define test conceptually as some

10   narrow thing so that sometimes this doesn't happen, it just

11   doesn't matter, because it's a comprising claim.

12       In other words, all of that is a lot of legal analysis

13   that is inapplicable.  This issue of one or multiple tests,

14   it's just immaterial as to what's going on here in this

15   claim and whether it's going to be met.

16              THE COURT:  Well, let me ask --

17              MR. DEVLIN:  And --

18              THE COURT:  Let me ask this though.

19              MR. DEVLIN:  Yes.

20              THE COURT:  I mean, I guess you're not conceding, but

21   what is the explicit antecedent basis for the test in claim 9?

22              MR. DEVLIN:  I think it's the activity that is

23   defined by claim 1.  So if you look at those two things

24   together, they define certain things going on, and that's the

25   test that's being done on the system for testing, that the

129

1   system for testing requires it to do certain things.  So when

2   those required things are going on, then if what's recited in

3   claim 9 happens, then you infringe.

4          THE COURT:  Okay.  So do you consider the preamble of

5   claim 1 to be limiting?

6          MR. DEVLIN:  Yes.  As I said before, Your Honor, we

7   don't -- we're fine with it being limiting.  I said the Court

8   has already said that --

9          THE COURT:  No, I know that, but I guess I'm trying

10  to figure out about -- it doesn't really cite any particular

11  test.  So it's limiting, the system being for testing, but it

12  doesn't cite any particular test.  Isn't that a problem?

13         MR. DEVLIN:  Well, it's technically -- there's no

14  word "a test" in here, so it's a potential problem.  That is,

15  technically there's an absence of appropriate antecedent basis.

16     But what the law says is that's not an invalidating

17  problem unless someone could not understand what the claim

18  meant.  And we submit that case law in our brief and we

19  cited it in our slides, Your Honor, but for the sake of

20  brevity, I won't bother pulling it up, but it's there.

21     And here -- and this gets back to the preamble point

22  also -- is limiting.  Well, you should construe a claim to

23  preserve validity.  So the answer is if this antecedent

24  basis issue depends on that, then yes, it should be deemed

25  limiting.  And I think that's probably the case here,

1   because the test does have some relationship obviously to

2   what's recited in claim 1, the system for testing.  Again,

3   those aren't the only words.  The system for testing,

4   comprising something.  And claim 8 depends from that and

5   adds more something, and those somethings, what's going on

6   there, would be the test.

7        And claim 9 depends from claim 8 and refers to what's

8   going on in claim 8.  So when that's happening, that's the

9   test.  Basically when the system is being used for the

10  purpose recited in the claims, that's a test, because that's

11  what the system is for, as recited in claim 1, a system for

12  testing.

13       So while the Defendants are correct and Your Honor's

14  point is correct, there is no actual antecedent basis for

15  the term "the test", that doesn't end the inquiry.  The

16  question then arises, would someone of ordinary skill in the

17  art be confused about this, and I say given the additional

18  recitations of claims 1 and 8, combined with the words of

19  the preamble, I think the answer to that is no.  Someone of

20  ordinary skill in the art would have an understanding of

21  what the scope of this claim is, given the rest of that

22  information.

23            THE COURT:  Thank you.  Any response?

24            MR. ROBB:  If I may just respond to a few points?

25            THE COURT:  Yes, go ahead.

131

1          MR. ROBB:  So, first, I think the suggestion was that

2     the standard was it could not be understood.  Of course, that's

3     not the standard.  After Nautilus the standard is whether it

4     would inform a person of skill in the art with reasonable

5     certainty about the scope of the claim.  And I think this

6     conversation demonstrates that it would not inform someone of

7     reasonable certainty of the scope of the claim.

8          Second point, so the case law, Mr. Devlin referenced

9     Bose.  In Bose there was an antecedent reference to an

10    ellipse and then a subsequent reference to an ellipse having

11    a major diameter.  Of course, all ellipses have major

12    diameters, and so the fact that the antecedent basis only

13    said an ellipse, not an ellipse having a major diameter, did

14    not make it unclear what the ellipse having a major diameter

15    referred to, because all ellipses have major diameters.

16         Here that's -- it's a very different problem.  So as

17    Your Honor indicated, there is no antecedent basis for the

18    test, right?  It's a system for testing, but the word "test"

19    itself does not appear anywhere in the claim before it, and

20    there's simply no -- and I should also say that the fact

21    that it's a comprising of claim, right?  Doesn't obviate the

22    need for an antecedent basis.

23         At the end of the day, without knowing what the scope

24    of the test is, we don't know whether a particular set of

25    actions by a user infringes the claim.  The claim applies if

132

1    certain events happen during the test, and without knowing

2    what the scope of the test is, it's simply not possible to

3    know whether it occurred during the test.  Nothing in the

4    claim, nothing in the specification provides any guidance on

5    that point.

6              THE COURT:  All right.

7              MR. ROBB:  I'm sorry.  One final point.  We talked

8    about a number of different kinds of tests today, and, you

9    know, so not knowing which test we're talking about, which

10   version of the test, which iteration of the test, you simply

11   don't know whether or not it happened during the test.

12             THE COURT:  Okay.  Thank you.  Anything else on this

13   one?

14             MR. DEVLIN:  Nothing further from Plaintiff, Your

15   Honor.  Thank you.

16             THE COURT:  Anything else from Defendants?

17             MR. REITER:  Nothing further from Defendants, Your

18   Honor.

19             THE COURT:  Well, thank y'all very much.  I thought

20   this worked out.  It's better in person, but certainly this was

21   a good substitute and we seemed to be able to -- seemed like we

22   handled it fine.

23       So I will -- my goal is always to get a decision out

24   within 30 days at the latest.  Usually it's before that.

25   Let me ask, I know, Mr. Devlin, you were going to maybe want

133

1    to submit something else after conferring with your team on

2    a couple of different items.  If you're going to submit

3    something one way or the other, can you do that by noon

4    tomorrow?

5              MR. DEVLIN:  Yes, Your Honor, we will do that.

6              THE COURT:  And then if that requires any kind of

7    response, if Defendants can submit something, if they feel

8    there's a need to respond, by 5:00 p.m. tomorrow then?

9              MR. REITER:  Could we have until 9:00 o'clock the

10   next day, Your Honor?

11             THE COURT:  Yes, that's fine, not a problem.

12             MR. REITER:  Not 9:00 a.m.  By 9:00 p.m.

13             THE COURT:  That's fine.

14             MR. REITER:  Thank you, Your Honor.

15             THE COURT:  Okay.  Y'all have a great day.  Stay

16   safe, and thank you.

17             MR. REITER:  Thank you, Your Honor.

18             MR. DEVLIN:  Thank you, Your Honor.

19

20

21   I certify that the foregoing is a correct transcript from

22   the record of proceedings in the above-entitled matter.

23

24   _____              _____

25   Jan Mason                            Date