**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION**

| | |
|---|---|
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., | |
| Plaintiffs, | Civil Action No. 4:21-cv-00670-ALM |
| v. | |
| BANK OF AMERICA N.A., | **JURY TRIAL DEMANDED** |
| Defendant. | |
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., | |
| Plaintiffs, | Civil Action No. 4:21-cv-00671-ALM |
| v. | |
| WELLS FARGO BANK, N.A., | **JURY TRIAL DEMANDED** |
| Defendant. | |

**<u>WAPP'S P.R. 4-5(a) OPENING CLAIM CONSTRUCTION BRIEF</u>**

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................1

II.     OVERVIEW OF THE PATENTED TECHNOLOGY ........................................1

III.    LEGAL STANDARDS—CLAIM CONSTRUCTION FRAMEWORK.....................3

IV.     AGREED TERMS ...............................................................................................6

V.      THE DOCTRINES OF ISSUE PRECLUSION AND JUDICIAL ESTOPPEL
        BAR DEFENDANTS' INDEFINITENESS DEFENSES ...............................6

VI.     DISPUTED TERMS ...........................................................................................8

        A.      "SOFTWARE AUTHORING/TESTING INTERFACE" TERMS................8

        B.      "NETWORK CHARACTERISTICS" ...............................................17

        C.      "INDICATIVE OF"..........................................................................20

        D.      "THE SELECTED CHARACTERISTICS"........................................25

# TABLE OF AUTHORITIES

## Cases

*3M Innovative Props. Co. v. Tredegar Corp.*
    725 F.3d 1315 (Fed. Cir. 2013) ........................................................................... 5

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008) ......................................................................... 26

*Burke, Inc. v. Bruno Indep. Living Aids, Inc.* 183 F.3d 1334 (Fed. Cir. 1999)............................. 3

*Diebold Nixdorf, Inc. v. ITC*,
    899 F.3d 1291 (Fed. Cir. 2018) ......................................................................... 17

*Dyfan, LLC v. Target Corp.*,
    28 F.4th 1360 (Fed. Cir. 2022) .................................................................... 12, 13

*Energizer Holdings, Inc. v. Int'l Trade Comm'n.*,
    435 F.3d 1366 (Fed. Cir. 2006) ......................................................................... 25

*Fisher-Price, Inc. v. Graco Children's Prods.*,
    154 F. App'x 903 (Fed. Cir. 2005) ..................................................................... 25

*GE Lighting Solutions, LLC v. AgiLight, Inc.*
    750 F.3d 1304 (Fed. Cir. 2014) ........................................................................... 5

*Golden Bridge Tech., Inc. v. Apple Inc.*
    758 F.3d 1362 (Fed. Cir. 2014) .................................................................... 5, 20

*Hacienda Records, L.P. v. Ramos*,
    718 F. App'x 223 (5th Cir. 2018) ........................................................................ 7

*Hall v. GE Plastic Pacific PTE Ltd.*, 327 F.3d 391 (5th Cir. 2003) ............................................. 8

*Horus Vision, LLC v. Applied Ballistics, LLC*,
    No. 13-cv-05460, 2014 U.S. Dist. LEXIS 170470 (N.D. Cal. Dec. 9, 2014)......................... 25

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.* 381 F.3d 1111 (Fed. Cir. 2004) ..... 4

*Intellectual Ventures II LLC v. BITCO Gen. Ins. Corp.*,
    No. 6:15-cv-59, 2016 U.S. Dist. LEXIS 3299 (E.D. Tex. Jan. 11, 2016) ......................... 11, 16

*Kearns v. Chrysler Corp.*,
    32 F.3d 1541 (Fed. Cir. 1994) ............................................................................ 8

*MacroPoint, LLC v. Ruiz Food Prods.*,
    No. 6:16-CV-1133, 2018 U.S. Dist. LEXIS 23745 (E.D. Tex. Feb. 14, 2018)....................... 11

*Markman v. Westview Instruments, Inc.* 517 U.S. 370 (1996) .................................................. 4, 5

*Mobile Commerce Framework, Inc. v. Foursquare Labs*, Inc.,
   No. 11-CV-0481, 2013 U.S. Dist. LEXIS 16353 (S.D. Cal. Feb. 6, 2013) ............................ 25

*N. Am. Container, Inc. v. Plastipak Packaging, Inc.*,
   415 F.3d 1335 (Fed. Cir. 2005) .................................................................................. 19

*N. Telecom, Inc. v. Datapoint Corp.*,
   908 F.2d 931 (Fed. Cir. 1990) .................................................................................... 24

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   134 S. Ct. 2120 (2014) ............................................................................................... 6

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   572 U.S. 898 (2014) ................................................................................................. 21

*Novartis Pharm. Corp. v. Accord Healthcare, Inc.*,
   21 F.4th 1362 (Fed. Cir. 2022) ................................................................................. 16

*PerdiemCo, LLC v. IndusTrack LLC*,
   No. 2:15-cv-727, 2016 U.S. Dist. LEXIS 87927 (E.D. Tex. July 7, 2016) ............................ 12

*Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*,
   161 F.3d 696 (Fed. Cir. 1998) ................................................................................... 12

*Phillips v. AWH Corp.* 415 F.3d 1303 (Fed. Cir. 2005) ................................................ 4, 5, 19, 20

*Pozen Inc. v. Par Pharm., Inc.*,
   696 F.3d 1151 (Fed. Cir. 2012) ................................................................................. 23

*Proceviat v. McDonough*,
   No. 2021-1810, 2021 U.S. App. LEXIS 27815 (Fed. Cir. Sep. 16, 2021) ............................ 21

*Schindler Elevator Corp. v. Otis Elevator Co.*,
   Civil Action No. 09-cv-0560, 2010 U.S. Dist. LEXIS 2463 (D.N.J. Jan. 13, 2010).............. 25

*Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*,
   844 F.3d 1370 (Fed. Cir. 2017) ................................................................................... 6

*Taylor v. Sturgell*,
   553 U.S. 880 (2008) ................................................................................................... 7

*Team Worldwide Corp. v. Intex Rec. Corp.*,
   No. 2020-1975, 2021 U.S. App. LEXIS 27284 (Fed. Cir. Sep. 9, 2021) ................................ 9

*Teleflex, Inc. v. Ficosa N. Am. Corp.*
   299 F.3d 1313 (Fed. Cir. 2002) ................................................................................... 4

iii

*Thorner v. Sony Computer Entm't Am. LLC*
  669 F.3d 1362 (Fed. Cir. 2012) ........................................................................ 5

*TVnGO Ltd. (BVI) v. LG Elecs. Inc.*,
  861 F. App'x 453 (Fed. Cir. 2021) ............................................................... 9, 21

*Uniloc 2017 LLC v. Google LLC*,
  No. 2:18-CV-00493-JRG-RSP, 2020 U.S. Dist. LEXIS 9748 (E.D. Tex. Jan. 20, 2020)........ 21

*Verve v. Crane Cams*,
  311 F.3d 1116 (Fed. Cir. 2002) ....................................................................... 23

*Vitronics Corp. v. Conceptronic, Inc.*
  90 F.3d 1576 (Fed. Cir. 1996) ....................................................................... 4, 5

*Wi-Lan Inc. v. LG Elecs.*,
  2019 U.S. Dist. LEXIS 160231 (S.D. Cal. May 23, 2019).................................... 23

*Williamson v. Citrix Online*,
  792 F.3d 1339 (Fed. Cir. 2015) ......................................................................... 9

*Zeroclick, LLC v. Apple Inc.*,
  891 F.3d 1003 (Fed. Cir. 2018) ....................................................................... 11

**Statutes**

35 U.S.C. § 112 ¶ 6 ........................................................................................ 10

35 U.S.C. § 112(f) ......................................................................................... 16

35 U.S.C. § 282(a) ........................................................................................ 20

**Other Authorities**

MPEP §2173 .................................................................................................. 24

**TABLE OF EXHIBITS**

| Ex. No. | Bates Range | Description |
|---|---|---|
| 1 | WAPP-FH000001 | U.S. Patent No. 8,924,192 |
| 2 | WAPP-FH000026 | U.S. Patent No. 9,298,864 |
| 3 | WAPP-FH000064 | U.S. Patent No. 9,971,678 |
| 4 | WAPP-FH000089 | U.S. Patent No. 10,353,811 |
| 5 | WAPP-FH000115 | U.S. Patent No. 10,691,579 |
| 6 | WAPP_MARKMAN_0000878 | Markman Order in prior litigation, signed April 27, 2020 |
| 7 | - | Declaration of Sam Malek, Ph.D. Regarding Claim Construction, dated April 21, 2022 |
| 8 | - | Declaration of Sandeep Chatterjee, Ph.D. Regarding Claim Construction, dated April 21, 2022 |
| 9 | - | WFB Invalidity Chart A03 re '192, Based on Primary Reference U.S. Patent Application Publication No. US 2003/156549 A1 - "Binder" |
| 10 | - | WFB Invalidity Chart C03 re '678 Based on Primary Reference U.S. Patent Application Publication No. US 2003/156549 A1 - "Binder" |
| 11 | - | BofA Invalidity Chart A03 re '192 Based on Primary Reference U.S. Patent Application Publication No. US 2003/156549 A1 - "Binder" |
| 12 | - | BofA Invalidity Chart C03 re '678 Based on Primary Reference U.S. Patent Application Publication No. US 2003/156549 A1 - "Binder" |
| 13 | - | WFB Invalidity Chart A16 re '192 Based on Primary Reference U.S. Patent Application Publication No. US 2006/0009159 A1 - "Leung" |
| 14 | - | WFB Invalidity Chart C16 '678 Based on Primary Reference U.S. Patent Application Publication No. US 2006/0009159 A1 - "Leung" |
| 15 | - | BofA Invalidity Chart A16 re '192 Based on Primary Reference U.S. Patent Application Publication No. US 2006/0009159 A1 - "Leung" |
| 16 | - | BofA Invalidity Chart C16 re '678 Based on Primary Reference U.S. Patent Application Publication No. US 2006/0009159 A1 - "Leung" |
| 17 | WAPP_MARKMAN_0000778 | Defendants' Claim Construction Brief in prior litigation, dated April 1, 2020 |
| 18 | WAPP_MARKMAN_0000619 | Declaration of Matthew B. Shoemake, Ph.D. in prior litigation, dated March 16, 2020 |

| Ex. No. | BATES RANGE | DESCRIPTION |
|---|---|---|
| 19 | - | Wells Fargo Bank, N.A.'s Invalidity Contentions in prior litigation, dated December 20, 2019 |
| 20 | WAPP0053352 | Bank of America, N.A.'s Invalidity Contentions in prior litigation, dated December 20, 2019 |
| 21 | WAPP0061187 | Ex. 1 to prior invalidity contentions - BB Dev. Environment with Simulator Invalidity Chart |
| 22 | WAPP_MARKMAN_0002924 | Webster's New World Dictionary defining "interface" |
| 23 | WAPP_MARKMAN_0002234 | IEEE Standard Computer Dictionary defining "interface" |
| 24 | WAPP_MARKMAN_0002921 | Microsoft Computer Dictionary defining "user interface" |
| 25 | WAPP_MARKMAN_0002280 | Microsoft Computer Dictionary defining "application development environment," "author," "graphical user interface," "integrated development environment" |
| 26 | WAPP_MARKMAN_0002889 | U.S. Patent No. 8,392,873 |
| 27 | WAPP_MARKMAN_0002849 | U.S. Patent No. 8,042,045 |
| 28 | WAPP_MARKMAN_0002867 | U.S. Patent No. 8,251,815 |
| 29 | WAPP_MARKMAN_0002827 | U.S. Patent No. 7,526,681 |
| 30 | WAPP_MARKMAN_0002799 | Pat. App. Pub. No. 2022/0100262 |
| 31 | MFSUB0016349 - MFSUB0016500 | Expert Report of Sam Malek Relating to the Validity of U.S Patent Nos. 8,924,192, 9,971,6678, and 9,298,864, dated December 22, 2022 |
| 32 | WAPP_MARKMAN_0002231 | Sandeep Chatterjee and James Webber, *Developing Enterprise Web Services An Architect's Guide* (2004) |
| 33 | WAPP_MARKMAN_0001648 | Sandeep Chatterjee et al., *Concurrent Event Handling Through Multithreading* (1999) |
| 34 | WAPP_MARKMAN_0001661 | Sandeep Chatterjee and Srinivas Devadas, *The MASC Computing Infrastructure for Intelligent Environments* (1999) |
| 35 | WAPP_MARKMAN_0001668 | Declaration of Sandeep Chatterjee, Ph.D. in Support of Petition for *Inter Partes* Review of U.S. Patent No. 8,301,713 B2, Case No. IPR2019-00899 |
| 36 | WAPP_MARKMAN_0001806 | Declaration of Sandeep Chatterjee, Ph.D. in Support of Petition for *Inter Partes* Review of U.S. Patent No. 9,128,981 B1, Case No. IPR2019-01516 |
| 37 | WAPP_MARKMAN_0002292 | Declaration of Sandeep Chatterjee, Ph.D. in Support of Petition for *Inter Partes* Review of U.S. Patent No. 7,412,486 B1, Case No. IPR2017-01002 |
| 38 | WAPP_MARKMAN_0002257 | Merriam-Webster's Collegiate Dictionary Tenth Edition defining "indicate" |
| 39 | WAPP_MARKMAN_0002260 | U.S. Patent Pub. No. 2021/0295223 |
| 40 | WAPP_MARKMAN_0002459 | U.S. Patent No. 10,798,007 |
| 41 | WAPP_MARKMAN_0002505 | U.S. Patent No. 11,095,439 |
| 42 | WAPP_MARKMAN_0002609 | U.S. Patent No. 11,276,279 |

| Ex. No. | BATES RANGE | DESCRIPTION |
|---|---|---|
| 43 | WAPP_MARKMAN_0002629 | U.S. Patent Pub. No. 2011/0246612 |
| 44 | WAPP_MARKMAN_0002765 | U.S. Patent No. 10,885,527 |
| 45 | WAPP_MARKMAN_0002784 | U.S. Patent Pub. No. 2022/0086181 |
| 46 | WAPP_MARKMAN_0002813 | U.S. Patent No. 10,949,850 |
| 47 | WAPP-FH003399 | '579 File History May 16, 2019 Non-Final Rejection |
| 48 | WAPP-FH003422 | '579 File History November 18, 2019 Claim Amendment |

## I.   INTRODUCTION

Plaintiffs Wapp Tech Limited Partnership and Wapp Tech Corp. (together, "Wapp") respectfully submit this Opening Claim Construction Brief. At issue is the proper construction of six claim terms proposed by Defendants for U.S. Patent Nos. 8,924,192 (the "'192 Patent"); 9,298,864 (the "'864 Patent"); 9,971,678 (the "'678 Patent"); 10,353,811 (the "'811 Patent"); and 10,691,579 (the "'579 Patent") (collectively the "patents-in-suit"). Exs. 1-5.

Defendants argue that all but one of the disputed claim terms are invalid as indefinite, a proposition they must prove by clear and convincing evidence. This is a burden they cannot carry, in part, because Wapp and its expert have shown the meanings of these terms were clear to skilled artisans at the time of the invention, in light of both the intrinsic and extrinsic record. Defendants' own expert cites no affirmative evidence to the contrary. Moreover, in Wapp's previous cases, Defendants agreed to be bound by any Final Judgment against Micro Focus as to validity for three of the five asserted patents. This agreement precludes Defendants from even making indefiniteness arguments in the first place under the doctrines of issue preclusion and judicial estoppel.

Defendants' proposed construction for the remaining claim term—"network characteristics"—is based entirely on a cropped partial quote from extrinsic evidence. Their construction attempts to import words into the claim, such as "identified directly," that are absent from the intrinsic record and nonsensical in the context of the claim. Their construction is wrong, and the Court should give the term its ordinary meaning instead.

## II.   OVERVIEW OF THE PATENTED TECHNOLOGY

The patents-in-suit are directed to the development and testing of mobile applications (*e.g.*, apps for smartphones). The patents-in-suit are all within the same patent family and relate

back to U.S. Patent No 7,813,910 (which is not asserted in this case). The '192, '678, and '811 Patents are continuations of the '910 Patent and generally share the same specification. The '864 and '579 Patents are divisions of a continuation-in-part (U.S. Patent No. 8,589,140) of the '910 Patent. As such, they include essentially the same specification as the '192, '678, and '811 Patent continuations. The '678, '811, '864, and '579 Patents incorporate the '192 Patent specification. *See* '678 Patent at 1:8-18; '811 Patent at 1:7-19; '864 Patent at 1:7-14; '579 Patent at 1:7-16. Thus, the citations herein are typically to the '192 Patent specification for simplicity.

The patents-in-suit address problems related to the development and testing of applications for use on mobile devices, such as phones and tablets, which are often referred to as mobile applications. Although typically developed on a computer, the applications are designed to run on a variety of mobile devices. *See* '192 Patent at 1:52-54. Thus, proper testing seeks to ensure that the applications run correctly on many different types of mobile devices. *See id.* at 1:58-61.

The patents-in-suit provide solutions that allow mobile application developers or testers to create applications that will efficiently run on a variety of mobile devices. In particular, the patents disclose a solution that emulates or simulates the hardware characteristics of different mobile devices so that developers or testers can verify proper operation of their mobile applications within an emulated or simulated mobile device environment. *See, e.g.*, *id.* at 2:12-34; *id.* at 5:55-6:9 (detailing mobile device characteristics that can be emulated/simulated). In addition, the patents-in-suit provide that the developers and testers can use actual physical devices to verify proper operation of the mobile applications. *See id.* at 5:9-12; 6:65-7:3; 10:26-29.

Another problem regarding mobile application development and testing that is recognized and addressed by the patents-in-suit relates to the networked nature of mobile applications. *See id.* at 2:4-8. Many mobile applications rely on a network (*e.g.*, cellular network) to communicate with servers and perform their respective functions. As such, a poorly performing network can significantly impact the performance of the mobile application on a mobile device. To address this problem, the patents-in-suit disclose the simulation/emulation of network characteristics indicative of different network conditions. *See, e.g.*, *id.* at 10:15-25; *id.* at 11:5-11. Using this approach, a mobile application developer or tester can verify the functionality of a mobile application within a simulated/emulated network environment that mirrors real-world network conditions that may be encountered by users of mobile devices. For instance, the mobile application developer or tester can simulate poor network conditions (*e.g.*, high latency, high pack-loss, low bandwidth availability) to verify that the mobile application performs appropriately in such conditions. *See id.* at 12:3-10.

The ability to simulate or emulate the hardware characteristics of a variety of mobile devices as well as the network characteristics of different real-world networks occurs within a software authoring environment. *See, e.g.*, *id.* at 2:21-22; 5:21-25. As explained in more detail below, that environment includes a visual user interface that allows the mobile application developer or tester to interact with the software tool. *See, e.g.*, *id.* at 13:46-52. For example, a developer can write code for the mobile applications through an interface and test operations can be performed through the interface. *See, e.g.*, *id.* at 9:46-53; 10:15-25.

## III.   LEGAL STANDARDS—CLAIM CONSTRUCTION FRAMEWORK

The claims determine the scope of patent protection. *Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1340 (Fed. Cir. 1999). The Supreme Court laid out a framework for

courts to construe the scope and meaning of disputed claim terms as a matter of law in *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 389-90 (1996).

Patents are presumed to be written for a "person of skill in the art" ("POSITA"). *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*). Thus, claim terms must be construed from a POSITA's viewpoint at the time of the invention. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004). In determining a term's meaning, "[a] court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean,'" including "'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.'" *Phillips*, 415 F.3d at 1314 (quoting *Innova*, 381 F.3d at 1116).

The intrinsic evidence includes the language of the asserted and other claims, the patent specification, and the prosecution history. "The claims define the scope of the right to exclude; the claim construction inquiry, therefore, begins and ends in all cases with the actual words of the claim." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1324 (Fed. Cir. 2002); *Phillips*, 415 F.3d at 1314-15. The specification is the next most informative source to construe the claims. "[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). Finally, the third tier of intrinsic evidence is the patent's prosecution history, because it "provides evidence of how the PTO and the inventor understood the patent." *Phillips*, 415 F.3d at 1317.

Besides "intrinsic" evidence, the Federal Circuit allows limited use of "extrinsic evidence" in certain contexts to educate the court about the field of the invention and the

viewpoint of a POSITA. Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. While acknowledging the value of extrinsic evidence in some cases, the Federal Circuit has also warned against giving it too much weight. Courts are prohibited from relying on extrinsic evidence that contradicts the intrinsic evidence. *Vitronics*, 90 F.3d at 1584 ("Only if there were still some genuine ambiguity in the claims, after consideration of all available intrinsic evidence, should the trial court have resorted to extrinsic evidence, such as expert testimony, in order to construe claim 1."); *see also Phillips*, 415 F.3d at 1317-18.

Under the accepted framework, the plain and ordinary meaning of the claims as would be understood by a POSITA is the general rule. *Innova,* 381 F.3d at 1116. There are "only two exceptions to [the] general rule" of plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution." *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). To change the meaning of a claim term, the definition or disavowal must be "clear" and "unmistakable." *See GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term" and "clearly express an intent to define the term."); *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013) ("Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable.").

The Supreme Court has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about

the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## IV.   AGREED TERMS

The parties have agreed to constructions for ten terms, as set forth in the joint claim construction chart at 2-3. *See* Dkt. 48 at 2-3. In Wapp's prior litigation against Defendants,[1] the parties litigated the claim construction issues for those ten terms and the Court entered its *Markman* Order. Ex. 6 (Prior Order). The agreed constructions here follow the Court's previous *Markman* rulings. Wapp respectfully requests that the Court adopt those constructions again.

## V.   THE DOCTRINES OF ISSUE PRECLUSION AND JUDICIAL ESTOPPEL BAR DEFENDANTS' INDEFINITENESS DEFENSES

Pending before the Court are Wapp's partial summary judgment motions that Defendants are barred from raising any invalidity defenses for the '192, '864 and '678 Patents under the doctrines of issue preclusion and judicial estoppel.[2] Defendants are barred from relitigating the validity of the following terms under preclusion and estoppel: (1) the "software authoring interface" terms ('192 claims 1 and 2); (2) the "software testing interface" term ('678 claim 45); and (3) the "indicative of" terms ('192 claim 1, '864 claim 1 and '678 claim 45). For brevity, Wapp incorporates by reference its pending motions and merely summarizes the application of issue preclusion and judicial estoppel to the above claim terms in this Section.

Both Defendants agreed and represented to this Court that they would treat any Final Judgment in Wapp's prior case against Micro Focus (MF) ("the MF suit"), as binding on the

---

[1] "Prior litigation" refers to *WAPP v. Wells Fargo*, No. 5:18-cv-501-ALM; *WAPP v. Bank of America*, No. 5:18-cv-519-ALM; consolidated under lead case No. 4:18-cv-469-ALM.

[2] Case No. 4:21-cv-670 at Dkt. 48 (Motion) and Dkt. 66 (Reply); Case No. 4:21-cv-671 at Dkt. 47 (Motion) and Dkt. 60 (Reply).

validity of the '192, '678, and '864 Patents. Defendants made this promise to obtain stays of Wapp's related infringement claims against them. In other words, Defendants cut the following bargain: they agreed to live with the outcome of the MF Suit on validity in exchange for a stay. After MF lost on invalidity and every other issue at trial, the Court entered a Final Judgment for Wapp.

In the context of this *Markman* proceeding, Defendants now want to relitigate the validity of the '192, '678, and '864 Patents based on alleged indefiniteness, regretting their choice to sit on the sidelines and have MF litigate validity. But under binding precedent, Defendants cannot. *See, e.g.*, *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (Issue preclusion bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim."); *Hacienda Records, L.P. v. Ramos*, 718 F. App'x 223, 228 (5th Cir. 2018) (reciting issue preclusion factors in Fifth Circuit). Because Defendants agreed any Final Judgment in the MF Suit was binding, Defendants face issue preclusion on each theory of their invalidity defense (including indefiniteness) for the '192, '678, and '864 Patents. Validity for these patents was actually litigated, determined, and essential to the Final Judgment, which this Court entered after a full opportunity to litigate at trial. The analysis is that simple. It does not matter that Wapp and MF later settled after the Court entered Final Judgment. The Final Judgment still exists.

The Supreme Court contemplated this specific use of offensive non-mutual issue preclusion in *Taylor v. Sturgell*, 553 U.S. 880 (2008), and the Federal Circuit has enforced a non-party's agreement to treat a prior invalidity determination as binding in *Kearns v. Chrysler Corp.*, 32 F.3d 1541 (Fed. Cir. 1994). The result in *Kearns* is neither surprising nor unfair. The law enforces agreements; that is the foundation of contract law.

An independent basis that bars Defendants from raising indefiniteness here is judicial estoppel. *See, e.g., Hall v. GE Plastic Pacific PTE Ltd.*, 327 F.3d 391, 396 (5th Cir. 2003). Defendants cannot assert that the Final Judgment from the MF Suit is not binding when they previously said the opposite to successfully obtain their desired stays.

For the above reasons, the Court need not even address most of the disputed terms below,[3] because Defendants' positions are based on their indefiniteness invalidity defense, which is procedurally barred under issue preclusion and judicial estoppel.

## VI. DISPUTED TERMS

### A. "software authoring/testing interface" terms

| Terms |
| --- |
| **"a software authoring interface configured to simultaneously visually emulate, via one or more profile display windows, a plurality of network characteristics indicative of performance of the mobile device when executing the application … further configured to simulate a network connection state encountered by the mobile device"** ('192 Patent, Claim 1) |
| **"the software authoring interface is configured to enable a user to select from one or more connection simulations for testing how well mobile content performs on the mobile device"** ('192 Patent, Claim 2) |
| **"a software testing interface configured to simultaneously visually simulate, via one or more profile display windows, a plurality of operator network characteristics including at least bandwidth availability indicative of performance of the mobile device when executing the application"** ('678 Patent, Claim 45) |

---

[3] Specifically, the Court need not address: (1) the "software authoring interface" terms ('192 claims 1 and 2); (2) the "software testing interface" term ('678 claim 45); and (3) the "indicative of" terms ('192 claim 1, '864 claim 1 and '678 claim 45).

| Plaintiffs' Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning. (But any words or phrases with an agreed construction should be given their agreed construction.) | These are means-plus-function terms that are indefinite for lack of sufficient corresponding structure in the specification. |

As set forth above, Defendants are procedurally barred from asserting indefiniteness. Defendants' positions also have no merit.

Defendants bear the burden of proving indefiniteness by clear and convincing evidence. *TVnGO Ltd. (BVI) v. LG Elecs. Inc.*, 861 F. App'x 453, 457 (Fed. Cir. 2021) ("Any fact critical to a holding on indefiniteness...must be proven by the challenger by clear and convincing evidence"). These are not means-plus-function terms. The absence of the word "means" gives rise to a presumption that §112, paragraph 6 does not apply. *Williamson v. Citrix Online*, 792 F.3d 1339, 1348 (Fed. Cir. 2015). To overcome this presumption, Defendants must show these terms do not recite sufficient structure: "The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* at 1349; *see also Team Worldwide Corp. v. Intex Rec. Corp.*, No. 2020-1975, 2021 U.S. App. LEXIS 27284, at *13 (Fed. Cir. Sep. 9, 2021) (A "critical question" in this inquiry "is whether the claim term is used in common parlance or by skilled artisans to designate structure, including either a particular structure or a class of structures").

Both parties' experts acknowledge that "interface" was known by skilled artisans as a name for structure. Dr. Malek (Wapp's expert) explains:

> A person of ordinary skill in the art would have understood the term "interface" to connote structure—specifically, a user interface. A user interface provides a structure through which a user can interact with and control a computer application, tool, or program. Two common forms of a user interface are graphical user interfaces (e.g., Windows applications) and command-line interfaces (e.g., a text-based interface such as a command shell or DOS prompt). These types of user interfaces have been known in the art since at least the mid-1970s.

9

Ex. 7 at ¶31. Dr. Chatterjee (Defendants' expert) agrees:

> An "Application Programming Interface" or API is a well known type of programmatic interface. A "user interface" is another type of interface that can refer to a virtual interface presented on a screen or can also refer to devices that users use to interact with a computer, such as a keyboard, mouse, and/or touchscreen.

Ex. 8 at ¶28. Dr. Chatterjee's admission, standing alone, establishes that Defendants cannot overcome the presumption that means-plus-function does not apply.

Defendants themselves also understand that these "interface" terms are structural and connote a user interface. The Local Patent Rules require Defendants' invalidity contentions to "chart…for each element that such party contends is governed by 35 U.S.C. § 112 ¶ 6, the identity of the structure(s), act(s), or material(s) in each item of prior art that performs the claimed function." P.R. 3-3(c). Neither Wells Fargo nor Bank of America identified these terms as subject to § 112 ¶ 6 in their invalidity contentions. Instead, their charts repeatedly cite to "user interface" structures in the alleged prior art. *See, e.g.*, Ex. 9 (WF A03) at 3-4, 16 (Wells Fargo alleging the "software authoring interface" limitation is taught by "a test console having a ***user interface*** … Test Console 7 is the ***graphic user interface*** to WTS all system functions … The models may be input through a ***graphical user interface (GUI)***.")[4]; Ex. 10 (WF C03) at 3-5 (same allegations for "software testing interface"); Ex. 11 (BoA A03) at 3-5, 17 (same allegations by BoA); Ex. 12 (BoA C03) at 3-4 (same allegations by BoA); Ex. 13 (WF A16) at 7-8,  (Wells Fargo alleging the "software authoring interface" limitation is taught by "real time ***GUI*** [that] can then used by designers to investigate the efficiency of various wireless device designs … Graph 221 may be in the form of a ***graphic user interface (GUI)*** and displayed on a

---

[4] All emphasis added unless otherwise noted.

monitor in communication with tester 120. … **user interface** adapter 408"); Ex. 14 (WF C16) at 7-8 (same allegations for "software testing interface"); Ex. 15 (BoA A16) at 7-8 (same allegations by BoA); Ex. 16 (BoA C16) at 7-8 (same allegations by BoA).

Defendants also conceded that "interface" connotes a user interface structure in their *Markman* briefing in the prior litigation. There, Defendants wrote that the term "interface" (in the context of the '678 patent) "frequently refer[s] to the **visual presentation of information**." Ex. 17 at 29. Their expert also stated that "the Asserted Patents describe the simulation or emulation of network characteristics in connection with **a window that displays profile data**." Ex. 18 at ¶54. Defendants never argued in their invalidity contentions or *Markman* briefing in the prior litigation that the "interface" terms were indefinite or that they were means-plus-function terms. *See* Exs. 19 and 20 at 22-25 ("interface" terms not listed among allegedly indefinite terms); Ex. 21 at 7-12 (claim charts did not identify "interface" terms as subject to §112(6) as required by P.R. 3-3(c)).

The Federal Circuit and this Court have repeatedly reached the same conclusion—"interface" is structural. *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018) ("program" and "user interface code" are "used not as generic terms or black box recitations of structure or abstractions, but rather as specific references to conventional graphical user interface programs or code"); *Intellectual Ventures II LLC v. BITCO Gen. Ins. Corp.*, No. 6:15-cv-59, 2016 U.S. Dist. LEXIS 3299, at *44 (E.D. Tex. Jan. 11, 2016) ("the intrinsic and extrinsic evidence shows that 'interface' is not a verbal construct but rather connotes sufficiently definite structure to one skilled in the art"); *MacroPoint, LLC v. Ruiz Food Prods.*, No. 6:16-CV-1133, 2018 U.S. Dist. LEXIS 23745, at *15 (E.D. Tex. Feb. 14, 2018) ("Defendant has not cited authority that determined 'interface' to be a nonce word…."); *PerdiemCo, LLC v. IndusTrack*

*LLC*, No. 2:15-cv-727, 2016 U.S. Dist. LEXIS 87927, at *123 (E.D. Tex. July 7, 2016) ("Defendants have failed to demonstrate that the term 'interfaces' does not connote structure.").

Dr. Chaterjee's position seems to be that, although "interface" is structural, it connotes too broad a class of structures. Ex. 8 at ¶28 ("These examples [APIs and user interfaces] arise in significantly different contexts and show that interfaces can be software … or hardware … showing that 'interface' by itself does not refer to any particular structure or class of structures."). This argument misses the mark on two counts. *First*, as recognized by the Federal Circuit and this Court, that a term is broad enough to include multiple structures does not make the term non-structural. *Intellectual Ventures*, 2016 U.S. Dist. LEXIS 3299, at *41-42 ("Defendants' primary argument is that because the specification provides a wide variety of types of interfaces, the term 'interface' must be considered a nonce word. However, merely because a term has a number of different meanings does not mean the term is merely a verbal construct."); *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696, 705 (Fed. Cir. 1998) ("Even though the term 'detector' does not specifically evoke a particular structure, it does convey to one knowledgeable in the art a variety of structures known as 'detectors.' We therefore conclude that the term 'detector' is a sufficiently definite structural term to preclude the application of § 112, ¶ 6.").

*Second*, the terms under construction here include more than just the word "interface." These terms, read in the context of the claim language and other intrinsic evidence,[5] would be understood by a POSITA to refer to a specific type of interface structure: a user interface. The

---

[5] *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1365-66 (Fed. Cir. 2022) ("Intrinsic evidence, such as the claims themselves and the prosecution history, can be informative in determining whether the disputed claim language recites sufficiently definite structure or was intended to invoke § 112 ¶ 6.").

claims use the words "software authoring interface" and "software testing interface," which a POSITA would have understood as referring to user interfaces for authoring or testing software, respectively. Ex. 7 at ¶32 ("the plain meaning of 'software authoring interface' that a POSITA understood in the 2005/2006 time period was: a user interface for a program used to author software"); *id.* at ¶54 ("the plain meaning of 'software testing interface' that a POSITA understood in 2005/2006 was: a user interface for a program used to test software"). Conversely, it makes no sense to think of an API as, for example, being used for "software authoring."

These structural terms are followed by additional claim language describing the structure's operations, *e.g.*, the "software authoring interface" is "configured to simultaneously **visually emulate**, via one or more profile **display windows**, a plurality of network characteristics indicative of performance of the mobile device when executing the application…." '192 Pat. at Claim 1. The claims' use of the phrases "visually emulate" and "display windows" makes clear that the specific "interface" structure claimed here is a user interface, rather than a non-visual interface such as an API. Consistent with the Court's prior construction, the parties have agreed that "simultaneously visually [simulate/emulate], via one or more profile display windows" means to "emulate simultaneously, and **display one or more windows** showing resources of the mobile device that are available to the application." Dkt. 48 at 2. This agreed construction shows that the claimed "interface" is a user interface structure that visually displays information using windows.

Because each claim recites both the structure-connoting term (*e.g.*, "software authoring interface") and the structure's operation (*e.g.*, "configured to simultaneously visually emulate…"), this further supports the conclusion that these terms are structural. *Dyfan*, 28 F.4th at 1368 ("[W]hen the structure-connoting term…is coupled with a description of the [term's]

13

operations, sufficient structural meaning generally will be conveyed to persons of ordinary skill in the art, and §112 ¶6 presumptively will not apply.").

The specification further confirms that the claimed "software authoring interface" and "software testing interface" are user interface structures. The specifications of the '192 and '678 Patents explain that "[t]he application is **authored** using an **application development tool**" and in some embodiments this tool is integrated with an "emulator … to form an **authoring environment** 122 that facilitates **development and testing** of application 104." *See, e.g.*, '192 Pat. at 2:21-22; 5:21-25; Ex. 7 (Malek Dec.) at ¶¶33-34, 48, 55-56. The application "authoring environment" is, in part, a "visual" environment, meaning it includes a user interface allowing the software developer to perform authoring and testing activities:

> Application authors (e.g., users of emulator 101) are provided with a **visual authoring environment** in which the authored application may be emulated as operating within one or more modeled mobile devices (that are optionally connected to a simulated wireless network) without leaving the authoring environment.

'192 Pat. at 13:46-52; *see also* Ex. 7 (Malek Dec.) at ¶¶35, 57.

Indeed, the specification is replete with explicit disclosures of this "visual" user interface structure with which the user interacts to develop and test the mobile application, *e.g.*:

> In one example of operation, Flash Player 154 plays application 104 within model 102. … Profiled data 152 is then **displayed** as frame based profile data 110 on display 140 **for review by the user**. Profile data 152 may be **displayed** in real time as application 104 is played within model 102. Alternatively, **the user** may scroll through profile data 152 as desired **by interacting with data display** 110. Alternatively, profile data 152 may be output as a report (not shown). The **user interacts with emulated mobile device display** 111 to control application 104 as if application were running on device 114.

*Id.* at 8:24-34; *see also id.* at 8:39-62 (describing profile displays). The patent figures also disclose multiple examples of user interface structures for authoring and testing software, *e.g.*:



*Id.* at Figs 5, 12; *see also* Figs. 9, 10, 11; *id.* at 3:5-7 ("FIG. 5 shows one exemplary window that includes the display of FIG.3, the display of FIG. 4 and an exemplary ***user interface***"); *id.* at 3:18-21 (Figs. 9, 10, 11, and 12 of the patent specification illustrate "***exemplary user interface screens*** for interacting with the emulator…to ***configure and test operation of the application*** within the model of the mobile device when connected to a wireless network."); *id.* at 10:34-38 ("FIGS. 9, 10, 11 and 12 show exemplary ***windows that allow a user to interact*** with emulator 101 ***for configuring and testing operation of application 104*** within model 102 when simulating connection to a wireless network."); *id.* at 11:67-12:4 ("Upon selection of a mobile device from list 1104, ***window 1200, FIG. 12, is displayed to allow the user to select desired network characteristics*** for simulation. Window 1200 shows a pull-down list 1202 of network characteristics that may be simulated by simulator 810.").

As shown in the above examples, the common specification repeatedly teaches that the "software authoring interface" and "software testing interface" connote a specific structure: a user interface. Dr. Malek discusses and analyzes in detail additional examples of supporting

specification disclosures in his declaration. Ex. 7 at ¶¶33-40, 48, 55-62. Dr. Chatterjee seems to contend that these specification disclosures are irrelevant because they do not use the exact words "software authoring interface" or "software testing interface." *See* Ex. 8 at ¶¶ 30, 80. But the specification need not recite the claim terms word-for-word to provide descriptive support for those terms. *Novartis Pharm. Corp. v. Accord Healthcare, Inc.*, 21 F.4th 1362, 1373 (Fed. Cir. 2022) (the specification "need not describe a limitation *in haec verba*").

Extrinsic evidence also shows that "interface" connotes structure to a POSITA. Multiple dictionaries from the time of the invention define "interface" as connoting definite structure, *e.g.,* Webster's New World Computer Dictionary Ex. 22 at -2927 (defining "interface" as "2. The portion of a program that interacts with the user."); *see also* Ex. 7 at ¶¶ 42-44, 64-67 (Dr. Malek citing and analyzing extrinsic evidence showing "interface" and like terms connotes known structure, attached as Exs. 22-29). As another example, a Bank of America patent application states: "applicants note that they do not intend any of the appended claims to invoke 35 U.S.C. § 112(f)." Ex. 30 (Pat. App. Pub. No. 2022/0100262) at [0061]. Yet several claim terms in BoA's application require an "interface configured to," *e.g.*: "a network **interface configured to** communicate with a virtual reality device." *Id.* at Claim 1. BoA, therefore, seems to understand that "interface configured to"—the same three words that appear in the challenged claim terms— is structural. Courts considering extrinsic evidence have also found it supports the conclusion that "interface" is structural. *See, e.g.*, *Intellectual Ventures*, 2016 U.S. Dist. LEXIS 3299, at *39 (finding "interface" connotes structure, citing Microsoft Computer Dictionary definition: "software that enables a program to work with the user ..., with another program..., or with the computer's hardware").

Dr. Chatterjee does not come forward with any affirmative evidence showing "interface"

is non-structural. In light of the intrinsic and extrinsic evidence teaching that "interface" is structural, Defendants cannot overcome the presumption against applying §112(6), and they certainly cannot meet their "clear and convincing" burden of proof on indefiniteness.

Even if the Court finds that any of these terms are means-plus-function terms, the Court should not conclude they are indefinite. Rather, the specification describes corresponding structure, as discussed above. *See Diebold Nixdorf, Inc. v. ITC*, 899 F.3d 1291, 1303 (Fed. Cir. 2018) (a means-plus-function term is not indefinite unless "a person of ordinary skill in the art would be unable to recognize the structure in the specification and associate it with the corresponding function in the claim"). Any means-plus-function construction should include the structural disclosures in the specification identified by Dr. Malek in his declaration, namely, a "user interface for an 'authoring environment' or 'application development environment' and equivalents thereof." Ex. 7 at ¶¶ 45, 68.

**B.** **"network characteristics"**

| Term | Plaintiffs' Construction | Defendants' Construction |
|---|---|---|
| **"network characteristics"** (᾽192 Patent, Claim 1; ᾽864 Patent, Claim 1; ᾽678 Patent, Claim 45; ᾽579 Patent, Claims 25, 26) | Plain and ordinary meaning. | "characteristics of the network, regardless of whether they are identified directly or identified as events" |

"Network characteristics" is a readily understood term that should be given its ordinary meaning. Defendants' proposed construction, on the other hand, is based on a selectively cropped and tortured reading of an extrinsic document from the prior litigation and renders this term unnecessarily vague and ambiguous. As Dr. Malek explains in his declaration: "To the extent Defendants contend that their construction is supported by my previous validity expert report dated December 22, 2020, I disagree. … Defendants' reliance is misplaced because it

takes an incomplete excerpt from my previous expert report out of context." Ex. 31 at ¶ 71. The

un-cropped version of the passage Defendants rely on is as follows:

> As such, it is my opinion that a person of ordinary skill would understand network characteristics to refer to characteristics of the network, regardless of whether they are identified directly (e.g., such as by selecting bandwidth), or identified as events (e.g., such as by selecting network activity that determines characteristics of a network from the perspective of a server or client (e.g., a mobile phone)).

Ex. 31 (MFSUB0016445). As Dr. Malek explains: "Defendants' proposed construction

selectively eliminates portions of the paragraph above rendering it unnecessarily confusing.

Moreover, the paragraph above was not intended to define the term 'network characteristics.'

Instead, this sentence was merely part of a response to Dr. van der Weide's opinions regarding

an alleged lack of written description. … In particular, Dr. van der Weide, who was Micro

Focus' expert, wrongly opined that the term 'network characteristics' excluded bandwidth." Ex.

31 at ¶ 71.

In the quoted paragraph, Dr. Malek was explaining that Figure 12 of the common

specification provides written description support for the term "network characteristics." In

doing so, he discussed how those network characteristics are "identified" in the context of Figure

12 and gave examples in parentheticals. By treating this passage as a claim construction, rather

than as a description of Figure 12, Defendants arrive at a confusing construction containing the

word "identified," even though the claims themselves never talk about "identifying" anything.

And by dropping the parentheticals from the construction, the meaning of "identified" becomes

even more unclear. The parentheticals explain that the things being "identified" are features of

Figure 12. Without the parentheticals, the phrase becomes unintelligible to a jury. What does it

mean for network characteristics to be "identified directly" in the context of the claim? Who or

what is doing the identification? "Directly" with respect to what? In the context of the original

statement, the words "identified directly" meant "directly identified in Figure 12," but the proposed claim construction gives no hint of this meaning.

When Dr. Malek **did** address the construction of "network characteristics" in a different paragraph of his prior report, he said the term should have its plain and ordinary meaning, which is what Wapp proposes here. Ex. 31 at ¶241; Ex. 7 at ¶72 ("in paragraph 241, I stated that the term 'network characteristics' should be given its ordinary meaning"). Defendants' proposed construction also ignores this context.

A construction based on a cropped quote from extrinsic evidence, divorced from context, that imports new limitations into the claims (*e.g.*, "identified directly") cannot possibly be correct. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) ("We have viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms."); *N. Am. Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1348 (Fed. Cir. 2005) ("unless required by the specification, limitations that do not otherwise appear in the claims should not be imported into the claims").

Dr. Chatterjee also points to specification passages that he contends support Defendants' construction. Ex. 8 at ¶143. *First*, none of the cited passages contain the words "identified," "identified directly," or "identified as events." These terms in Defendants' proposed construction come exclusively from the extrinsic evidence and have no intrinsic support. *Second*, all of the intrinsic evidence Dr. Chatterjee cites are descriptions of Figure 12, *i.e.*, the figure Dr. Malek was discussing in his prior report. But Dr. Malek's ultimate conclusion in his prior validity report, based on his understanding of Figure 12, was that "network characteristics" should be given its plain and ordinary meaning. Ex. 31 at ¶241. *Third*, to justify their departure from the plain and ordinary meaning, Defendants must show that the intrinsic evidence, such as Figure 12,

includes an express definition or disclaimer. *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (There are "only two exceptions to [the] general rule" of plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term"). But Dr. Chatterjee's cites to the intrinsic record do no such thing. Absent disclaimer or disavowal, limitations from exemplary embodiments such as Figure 12 must not be imported into the claims. *Phillips*, 415 F.3d at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments").

If the Court is inclined to adopt a construction based on Dr. Malek's prior validity report, any such construction should at least include the clarifying parenthetical statements "(e.g., such as by selecting bandwidth)" and "(e.g., such as by selecting network activity that determines characteristics of a network from the perspective of a server or client (e.g., a mobile phone))" that Defendants have omitted from their proposed construction.

### C.    "indicative of"

| Term | Plaintiffs' Construction | Defendants' Construction |
|---|---|---|
| **"indicative of"** ('192 Patent, Claim 1; '864 Patent, Claim 1; '678 Patent, Claim 45; '811 Patent, Claims 1, 4, 9, 22, 24; '579 Patent, Claim 7) | Plain and ordinary meaning. | Indefinite |

As set forth above, Defendants are procedurally barred from asserting indefiniteness for the '192, '864 and '678 claims. Defendants' positions also have no merit.

The presumption that a patent is valid, set forth in 35 U.S.C. § 282(a), may be overcome on the ground of indefiniteness only if a patent's "claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those

skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). Defendants must prove indefiniteness by clear and convincing evidence. *TVnGO*, 861 F. App'x at 457. "In the face of an allegation of indefiniteness, general principles of claim construction apply. … The words of a claim are generally given their ordinary and customary meaning, which is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.*

The phrase "indicative of" has a well understood English meaning, and courts routinely recognize this. *See Uniloc 2017 LLC v. Google LLC*, No. 2:18-CV-00493-JRG-RSP, 2020 U.S. Dist. LEXIS 9748, at *106 (E.D. Tex. Jan. 20, 2020) ("The Court accordingly construes 'indicative of' to have its plain meaning"). This is not a technical term; it is a common phrase jurors use and understand. Dr. Malek explains, "the word 'indicative' means 'serving to indicate.' Merriam-Webster's Collegiate Dictionary Tenth Edition at 592. … The same dictionary further defines 'indicate' as 'to point out or point to' or 'to be a sign, symptom, or index of.' *Id.* This is consistent with my understanding of the plain and ordinary meaning of the phrase 'indicative of.'" Ex. 7 at ¶74 and Ex. 38, WAPP_MARKMAN_0002257. Hundreds of Federal Circuit opinions use the phrase "indicative of" with the expectation their audience will understand what these words mean. *See, e.g.*, *Proceviat v. McDonough*, No. 2021-1810, 2021 U.S. App. LEXIS 27815, at *6 n.2 (Fed. Cir. Sep. 16, 2021) ("This failure is ***indicative of*** a broader failure to provide the court with a complete record.").

The specification is consistent with the ordinary English meaning of "indicative of." The specification repeatedly uses words like "indicate" in their ordinary way. For example, the specification discusses a profile window where "each bar 304 ***indicates*** processor resource utilization for each of certain frames 223 of application 104." '579 Patent at 8:27–28. That

window also includes a capacity line that "***indicates*** the maximum processor resource available to application 104." *Id.* at 8:36–37. The specification's fuse of the word "indicate" informs a POSITA that this term has its plain and ordinary meaning. Ex. 7 at ¶75.

Dr. Chatterjee has also used phrases like "indicate" and "indicative of" in his own writings. *See* Ex. 32 at WAPP_MARKMAN_0002231 at -2233 (describing message "whose name is ***indicative of*** its eventual use in the Web service"); *see also* Ex. 7 at ¶76-77 (collecting additional examples, attached as Exs. 32-37). Defendants, likewise, have used the phrase "indicative of" in multiple patents and patent applications. *See, e.g.*, Ex. 44 (Patent No. 10,885,527) at Claim 10 (claiming "location data ***indicative of*** a location of a mobile device associated with a user"); Ex. 40 (Patent No. 10,798,007) at Claim 1 (claiming "data ***indicative of*** the first routing network," "data ***indicative of*** the second routing network," and user parameter "***indicative of*** a desired benefit for the user"); Ex. 7 at ¶¶78-80 (collecting additional examples, attached as Exs. 39-46).

Dr. Chatterjee responds to these examples by stating: "In the above publications, I used the terms such as 'indicative of' and 'indicate' in a variety of contexts … This supports my opinion that 'indicative of' has different meanings that vary in a wide variety of contexts. … The mere fact that 'indicative of' or other terms are used in some other patents or applications in other contexts does not support that the term 'indicative of' alone has a well-established meaning." Ex. 8 at ¶¶135, 137. The fact that a word or phrase is used in a "variety of contexts" does not make it unclear or indefinite. Words like "because" and "the" are used in a variety of contexts but are well-understood. Dr. Chatterjee, Defendants, the Federal Circuit, and others use the phrase "indicative of" in a variety of contexts because they know its meaning will be understood in these contexts.

Dr. Chatterjee's core indefiniteness argument is that "indicative of" is indefinite in the context of these patents because the specification does not use the exact phrase "indicative of," but this is not a requirement. *Wi-Lan Inc. v. LG Elecs.*, 2019 U.S. Dist. LEXIS 160231, at *43 (S.D. Cal. May 23, 2019) (rejecting argument that a term "is indefinite because the term … is only found in the '351 patent's claim language, and it does not appear anywhere in the specification"); *Pozen Inc. v. Par Pharm., Inc.*, 696 F.3d 1151, 1167 (Fed. Cir. 2012) (an originally filed disclosure "does not have to provide *in haec verba* support" for the claim term).

Dr. Chatterjee acknowledges that "claim 22 of the '811 patent recites exemplary characteristics indicative of a mobile device" and "the specification describes an embodiment in which a mobile device is emulated using a model based upon characteristics 'defining performance of the mobile device' ('811 patent, 2:14-21)" and "the specification enumerates limited parameters as 'mobile device characteristics' in Table 1." Ex. 8 at ¶¶112-15. Dr. Chatterjee also cites examples of "characteristics indicative of a network" and "network characteristics indicative of performance of the mobile device" in the claims and the specification. *Id.* at ¶121 ("claim 24 of the '811 patent and claim 7 of the '579 patent" recite examples of characteristics indicative of a network); *id.* at ¶123 ("'811 patent, 11:49-59, 12:26-42" gives examples of network characteristics); *id.* at ¶ 127 ("claim 45 of the '678 patent" gives an example of network characteristics indicative of performance of the mobile device).

Nevertheless, Dr. Chatterjee claims these disclosures are insufficient because they do not "prescribe[] the entire scope of the term nor provide[] any guidance on what other characteristics the term may encompass." *Id.* at ¶112. But this is not the legal standard. A patent need not (and cannot be expected to) explicitly recite every example within the scope of the invention.  *See Verve v. Crane Cams*, 311 F.3d 1116, 1119 (Fed. Cir. 2002) ("Patent documents are written for

persons familiar with the relevant field; the patentee is not required to include in the specification information readily understood by practitioners, lest every patent be required to be written as a comprehensive tutorial and treatise for the generalist, instead of a concise statement for persons in the field."). Rather, Defendants must prove by clear and convincing evidence that the specification fails to inform a POSITA with "reasonable certainty" as to the meaning of the claim term. The multiple disclosures of enabling examples, which Dr. Chatterjee admits are present in the specification, inform a POSITA.

Dr. Chatterjee also points to the prosecution history of the '579 Patent, noting that the examiner rejected the term "simulate one or more characteristics indicative of the selected mobile device type." Ex. 47 at 2. But this is a different term than those at issue here, and there is nothing in the record suggesting that the words "indicative of" had anything to do with the examiner's rejection of this term. In fact, the ***same patent examiner*** allowed numerous other claims that include the phrase "indicative of" (including all of the claims at issue here), which he never rejected as indefinite. *See* Ex. 7 at ¶82. This shows that the examiner understood the phrase "indicative of" and did not consider it indefinite. A patent examiner must evaluate definiteness during prosecution. *See* MPEP §2173 ("It is of utmost importance that patents issue with definite claims [and] claims that do not meet this standard must be rejected [as] indefinite"). The examiner is presumed to have done his job in allowing these terms. *See N. Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 939 (Fed. Cir. 1990).

### D.      "the selected characteristics"

| Term | Plaintiffs' Construction | Defendants' Construction |
|---|---|---|
| **"the selected characteristics"** ('579 Patent, Claim 1) | Plain and ordinary meaning. | Indefinite |

Defendants allege this term is indefinite for lack of antecedent basis. Claim terms often have an explicit antecedent basis (*e.g.*, the same term is recited verbatim earlier in the same claim). But explicit antecedence is not required: "[a] claim is not invalid for indefiniteness if its antecedent basis is present by implication." *Fisher-Price, Inc. v. Graco Children's Prods.*, 154 F. App'x 903, 909 (Fed. Cir. 2005); *see also Energizer Holdings, Inc. v. Int'l Trade Comm'n.*, 435 F.3d 1366, 1370-71 (Fed. Cir. 2006). The use of "the" as the preceding article of a term suggests shorthand recognition of implied antecedence. *Mobile Commerce Framework, Inc. v. Foursquare Labs*, Inc., No. 11-CV-0481, 2013 U.S. Dist. LEXIS 16353, at *13 (S.D. Cal. Feb. 6, 2013). And often, the "context of the claim itself" is enough to imply the antecedent basis. *Horus Vision, LLC v. Applied Ballistics, LLC*, No. 13-cv-05460, 2014 U.S. Dist. LEXIS 170470, at *35 (N.D. Cal. Dec. 9, 2014). The test is whether the claim provides "reasonable certainty" as to the antecedent basis. *Nautilus*, 572 U.S. at 901. As with all indefiniteness theories, Defendants bear the burden of proof by clear and convincing evidence. *Id.* at 912 n.10. Consistent with these principles, courts routinely find that even strikingly different claim language provides antecedent basis support. *See, e.g., Schindler Elevator Corp. v. Otis Elevator Co.*, Civil Action No. 09-cv-0560, 2010 U.S. Dist. LEXIS 2463, at *24-25 (D.N.J. Jan. 13, 2010) ("The phrase 'said strand pattern' refers to the 'plurality of wires . . . in a twisted pattern'").

The pertinent claim language is as follows:

1. A non-transitory, computer-readable medium comprising software instructions for developing an application to be run on a mobile device, wherein the software instructions, when executed, cause a computer to:

> display a list of one or more *mobile device types from which a user can select*;
>
> simulate one or more *characteristics of a selected mobile device type*;
>
> initiate loading of at least one of *the selected characteristics* from at least one of a remote server and a computer-readable media; …

'579 Pat. at Claim 1.

It is readily apparent from the context of the claim itself that the phrase "the selected characteristics" finds its antecedent basis in the "one or more characteristics of a selected mobile device type." The claim lets a user *select* a mobile device type and the *selected* mobile device type has associated *characteristics*. Therefore, the characteristics of the selected mobile device type are the *selected characteristics*. This is how a POSITA would understand the term—there is no ambiguity. Ex. 7 at ¶84. The specification's description of Figure 6 is also consistent with this understanding. '579 Pat. at 9:20-22 ("a user of window 500 *selects a mobile device* using pull-down list 502 and emulator 101 *loads mobile device characteristics* 115 into memory 132.").

Dr. Chatterjee discusses the "order" in which the claim elements would be performed, considering two different orderings. Ex. 8 at ¶¶94, 97. It is not clear why Dr. Chatterjee thinks that the elements of this claim have *any* order, and he does not provide any explanation or support for this theory. Generally speaking, claim elements do not have a temporal order. *See Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1345 (Fed. Cir. 2008) ("[A]s a general rule the claim is not limited to performance of the steps in the order recited, unless the claim explicitly or implicitly requires a specific order."). It is also not clear why Dr. Chatterjee thinks the temporal ordering of the claim elements is relevant to the antecedent basis issue.

26

Antecedent basis is concerned with the order of the *words* in the claim (*i.e.*, whether an earlier-recited term provides support for a later-recited one). The *temporal* order in which the claim elements are actually performed has nothing to do with antecedent basis.

Dr. Chatterjee also cites to the prosecution history, where the applicant amended the claim as follows:

> simulate one or more characteristics ~~indicative of~~ a [[the]] selected mobile device type;
> initiate ~~down~~loading of at least one of the <u>selected</u> ~~one or more~~ characteristics ~~indicative of the selected mobile device type~~ from <u>at least one of</u> a remote server <u>and a computer-readable media</u>;

Ex. 8 at ¶102 (citing Ex. 48 at 1). Dr. Chatterjee argues that this amendment means "the selected characteristics" cannot rely on the "one or more characteristics" for antecedent basis, since "[t]o do so would be to effectively un-amend the claims." *Id.* Dr. Chatterjee's interpretation of the amendment does not make sense. The most plausible interpretation is that the applicant, having deleted the words "indicative of" from the preceding term, wished to amend the subsequent term to maintain consistency. There is no indication that the applicant intended to break the antecedent basis relationship between the two terms; rather, the amendment indicates the applicant's desire to maintain the existing relationship by deleting "indicative of" from both. *See also* Ex. 7 at ¶85 (Dr. Malek discussing the claim amendment, Ex. 48).

Because a POSITA would readily understand that the antecedent basis for "the selected characteristics" is "one or more characteristics of a selected mobile device type," Defendants cannot carry their "clear and convincing" burden of proof on indefiniteness.

Dated: May 19, 2022

Respectfully submitted,

*/s/ Leslie V. Payne*

Leslie V. Payne
State Bar No. 0784736
lpayne@hpcllp.com
R. Allan Bullwinkel
State Bar No. 24064327
abullwinkel@hpcllp.com
Christopher L. Limbacher
State Bar No. 24102097
climbacher@hpcllp.com
**HEIM PAYNE & CHORUSH, LLP**
1111 Bagby St., Suite 2100
Houston, Texas 77002
Telephone: (713) 221-2000
Facsimile: (713) 221-2021

J. Michael Young
SBN 00786465
myoung@somlaw.net
Roger D. Sanders
SBN 17604700
rsanders@somlaw.net
**SANDERS, MOTLEY, YOUNG &
GALLARDO, PLLC**
111 South Travis Street
Sherman, Texas 75090
(903) 892-9133
(903) 892-4302 (fax)

**ATTORNEYS FOR PLAINTIFFS WAPP
TECH LIMITED PARTNERSHIP AND
WAPP TECH CORP.**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on May 19, 2022, a copy of the foregoing and attachments thereto were served via the Court's ECF system on all counsel of record in this matter.

*/s/ Leslie V. Payne*
Leslie V. Payne
