# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | | |
|---|---|---|
| WAPP TECH LIMITED PARTNERSHIP and WAPP TECH CORP., | § § § | |
| *Plaintiffs,* | § § | Case No. 4:21-cv-00671-ALM |
| v. | § § | JURY TRIAL DEMANDED |
| WELLS FARGO BANK, N.A., | § § | |
| *Defendant.* | § § § | |

## PLAINTIFFS' MOTION TO COMPEL

**TABLE OF CONTENTS**

I.   FACTUAL & PROCEDURAL BACKGROUND ............................................................. 1

    A.   Wapp's patented technology and Wells Fargo's infringement. .............................. 1

    B.   The Court finds in the co-pending Bank of America matter that "discovery is appropriate if it involves the mobile app." ............................................................. 2

    C.   The Court orders Wells Fargo to produce discovery on mobile applications generally and the USAA patent license on mobile check deposit technology. ...... 3

    D.   The Three Current Disputes. ................................................................................... 4

II.  ARGUMENTS ................................................................................................................. 5

    A.   Data about features and transactions on mobile banking applications is relevant to Wapp's damages measures and should be produced. ............................................. 5

        1)   The requested information allows Wapp's damages expert to measure Defendant's benefits that resulted from the accused infringement. ................ 5

        2)   The Court's prior rulings should apply with equal force to features and user transactions on those mobile applications. ....................................... 6

    B.   The difference between Defendants' profits from mobile banking customers and from non-mobile banking customers is also relevant to damages. ......................... 7

    C.   Defendants should produce documents that discuss the correlation between mobile banking usage and the reduction of physical bank branches. ..................... 9

III. CONCLUSION ............................................................................................................... 10

Plaintiffs respectfully request that the Court compel Defendant Wells Fargo to produce three categories of documents:

1. documents and data that pertain to the features of Wells Fargo's mobile banking applications that are developed and tested through its infringing activities, and user transactions (*e.g.,* check deposits, transfers, balance inquiries, etc.) performed on those mobile banking applications;

2. data showing the difference between Defendant's profits generated from mobile banking customers versus customers not using mobile banking; and

3. documents that discuss the causation or correlation between mobile banking usage and the reduction of physical bank branches.

All three requests seek evidence about the benefits Wells Fargo has derived from its infringing activity that can be used to prove Wapp's damages. Wapp accuses Wells Fargo of infringing Wapp's patents that cover the development and testing of mobile applications. Wells Fargo's mobile banking applications are, therefore, the end results of the infringement. And the benefits Wells Fargo derives from its mobile applications are the resulting benefits of that infringement. Accordingly, the Court should require Wells Fargo to produce this information.

I.     **FACTUAL & PROCEDURAL BACKGROUND**

   A.     **Wapp's patented technology and Wells Fargo's infringement.**

Wapp has asserted infringement of five patents in this case: Nos. 8,924,192, 9,298,864, 9,971,678, 10,353,811; and 10,691,579. *See generally* Dkt. 1. The five patents-in-suit all pertain to the development and testing of mobile applications. *See, e.g.*, Ex. 1 (`192 Pat.) at 14:52–53 (claiming "a system for developing an ***application for a mobile device*** …").

Wells Fargo uses mobile application development tools, such as Apple's XCode and Google's Android Studio (among others), in an infringing manner to build and test mobile banking applications. *See, e.g.*, Dkt. 1 at ¶¶ 66–67. According to recent Wells Fargo Quarter Report to investors, these applications, which are the result of Wells Fargo's infringing activity, have

1

reached over 27 million users who are using them, for example, to deposit checks and pay bills. *See* Dkt. 1 at ¶ 64, n. 20.

> **B.    The Court finds in the co-pending Bank of America matter that "discovery is appropriate if it involves the mobile app."**

On March 17, 2022, Wapp requested the 13 categories of damages-related documents in the co-pending Bank of America dispute. *See* Ex. 2. In response, Bank of America refused to produce any responsive documents based on the objection that documents about "mobile apps" were not relevant because Wapp's patents-in-suit pertained to app "development tools." *See* Ex. 3.

On April 21, 2022, the Court held a teleconference regarding the parties' dispute over the 13 damages-related document requests, as well as three Wapp interrogatories that were related to similar damages issues. *See* Ex. 4. At the April 21 hearing, the Court advised the following:

- "discovery is appropriate if it involves the mobile app,"
- discovery into "issues that actually relate to the mobile app" is "appropriate," and
- "if it involves the mobile app, then it's discoverable."

*See* Ex. 4 at 20:25–21:1, 21:5–7, 21:13–14.

After the Court provided this guidance, Bank of America pressed the specific issue of "revenue from check deposits from mobile apps" as "a step too far" and goes "a step even beyond ***usage*** of the mobile apps*.*" *Id.* at 22:10–15. Bank of America specifically distinguished mobile deposit "revenue" from mobile app "***usage***" — which would of course include usage such as check deposits, bill payments, and money transfers — in seeking a carve-out from what is discoverable about mobile banking applications. Indeed, the entire focus of Bank of America's argument for a carve-out was mobile deposit "revenue*.*" *Id.* at 24:8 – 19 (argument about "a customer, how much

2

they deposit into their bank account with the mobile app"). The Court stated that Wapp could file a motion to compel on the issue of check deposit *revenue*. *Id.* at 24:20 – 25.

During the same hearing, the Court also held that "the interrogatories [Wapp sought to compel] all relate to the issue of mobile apps and should be supplemented." *See id.* at 23:4-7. This includes Wapp's Interrogatory No. 12:

> Identify and describe **all metrics and data** tracked and / or stored by you or on your behalf since 2014 **for each application** identified by you in response to Interrogatory No. 1, **including** the volume of downloads, the volume of installations, the number of users, the demographics of users, the volume and frequency of use of each application, the volume and frequency of **use of features within each application**, and the **type and volume of transactions performed** (number of transactions and dollar amount of transactions). Your answer should include how and where any such metrics are stored.

*See* Ex. 5 at 10. In other words, although it carved out check deposit revenue, the Court specifically affirmed that discovery into the mobile apps is appropriate, and granted Wapp's request for supplementation regarding metrics, data, and usage of features within the mobile applications, including the type and volume of transactions.

### C. The Court orders Wells Fargo to produce discovery on mobile applications generally and the USAA patent license on mobile check deposit technology.

On April 27, 2022, the Court held a discovery hearing in the present matter to resolve a dispute about three damages-related interrogatories (which Wapp had also disputed with Bank of America). *See* Ex. 6. This included Wapp's Interrogatory No. 13 to Wells Fargo, which is identical to Wapp's Interrogatory No. 12 to Bank of America quoted above. *See* Ex. 7 at 10.  The Court granted Wapp's request on all three interrogatories, including No. 13, and reiterated that "if it's related to the mobile applications, it should be produced." *See* Ex. 6 at 10:9–12.

Wapp and Wells Fargo also disputed whether Wells Fargo should produce its patent license with USAA which pertains to mobile check deposit technology. Wells Fargo argued that because Wapp's patents pertain to mobile application development and testing, and USAA's patents pertain

3

to depositing checks via mobile applications, the USAA license was therefore irrelevant. *See* Ex. 12 at 1-2. The Court ultimately rejected Wells Fargo's argument that mobile check deposits are not relevant, and ordered Wells Fargo to produce the USAA license. *See* Dkt. 63.

### D. The Three Current Disputes.

Based on guidance from the Court's prior rulings, Wapp revised its original 13 categories of document requests to a narrowed set of 10 categories that specifically target information "related to the mobile [banking] applications." *See* Ex. 8. Among other things, Wapp removed three requests for bank branch closure data generally, as well as its prior requests for check deposit revenue amounts, to streamline issues in light of the Court's guidance. *Compare* Ex. 8 *with* Ex. 2.

While both Defendants have agreed to produce certain responsive documents, they have also raised three identical objections that attempt to whittle away at the Court's prior rulings:

1. refusal to produce documents or data related to specific features or user transactions on their mobile banking applications;

2. refusal to produce documents showing the profit differential between their mobile banking and non-mobile banking customers in response to Request No. 5; and

3. refusal to produce documents that discuss the correlation or causation between mobile banking application usage and physical branch reductions, in response to Request No. 10.

*See* Ex. 9 at 1-2; Ex. 10 at 1-2.

Defendants base their first and second objections primarily on the same argument they previously advanced—the ratcheting screwdriver objection—that Wapp's patents cover app development and testing of applications but not the applications themselves, which renders information about the mobile applications themselves irrelevant. *See* Ex. 9 at 1; Ex. 10 at 1-2. Defendants advance their third objection by conflating Wapp's current Request No. 10, which seeks documents regarding *correlation*, with Wapp's previous Request Nos. 11-13, which sought branch closure data generally. The Court should overrule all three objections.

4

## II. ARGUMENTS

### A. Data about features and transactions on mobile banking applications is relevant to Wapp's damages measures and should be produced.

#### 1) The requested information allows Wapp's damages expert to measure Defendant's benefits that resulted from the accused infringement.

Wapp needs to know how much the mobile banking applications are being used by the Defendants' customers, because that allows Wapp and its damages expert to figure out how much economic benefit the Defendants derive from the infringing activity.

For example, if a bank is able to process a million checks via mobile applications, which costs the bank $1 per check in processing costs, whereas it would have cost $5 in processing that same check deposit via a branch teller, then the bank earned 4 million dollars in cost savings that is directly attributable to the mobile banking application developed and tested using Wapp's patented technology. Wapp's economics expert should be able to consider this type of economic benefits in evaluating damages. To that end, in his declaration, Wapp's expert (Mr. Roy Weinstein) sets out the various *Georgia-Pacific* factors this information would inform:

- Factor 9 – "benefits of the patented property over old modes if any";

- Factor 12 – "the portion of profits or selling price in the market attributed to the patents";

- Factor 6 – "the effect of selling the patented specialty in promoting sales of other products";

- Factor 8 – "profitability and commercial success of products made under the patents"; and

- Factor 11 – "the extent to which the infringer has made use of the invention and the value of that use."

*See* Ex. 11 at ¶ 5.

In opposition, Defendants continue to re-urge the same argument the Court previously rejected: because Wapp's patents pertain to development and testing of mobile applications, information and data about usage of applications are not relevant because the apps themselves do

5

not infringe. *See* Ex. 9 at 1 (arguing "the requested data has nothing [sp] to do with app ***development*** or ***simulation***…"); Ex. 10 at 2 (arguing "Wapp continues to seek documents irrelevant to ***testing*** …"). It is common, however, to seek discovery into a defendant's products that are made through infringing activities, even if the end products themselves do not infringe.

In fact, "one of the simplest ways to determine the value of an infringing use of a patented method during research is to ascertain how many sales were made based on that infringing use." *Carnegie Mellon University. v. Marvell Technology Group, Ltd.*, 890 F. Supp. 2d 602, 610 (W.D. Pa. 2012), *aff'd in part, rev'd in part, vacated in part*, 807 F.3d 1283 (Fed. Cir. 2015). Even the case law Defendants have relied on to oppose this discovery supports that idea. In its April 26, 2022 submission, Wells Fargo cited to the *Infernal Tech.* case (Ex. 6 at 2), in which the court noted that it "agrees that, in some instance, it may be appropriate to base damages for internal use of a claimed [manufacturing] method on product sales." *See Infernal Tech. LLC v. Activision Blizzard Inc.*, No. 3:18-CV-01397-M, 2021 WL 4391250, at *12 (N.D. Tex. Sept. 16, 2021).

Perhaps unsurprisingly, neither Defendant has cited a single case denying discovery into the end products a defendant has created based on infringing instrumentalities or activities. Therefore, as the Court previously held, discovery into information about the Banks' mobile applications is appropriate.

> **2)** **The Court's prior rulings should apply with equal force to features and user transactions on those mobile applications.**

As set forth above, this Court has held that if discovery is "related to the mobile application," then it is appropriate. *See, e.g.*, Ex. 6 at 10:9–12. Indeed, the Court previously ordered both Defendants to answer an interrogatory that required each Defendant to "Identify and describe ***all*** metrics and data … for each application … including the volume and frequency of ***use of features within*** each application, and the type and volume of ***transactions performed*** ..." *See* Ex.

6

5 at 10; Ex. 7 at 10. In two bites at the apple, Defendants have still not offered any credible reason why some data about mobile application usage, such as app downloads, installations, logins, would be discoverable; but others, such as the number of checks deposited or bills paid, would not be. Such a position strains logic, and indeed, would contradict the Court's prior rulings set forth above.

In fact, when Bank of America sought a carve-out from discovery into issues related to mobile applications, Bank of America explicitly distinguished "***revenue*** from check deposits from mobile apps" from the "*usage* of the mobile apps." *See* Ex. 4 at 22:10–15. And when Wells Fargo tried to expand that carve-out to *any* issues related to check deposits in opposition to production of the USAA License, the Court rejected that attempt and ordered it produced. *See* Dkt. 63.

Defendants now push back against those previous rulings. But the Court should reach the same results again. Discovery is "appropriate if involves the mobile app" and "if [information] is related to the mobile applications, it should be produced." *See* Ex. 4 at 21:1; Ex. 6 at 10:9–12. The Court has ordered both Defendants to answer interrogatories identifying and describing data about the "features within" and "transactions performed" on mobile applications. There is no reason why Defendants should not be ordered to produce the same data about "features" and "transactions" on their mobile applications that the Court had already ordered Defendants to "identify and describe."

**B.     The difference between Defendants' profits from mobile banking customers and from non-mobile banking customers is also relevant to damages.**

Wapp seeks information about Defendants' profit enhancements from mobile banking customers compared to customers not engaged in mobile banking. As explained in Mr. Weinstein's declaration, this is another category of economic benefits that Defendants derive from offering their banking services on mobile applications. *See* Ex. 11 at ¶ 9.

Defendants oppose production of this information because it implicates profits associated with customers who do not engage in mobile banking. *See* Ex. 9 at 2.[1] However, the difference between a defendant's profits associated with infringing activities, and its profits from activities "absent the infringement," is routinely recognized as a viable measure of patent infringement damages. *See, e.g.*, *Sprint Commc'ns Co. L.P. v. Cequel Commc'ns, LLC*, No. CV 18-1752-RGA, 2022 WL 1801433, at *1 (D. Del. June 2, 2022) (finding that "the patentee may be awarded the difference between an infringer's net profit from infringing sales and the infringer's usual net profit absent the infringement") (citing *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986)); *see also Metaswitch Networks Ltd. v. Genband US LLC*, No. 2:14-CV-744-JRG, 2016 WL 874737, at *4 (E.D. Tex. Mar. 5, 2016).

In other words, there is nothing unusual about seeking profits associated with non-infringing activities in order to determine the *comparative* increase in profits a defendant derives from infringing activities. And, as set forth in Mr. Weinstein's declaration, that is precisely the purpose for which Wapp seeks this information.

> Revenue enhancements will include incremental profits associated with the ability of Bank of America to offer a reliable mobile app through their use of WappTech's patented technology, including incremental profits from increased customer adoption of mobile banking apps, incremental profits from increased retention of current mobile banking customers, customer acquisition through the use of mobile banking apps, and profits generated from cross-selling to mobile banking customers.

*See* Ex. 11 at ¶ 9. In addition, Mr. Weinstein's declaration identifies numerous *Georgia-Pacific* factors this incremental profit enhancement information would be relevant to. *See* Ex. 11 at ¶ 5.

---

[1] Wells Fargo did not articulate any specific arguments opposing the production of profit differential data in its most recent submission. *See* Ex. 10 at 1-2. Based on arguments at the hearing and prior meet-and-confers, Wapp presumes Wells Fargo shares Bank of America's arguments.

### C. Defendants should produce documents that discuss the correlation between mobile banking usage and the reduction of physical bank branches.

Initially, Wapp served three discovery requests that sought data about bank branch closures and construction avoidance *generally*:

11. Documents or data that show the number of physical bank branch closures from 2014 to present in the United States.

12. Documents or data that show Bank of America's future expectations or forecasts of the number of physical bank branch closures in the United States.

13. Documents or data that show estimated cost savings due to branch closures, including fixed and variable cost savings.

*See* Ex. 2 at 3.

Defendants argued that there was *no* evidence of any correlation between mobile banking and branch closures, and the Court found that general information about branch closures is "too far afield based on everything that I've seen *right now*." *See* Ex. 4 at 21:8–11. Based on that guidance, Wapp removed its prior Request Nos. 11-13, and served a *new* request:

10. Documents or data that show or discuss **the correlation or causation** between mobile banking application usage and physical bank branch closures or reduction in bank branch construction, including any cost savings resulting from such closures or construction avoidance.

*See* Ex. 8 at 1. Stated differently, after Defendants argued that Wapp should have to show correlation between mobile application usage and physical branch reductions before Wapp can seek discovery about branch reduction information, Wapp served a discovery request to begin establishing that correlation. Defendants, however, pretend as if Wapp is re-urging the identical requests that the Court had denied. *See* Ex. 9 at 2; Ex. 10 at 2. That is misleading.

Ultimately, if Defendants are correct that there is no evidence of any correlation between mobile banking and branch closures, then the documents Wapp seeks would not exist, and Defendants can simply say so in response. But Defendants' public documents suggest that there is

9

a correlation. For example, one Bank of America's annual reports specifically discusses the "650 financial centers" it has avoided constructing due to the number of checks deposited via mobile applications. *See* Ex. 13 at 2. In addition to Bank of America's own public statements, multiple industry reports establish the connection between mobile banking and branch reductions. *See* Ex. 14 at 2 ("The rapid adoption of mobile banking has allowed big banks to massively shrink the number of expensive branches they operate."); Ex. 15 at 8 ("The drop in branch visits is likely because simple transactions – depositing checks, transferring funds, making a loan payment – have moved to the mobile channel.").

Accordingly, Wapp seeks discovery from Defendants to establish the correlation and bolster evidence of its damages by pointing to Defendants' cost-savings that result from the infringing activity, as explained above.

### III.   CONCLUSION

For the reasons stated herein, Wapp requests that the Court order Defendants to produce the documents responsive to Request Nos. 1-10 (Ex. 8).

| | |
|---|---|
| Dated:  June 13, 2022 | Respectfully submitted,<br><br> /s/ *Weining Bai*<br>Jason McManis<br>Texas Bar No. 24088032<br>jmcmanis@azalaw.com<br>Weining Bai<br>Texas Bar No. 24101477<br>wbai@azalaw.com<br>**AHMAD, ZAVITSANOS & MENSING P.C.**<br>1221 McKinney Street, Suite 2500<br>Houston, TX 77010<br>Telephone: 713-655-1101<br>Facsimile: 713-655-0062<br><br>Leslie V. Payne<br>State Bar No. 0784736<br>lpayne@hpcllp.com<br>R. Allan Bullwinkel<br>State Bar No. 24064327<br>abullwinkel@hpcllp.com<br>Alden G. Harris<br>State Bar No. 24083138<br>aharris@hpcllp.com<br>Christopher L. Limbacher<br>State Bar No. 24102097<br>climbacher@hpcllp.com<br>HEIM PAYNE & CHORUSH, LLP<br>1111 Bagby St., Suite 2100<br>Houston, Texas 77002<br>Telephone: (713) 221-2000<br>Facsimile: (713) 221-2021<br><br>J. Michael Young<br>SBN 00786465<br>myoung@somlaw.net<br>Roger D. Sanders<br>SBN 17604700<br>rsanders@somlaw.net<br>SANDERS, MOTLEY, YOUNG & GALLARDO, PLLC<br>111 South Travis Street<br>Sherman, Texas 75090<br>(903) 892-9133<br>(903) 892-4302 (fax) |

                                      **ATTORNEYS FOR PLAINTIFFS WAPP TECH LIMITED PARTNERSHIP AND WAPP TECH CORP.**

## CERTIFICATE OF CONFERENCE

I certify that lead and local counsel for Plaintiffs and Defendants have conferred regarding the relief sought herein, and subsequently engaged in a discovery teleconference with the Court on June 8, 2022, per the Court's procedures, during which the Court instructed Plaintiffs to file this Motion to Compel.

                                              */s/ Weining Bai*
                                              Weining Bai

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was filed electronically in compliance with Local Rules CV-5(a) on June 13, 2022. As such, this document was served on all counsel of record pursuant to Local Rules CV-5(a)(3)(A) and the Federal Rules of Civil Procedure.

                                              */s/ Weining Bai*
                                              Weining Bai